1

1          IN THE UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF ARKANSAS
2                    WESTERN DIVISION

3

4   UNITED STATES OF AMERICA,        .
                                     . Docket No. 4:17-CR-00267-1-DPM
5   PLAINTIFF,                       .
                                     . Little Rock, Arkansas
6   VS.                              . February 27, 2018
                                     . 3:32 P.M.
7   ERIC SCOTT KINDLEY,              .
                                     .
8   DEFENDANT.                       .
     . . . . . . . . . . . . . .

9

10

11                    TRANSCRIPT OF

12                    BOND HEARING

13          BEFORE THE HONORABLE BETH DEERE

14          UNITED STATES MAGISTRATE JUDGE

15

16

17

18  ELECTRONIC COURT RECORDER-OPERATOR:  Ms. Suzy Flippen

19

20  Transcription Service:           Robin Warbritton
                                     Post Office Box 262
21                                   Vilonia, AR  72173

22

23

24  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

```
 1   APPEARANCES:

 2   For the Government:        Ms. Fara Gold
                                U.S. Department of Justice - Civil
 3                              Rights
                                601 D Street N.W.
 4                              Washington, DC  20004

 5                              Ms. Maura D. White
                                U.S. Department of Justice - Criminal
 6                              Division
                                Appellate Section
 7                              950 Pennsylvania Avenue, NW
                                Room 1264
 8                              Washington, DC  20530

 9                              Mr. Ali Ahmad
                                U.S. Attorney's Office
10                              Eastern District of Arkansas
                                Post Office Box 1229
11                              Little Rock, AR  72203-1229

12   For the Defendant:         Mr. Christophe A. Tarver
                                Federal Public Defenders Office
13                              The Victory Building
                                1401 West Capitol Avenue
14                              Suite 490
                                Little Rock, AR  72201
15

16

17

18

19

20

21

22

23

24

25
```

3

I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

DEFENDANT'S WITNESS:

Sonja Young                7


GOVERNMENT'S WITNESS:

Kyle Roberts              16        90        98


| EXHIBITS: |  | IDENTIFIED | RECEIVED |
|---|---|---|---|
| Government's Exhibits 1A through 1F |  | 67 | 69 |

4

1                    P R O C E E D I N G S

2        (Call to order of the Court.)

3            THE COURT:  Our calendar usually runs like a clock

4  and this afternoon the planets are out of alignment.  All

5  right.  We're going to get back on track though with *United*

6  *States v. Eric Scott Kindley*, number 4:17-CR-267.

7            Mr. Kindley is in the courtroom with his attorney,

8  Mr. Tarver.

9            And for the prosecution, we have Assistant United

10 States Attorney Fara Gold, who is here from D.C., I believe;

11 is that correct?

12           MS. GOLD:  Yes.  Good afternoon.

13           THE COURT:  Good afternoon.  Welcome to Arkansas.

14           MS. GOLD:  Thank you.

15           THE COURT:  And Ali Ahmad, who is back benching for

16 moral support, I'm told.

17           And so --

18           MS. GOLD:  And I'm also joined by co-counsel, Maura

19 White, also from the Civil Rights Division.

20           THE COURT:  All right.  Welcome, Ms. White.  I didn't

21 have your name down.

22           MS. WHITE:  Good afternoon, Your Honor.

23           THE COURT:  I'm glad you're here.

24           All right.  So, Mr. Kindley has been arraigned.  And

25 at that time, he was detained with a reservation of rights to

1  a bond hearing, and this is the bond hearing.

2        Is this a presumption case?

3        MS. GOLD:  It is, Your Honor.

4        THE COURT:  Do you stand on the presumption or do you

5  wish to go first?

6        MS. GOLD:  We can -- we stand on the presumption, I

7  just want to make sure that the Court received our response

8  that we filed, as well.

9        THE COURT:  Yes, I did.  It's right here.  And I

10  should also say I also have received -- I'll count them here

11  -- a number of Pretrial Services Reports, so I'll ask you, Mr.

12  Tarver, do you have all four of those?

13        MR. TARVER:  There are four?  I have three.

14        MS. GOLD:  Three, Your Honor.

15        THE COURT:  Well, did you get the one page from

16  today, I think?

17        MS. SCIFRES:  There should be one from Arizona,

18  California, and then I think -- I think Arizona may have had

19  two of them.

20        MS. GOLD:  We have three, Your Honor.

21        THE COURT:  Pardon?

22        MS. GOLD:  We have three.

23        MS. SCIFRES:  Yeah.  There's --

24        MR. TARVER:  Yeah.

25        MS. SCIFRES:  -- there's three.  One from California,

1 which is the detailed report, and then -- and then there's

2 another addendum from Arizona, and also one from Arkansas.

3          THE COURT:  All right.  Well, I'll tell you what I've

4 got.  The -- the two page report from today, from our Pretrial

5 Services Officer.  I have one dated January 2nd of this year

6 from Arizona.

7          MR. TARVER:  I don't have that one.

8          THE COURT:  I have one from June 5th from California.

9 And June 6th of 2017, also from Arizona.

10          So if anybody would like to see any of those.

11          MR. TARVER:  Can I see the January 2nd?  Because

12 that's the one --

13          THE COURT:  You may.

14          MR. TARVER:  -- apparently I don't have.

15          THE COURT:  Well, it's going to be the last one.

16          And, Mr. Tarver, you did get the Government's

17 response in opposition to your motion for bond?

18          MR. TARVER:  Yes.

19          THE COURT:  Let me know when you're ready.

20          MR. TARVER:  Excuse me?

21          THE COURT:  Let me know when you're ready.  You can

22 take all the time you need.

23          MR. TARVER:  I'm ready.

24          THE COURT:  All right.

25          MR. TARVER:  Do you need this back right now?

1    THE COURT:  I suspect it's my only copy, but I bet I

2 can get another one.  Or, I'll tell you what, I'll bet Ms.

3 Fortner would be happy to go make a photocopy.

4    All right.  So now, back to you.  Do you wish to

5 stand on the presumption?

6    MS. GOLD:  Stand on the presumption and present

7 evidence once the burden is met by the defense if he so meets

8 it.

9    THE COURT:  All right.  Mr. Tarver?

10    MR. TARVER:  I call Sonja Young.

11    THE COURT:  All right.  Ms. Young.  All right.  If

12 you would come forward, please.  If you'd just come right over

13 here.  Right over here.  And raise your right hand.  Do you

14 swear the testimony you're about to give will be the truth,

15 and nothing but the truth, so help you God?

16    MS. YOUNG:  Yes, ma'am.

17    SONJA YOUNG, DEFENDANT'S WITNESS, SWORN.

18    THE COURT:  All right.  Have a seat.

19                    DIRECT EXAMINATION

20 BY MR. TARVER:

21 Q    Would you state your name and address for the Court,

22 please?

23 A    My name and what, sir?

24 Q    Address.

25 A    Oh.  I am Sonja Young.  My address is 1036 South 21st

1  Street, Richmond, Indiana, 47374.

2  Q    And, Ms. Young, do you know Eric Kindley?

3  A    Yes, I do.

4  Q    And how do you know him?

5  A    He is my son.

6  Q    And how long have you lived at that address in Richmond,

7  Indiana?

8  A    At that address, five years.

9  Q    And are you employed?  Do you work?

10 A    I have been and I was, but I'm in between jobs right now.

11 Q    So you're -- are you home --

12 A    Yes.

13 Q    -- all day?

14 A    Yes.  I only do part-time, I'm not like five/six days a

15 week.

16 Q    And who else lives at that address?

17 A    My husband, Harold.

18 Q    And does your husband -- is he employed?

19 A    He is a insurance man, does it from home, independent

20 insurance agent.  He is a pastor -- associate pastor of our

21 church.  He does jail ministry once a month.  He does Hope

22 House ministry, which is an addiction home.  And we have,

23 together, a ministry in front of our courthouse in Richmond,

24 Indiana, where we minister to people coming and going from the

25 courthouse, meeting their needs and their hurts and their

1  brokeness, and we do that every Monday, and he is the team

2  leader.

3  Q   But, other than those activities, are the two of you

4  usually at home?

5  A   Yes.

6  Q   Now, is there a land line there at the home?

7  A   Yes.  It's connected to our fax machine.

8  Q   And I talked to you about Eric being able to live with you

9  if he is to -- if he were to be released, being able to live

10  with you at your residence?

11  A   Yes.

12  Q   And would you allow him to live there?

13  A   Yes.

14  Q   Would you have any concerns about him living at your home?

15  A   No, I have no problem with him being in our home.

16  Q   I also talked to you about -- about serving as a third

17  party custodian?

18  A   Yes, sir.

19  Q   And my understanding is that you were approved as a third

20  party custodian for his case that was in Arizona?

21  A   Yes.

22  Q   And that case has since been dismissed?

23  A   Yes.

24  Q   And did the Court or the Probation Officer go over you --

25  with you the -- the -- what's required of a person serving as

1  a third party custodian?

2  A   Yes, she did.  We spent a day -- about a half a day in

3  Indianapolis with her and she explained the whole -- took the

4  paper and explained everything in detail to me, and helped me

5  to understand.  And I -- and I said I understand and I'm

6  willing to follow all the rules.  And one of the questions she

7  asked me was, "If your son disobeys or goes against one of the

8  rules, would you turn him in?"  And I said, "Yes, I would.

9  I'm laying my life on the line."  And I said, "I will not have

10  my home disrupted.  And I believe that he will follow all the

11  rules."  So, yes, I will follow all the rules.

12  Q   And so you understand that if the Court were to release

13  him and -- if he were to be released on conditions, that one

14  of the requirements of you as a third party custodian would be

15  to notify the Court --

16  A   Yes.

17  Q   -- if he violated --

18  A   Yes.

19  Q   -- any of those conditions?

20  A   I do.

21  Q   And you would be able to do that?

22  A   Yes, ma'am -- or sir.  Yes, sir.

23  Q   And you would do that?

24  A   Yes, I would.

25  Q   And you understand that if you -- if that happened, in all

1  likelihood, that he would then go back to jail --

2  A   Yes.

3  Q   -- or go back into custody?

4  A   I understand all the conditions.  I understand the

5  ramification of it all.  And I believe that my son will follow

6  the rules, because he has always followed the rules and that

7  sort of thing, and I have no -- I have no problem following

8  the rules.  I've always respected the law and the laws of my

9  land.  So, no, I have no problem with following what the law

10 requires me to do.

11 Q   Do you know --

12 A   It's a -- it's a hard thing to do as a mother, but it's

13 tough love, and I believe in being obedient.

14 Q   Does -- do you know if Eric would have any job prospects

15 if he were to be released there in Indiana?

16 A   Yes.  We -- our pastor owns a company, and we're believing

17 that he'll be able to work for him.  They -- they have several

18 different things they do, like they make the pillows for the

19 heart patients to hold against their chests and things.  And,

20 yes, we -- we want him to work.  We want him to get his life

21 in -- in line and in order once again.

22 Q   And would he have transportation, if he were required to

23 meet with his Probation Officer, would he have transportation

24 --

25 A   Yes.

1  Q   -- to and from?

2  A   Yes.  He has a car that we have been taking care of.  And

3  we have a vehicle.  So, yes, he would be taken to Indianapolis

4  or wherever we would have to go to the particular probation

5  office.  We would see that he got there and back, yes.

6  Q   And would you be able to attend those meetings with him or

7  travel with him if he were to have to do that?

8  A   Yes, I would.

9  Q   And how far is Indianapolis from Richmond, Indiana?

10 A   Well, it's about 60 -- it's almost an hour from our house.

11   So, it's not really all that bad.  It's just about an hour.

12 Q   And is that where you had to go to --

13 A   Yes.

14 Q   -- to sign the paperwork --

15 A   Uh-huh.

16 Q   -- for the third party custodian -- the release papers?

17 A   Yes.  Uh-huh.

18 Q   And I believe that one of the other conditions that they

19 -- that was placed on Eric in Arizona was that he had a

20 curfew?

21 A   He had a what, a curfew?

22 Q   Yes.

23 A   Yes.  And we -- we accepted that.  We were going to ask

24 the judge if he would allow the evening curfew to be a little

25 longer because we wanted Eric to be able to go to church with

1  my husband on the men's Bible study night and to go to church

2  on Sunday night with us at a discipleship class, so that he

3  could learn and he could be there, which would be beyond seven

4  o'clock, and we were going to ask that -- that they run it out

5  to about 9:00 so that they would have time to go and get home

6  and be there on time.  And I understood that ruling, too, so.

7  Q   What nights do you guys have church -- or when do you guys

8  go to church?

9  A   Tuesday nights is our men's Bible study.  And Sunday night

10 is our discipleship class.

11 Q   And what time do those services start or those classes

12 start?

13 A   I believe the men's is at 6:30 on Tuesday.  And our

14 discipleship class is at 6:00 in the evening on Sunday

15 evening.

16 Q   And how far is the church from where you live?

17 A   Oh, maybe two miles at the most.  It's just right down the

18 road from where we live.  And he would be with my husband

19 during that time.  He would not go alone.

20 Q   And your husband is here today?

21 A   Yes, he is, sir.

22 Q   Now you said that right now you are between jobs.  Is

23 there -- what are the prospects of you getting another job in

24 the near future?

25 A   I worked for Walmart for 16 years and I have got my

1  application back in to Walmart.  I want to go back to my

2  store.  And so, I'm -- I'm in the process of dealing with them

3  and talking with them and getting the app going and -- and

4  getting a job again at my Walmart.

5  Q    And I know you were approved as a third party custodian in

6  Arizona, but have you ever been convicted of a felony?

7  A    No, sir, I have not.

8          MR. TARVER:  May I have just a moment?

9          THE COURT:  You may.

10 BY MR. TARVER:

11 Q    Are there any firearms in your residence?

12 A    No, sir, my husband doesn't believe in firearms.  We have

13 no guns, no swords, no nothing like that in our home.

14 Nothing.

15 Q    And there was some question about Eric's passport; do you

16 have any idea where that is?

17 A    His passport is in California, locked up in a lockbox, in

18 a storage unit.  I have the key.  And I have -- I will not go

19 get it.  I will not go get that passport.  And I'm not even

20 sure it's any good anymore.  I'm not real sure.  But it is

21 locked up, doubly locked.

22 Q    And he was restricted from leaving the state of Indiana

23 other than to come to court?

24 A    Yes.  Yes.

25          MR. TARVER:  I'll pass the witness.

1        THE COURT:  Any cross?

2        MS. GOLD:  I have no questions, Your Honor.  Thank

3 you.

4        THE COURT:  All right.  Thank you, Ms. Young.  You

5 may stand down.

6     (Witness stands down.)

7        THE COURT:  All right.  The defendant has come

8 forward with some -- do you want to present anything else?

9        MR. TARVER:  No, Your Honor.

10        THE COURT:  All right.  I think the defendant has

11 come forward with some evidence, which shifts the burden of

12 going forward back to the Government.

13        MS. GOLD:  Yes, Your Honor.  We call Agent Roberts.

14 I just wanted to ask, I know that we filed that long response,

15 if there is any part of it that Your Honor is going to adopt

16 for the record or if you want me elicit testimony in support

17 of the response in its entirety?

18        THE COURT:  We do permit proffers, but I'll ask, Mr.

19 Tarver, have you had ample opportunity to go over the

20 Government's --

21        MR. TARVER:  I have not had an opportunity to go over

22 it with my client, and so we would -- yeah.

23        MS. GOLD:  That's okay.  We can put on that

24 testimony.

25        THE COURT:  All right.

Roberts - Direct                                          16

1          MS. GOLD:  I just didn't know if the Court wanted us

2    to repeat that, but that's fine.

3          At this time, the Government would call Special Agent

4    Kyle Roberts.

5          THE COURT:  Agent Roberts, if you'd come forward and

6    raise your right hand.  Do you swear the testimony you're

7    about to give will be the truth, nothing but the truth, so

8    help you God?

9          MR. ROBERTS:  I do.

10      KYLE ROBERTS, GOVERNMENT'S WITNESS, SWORN.

11          THE COURT:  Have a seat.  If you'd like to question

12   from the counsel table, you may.

13          MS. GOLD:  I'll start over here if that's okay, Your

14   Honor.

15          THE COURT:  Okay.

16          MS. GOLD:  And if I get tired, I'll have a seat.

17   Thank you.

18                        DIRECT EXAMINATION

19   BY MS. GOLD:

20   Q    Good afternoon, Agent Roberts.  Can you state your name?

21   A    Yeah.  It's Kyle Roberts.

22   Q    And can you tell the Court where you're currently

23   employed?

24   A    I'm employed as a special agent with the FBI in Phoenix.

25   Q    And how long have you been with the FBI?

1  A    Since 2010.

2  Q    Have you been in Phoenix the entire time?

3  A    No.

4  Q    Where were you before that?

5  A    I was also in Shreveport, Louisiana.

6  Q    Okay.  And when did you arrive in Phoenix?

7  A    In 2015.

8  Q    And are you assigned specifically to the Civil Rights

9  Squad?

10 A    Yeah, we work civil rights and public corruption.

11 Q    So what kinds of crimes do you investigate?

12 A    Investigate sexual misconduct cases, hate crime, color of

13 law cases, things of that nature.

14 Q    Color of law meaning law enforcement misconduct, correct?

15 A    Correct.

16 Q    Okay.  And did you come to be assigned to the

17 investigation involving the defendant, Eric Kindley?

18 A    Yes.

19 Q    And can you explain for the Court how that came about?

20 A    Yes.  We received information from the Apache County

21 Sheriff's Office in Arizona about some inmate complaints.

22 Q    And when you -- just for the Court's understanding, Apache

23 County is where relative to Phoenix?

24 A    It's in the Northeastern part of Arizona.  It's a small

25 sheriff's office.

1   Q    And were you alerted by a detective or deputy up in Apache

2   County?

3   A    Yes.  Deputy Dodge.

4   Q    Deputy Dodge.  And what did Deputy Dodge alert you to?

5   A    He said that his office had two separate females that had

6   been transported to the jail, and each female had an

7   allegation that they were sexually assaulted during their

8   transports.

9   Q    And they were -- these allegations were at the hands of

10  the defendant, Eric Kindley, who is a transport officer; is

11  that correct?

12  A    Yes.

13  Q    Okay.  And can you just explain the background for the

14  Court of Mr. Kindley and his company that he was running at

15  that time that the investigation began and then his company

16  prior?

17  A    Yeah.  His company, at the time, was a company called

18  Group Six, he operated under the name of Special Operations

19  Group.  That company was primarily himself and his girlfriend

20  at the time, that had a supporting role.  But Mr. Kindley had

21  a -- basically a Dodge minivan.  It was a minivan like any

22  family member would own.  There's no markings on it.  There's

23  no cage in the van.  So he transported prisoners all across

24  the country, and mainly utilized local small jails that sought

25  out his assistance.

1  Q    And based upon your investigation, Mr. Kindley transported

2  these individuals, both male and female, by himself; is that

3  correct?

4  A    That's correct.

5  Q    Was he subject to any regulation as far as your

6  investigation has borne out?

7  A    No.

8  Q    And so, he had basically unfettered access to these

9  inmates; is that right?

10 A    That's correct.

11 Q    Okay.  And when you said his girlfriend played a

12 supporting role, is that she did the -- the bookkeeping?

13 A    Yes, she would do that.  She would also help him find

14 jails to go to.

15 Q    And she was based where they lived in Northern California;

16 is that right?

17 A    Correct.

18 Q    And based upon your investigation, how long was Mr.

19 Kindley living in Northern California?

20 A    Oh, over ten years.

21 Q    Okay.  So I just asked you before about he transported

22 these -- these inmates alone; is that correct?

23 A    Yes.

24 Q    Okay.  And over the course of this investigation, you not

25 only investigated the allegations by the two individuals that

1    initially reported, did you look for -- fully investigate

2    other allegations?

3    A    Yes, I did.

4    Q    Is it a process that is ongoing?

5    A    It is.

6    Q    Approximately how many prior female transports have you

7    interviewed to date?

8    A    About 20.

9    Q    Okay.  And are they all around the country?

10   A    I'm sorry?

11   Q    Are they all around the country?

12   A    Yes, they are.

13   Q    Okay.  And of those approximately 20, about how many of

14   them have alleged some sort of sexual misconduct and/or --

15   ranging from inappropriate conduct, propositions, all the way

16   to sexual assault?

17   A    Around 13 or 14.

18   Q    Okay.  Now, in -- in investigating those allegations, and

19   we'll get more into it in a few minutes, but I just want to go

20   back to this idea of Mr. Kindley transporting them alone.

21   During the course of your investigation and trying to

22   corroborate these various allegations, did you talk with and

23   interview various corrections officers at the jails throughout

24   the country who either received the inmate or let the inmate

25   go to Mr. Kindley?

1  A   Yes.

2  Q   And universally, what was their reaction to -- to -- many

3  of these corrections officers, with regard to the fact that he

4  was transporting the women alone?

5  A   Yeah, they couldn't believe that he would be transporting

6  women -- a woman all by himself.

7  Q   Okay.  And, in fact, when you interviewed one of them, in

8  particular, a deputy out of Marin County, who picked up the

9  first victim who came forward, what was his reaction with

10 regard to looking for a -- a second corrections officer?

11 A   Yeah, he was -- he was surprised.  He saw the van, and Mr.

12 Kindley's van is made out to where the front passenger's seat

13 actually kind of depicts the look of a female.  There's a

14 scarf that wraps around the seat with a hat.  And that

15 particular officer thought that, by chance, Mr. Kindley had a

16 female corrections officer or somebody else with him.

17 Q   Because from afar, it gave that appearance?

18 A   Correct.

19 Q   And so when you later on -- when Mr. Kindley was arrested,

20 when you later on conducted the search pursuant to a warrant

21 of his van, did you find that the passenger's seat was

22 similarly outfitted?

23 A   Yes.

24 Q   Okay.  Prior to running Special Operations Group, the name

25 of the company that Mr. Kindley operates now, did he operate

1  another prison -- private prison transfer company?

2  A    Yes.

3  Q    And what was that called?

4  A    It was called CSI Court Services, Inc.

5  Q    And from approximately when to approximately when was that

6  company in business?

7  A    It was -- it was probably 2002 all the way up to 2015 when

8  he started his new company.

9  Q    So, dating back to 2002, based upon your investigation, is

10 when, at the very least, Mr. Kindley has been transporting

11 inmates in this private capacity?

12 A    Yes.

13 Q    And based upon your investigation, the same kind of lack

14 of regulation, unfettered access?

15 A    Yes.

16 Q    Okay.  I want to talk about, specifically, I'm going back

17 to these -- these two women who -- who were alleged sexual

18 misconduct, and then were referred to you by the Apache County

19 Sheriff's Office.  Did you -- as part of your investigation,

20 did you determine -- did they have jurisdiction, first of all;

21 did Apache County have jurisdiction over the crimes that were

22 alleged?

23 A    No, because one of the inmates that had been transported

24 was assaulted in different districts in a different state, so

25 they determined that they didn't -- they didn't have the means

1  to prosecute the case.

2  Q   And they didn't have the jurisdiction because the assaults

3  didn't occur in Apache County?

4  A   That's correct.

5  Q   So, based upon your investigation, the first victim who

6  came forward, Shella Huey, where was jurisdiction determined

7  for the sexual assault that Mr. Kindley committed upon her?

8  A   That would be in the Central District of California and

9  the District of Arizona.

10  Q   Okay.  And specifically in the Central District of

11  California, what -- what did she allege?

12  A   She alleged that she was vaginally raped in a remote area

13  of the desert.

14  Q   At gunpoint; is that correct?

15  A   That's correct.

16  Q   And, in fact, Mr. Kindley threatened to "blow her brains

17  out," quote, correct?

18  A   Yes.

19  Q   And then, the allegations in the District of Arizona, that

20  the first victim alleged, included what?

21  A   Included digital penetration and also forced oral sex.

22  Q   Forced oral sex on -- on -- meaning the victim had to

23  perform oral sex on Mr. Kindley, correct?

24  A   That's correct.  Yes.

25  Q   Okay.  Now turning to here, the Eastern District of

1  Arkansas, there was another woman who came forward, Emma, she

2  was transported from Shelby County, Alabama; is that correct?

3  A    Yes.

4  Q    To Apache County, Arizona; is that correct?

5  A    That's correct.

6  Q    In January of last year?

7  A    Yes.

8  Q    Just to back up a little bit, about how soon after they

9  originally -- they came forward, were you alerted to these

10 allegations?

11 A    It was -- let's see, about four or five days, I think.

12 Q    Was it the beginning of February?

13 A    Yes, correct.

14 Q    And that was after it was reported, not after it happened,

15 correct?

16 A    That's right.  Yes.

17 Q    Okay.  So, turning your attention to Emma and her

18 transport from Alabama to Arizona, can you -- can you explain

19 to the Court how old Emma is or was at the time?

20 A    I think she was in her 20s.

21 Q    27?  Does that sound correct?

22 A    That sounds right.

23 Q    Okay.  And what did Emma report with regards to when the

24 defendant first picked her up from Alabama?

25 A    Well, she was picked up by Mr. Kindley and there was a --

1  some surveillance that was recovered during that pick up.

2  Q   Okay.  And so, what did -- before the surveillance was

3  recovered, Emma reported that when Mr. Kindley arrived, he

4  made a comment to her; do you -- can you tell the Court what

5  that comment was?

6  A   Oh, yeah, he made a comment that either, "What happens in

7  the van stays in the van" or "What's said in the van stays in

8  the van."

9  Q   Okay.  And I know we're going -- we're getting pretty fact

10 intensive, so if there's anything that you need to refer to

11 your -- refresh your recollection with --

12 A   Okay.

13 Q   -- please -- please do so.  So, he picked her up on

14 January 28th of 2017; is that correct?

15 A   That's right.

16 Q   And that comment, "What happens in the van stays in the

17 van," that -- that Emma reported, did you then verify that

18 with surveillance video?

19 A   Yes, I did.

20 Q   And did you take a look at that surveillance video?

21 A   Yes.

22 Q   And what did you find?

23 A   Yeah, it shows Mr. Kindley in the area of the jail picking

24 up Ms. Solis, he tells her that he's going to be transporting

25 her to Arizona.  He mentions that he's -- on the way, they

1  have to pick up, I think in his words, he says, "some dip-shit

2  in Kansas."  And then he makes a comment, he either says,

3  "What happens in the van stays in the van" or "What's said in

4  the van stays in the van."

5  Q   And did he ever actually pick anybody up in Kansas on the

6  way?

7  A   No.

8  Q   Okay.  And so what did Emma describe happened in the

9  beginning of that transport?

10 A   Yeah, so as they started to drive, Mr. Kindley began

11 questioning her.  The questions initially were more personal

12 in nature, asking her about her boyfriend, whether -- how

13 their relationship was.  Then it became, at some point, more

14 sexual in nature, where he asked her other questions about

15 whether or not she thought Mr. Kindley was a good looking man,

16 asked her about her breast size, and some other things.

17 Q   And those questions that Emma reported to you, are those

18 similar in nature to the questions that were reported to you

19 by Shella, the first victim?

20 A   Yes.

21 Q   And how about Christina, the third victim, or Kristin, or

22 Jennifer, or any of the other 14 other women that you

23 described before?

24 A   Yes, there were numerous other women that all described

25 something very similar as far as the line of questioning.

1  Q    And these 14 women, do they all know each other?

2  A    No.

3  Q    Okay.  So, once -- once Mr. Kindley engaged in this

4  questioning behavior, did -- and he asked about -- as you

5  said, he commented on her -- on her breast size and so forth,

6  did he then become even more sexually explicit?

7  A    Yes.

8  Q    Can you explain to the judge what -- what kinds of things

9  he told her, once he offered her some hand cream to use?

10 A    Yes, at some point, Mr. Kindley offered her some hand

11 lotion.  She had been in jail for a while and her skin was

12 really dry and cracked, so she accepted the lotion, used the

13 lotion.  And then, while -- or a short time afterward, Mr.

14 Kindley began telling stories about -- stories about other

15 women that he had transported that had used lotion, and he

16 used the words that, "They had taken the lotion, they had

17 masturbated in the backseat, and had rubbed the lotion on

18 their nipples and pussies."

19 Q    And those were his words?

20 A    Yes.

21 Q    Okay.  And again, this language that he used, his

22 discussion of masturbation, the comments about women that he's

23 transported, is this again a recurring theme among the various

24 women that you've interviewed?

25 A    Yes, it is.

1  Q   Okay.  And then, when -- and then what did he say to Emma

2  with regard to -- actually, what did Emma report to you was

3  her reaction as she's listening to Mr. Kindley talk about the

4  other women who were masturbating in the back of the van?

5  A   I mean, she was -- she was scared, she didn't know what to

6  believe.

7  Q   Okay.  And then, he began -- he began -- excuse me, Mr.

8  Kindley began discussing other inmates in the backseat and

9  other sex acts; is that correct?

10 A   Yes.

11 Q   And can you explain for the judge what kinds of things he

12 was telling Emma?

13 A   Yeah, he talked about several different stories.  He

14 talked about one transport where there was several male

15 inmates and a female inmate in the back of the van, he bragged

16 that everybody in the van had played with her, but she didn't

17 mind it because she had -- because they were all in jail.

18 There was another story that he told about a female inmate he

19 was transporting that performed oral sex on another male

20 inmate and that the female did the same to Mr. Kindley

21 because, in his words, "Sharing is caring."

22 Q   And all of this is based around this idea, according to

23 what Emma reported, that the defendant was saying to her, you

24 know, these women are in jail, they have needs, and so,

25 therefore, it was as though he was meeting a need for a woman

1  who had been in jail; is that correct?

2  A    Correct.

3  Q    Again, does this -- does this theme of -- of women as

4  objects for the defendant to use as he would, has that become

5  a theme in the investigation?

6  A    Yes, it has.

7  Q    And we'll get to this in a -- in a second in more detail,

8  but as part of your investigation, two prior employees of the

9  defendant were investigated, correct?

10 A    Yes.

11 Q    Two people were interviewed, correct?

12 A    That is correct.  Yes.

13 Q    And these two prior employees, William Cassidy [phonetic]

14 and Albert Long, worked for the defendant when -- when he ran

15 CSI; is that right?

16 A    That's right.

17 Q    And as a general matter, can you tell the Court what Mr.

18 Kindley spoke to them about in terms of his attitude toward

19 the women that he transports?

20 A    Yeah, he -- basically, his opinion was that, "They're your

21 transports, you can transport the women how you want to do it,

22 just don't get caught."

23 Q    And he actually bragged about -- and we'll get into it in

24 more detail, but he actually -- he, the defendant, actually

25 bragged about having sex with inmates who he picked up, and

1  then dropping them off in a county, correct?

2  A    That is correct.

3  Q    And these two employees, who he had these conversations

4  with, and with who he promoted this activity, they each have

5  been since convicted for committing similar crimes that the

6  defendant is charged with, correct?

7  A    Yes.

8  Q    Okay.  Getting back to the defendant's conversations with

9  Emma, when he was talking about sharing is caring, and then

10 did he also describe that the women who were in the vehicle

11 were quote, "hard up"?

12 A    Yes.

13 Q    And this idea that, you know, women are in jail, and

14 therefore, they must have sexual needs that aren't being taken

15 care of?

16 A    Correct.

17 Q    And then did he ask -- did he ask Emma about her needs?

18 A    Yeah, he asked her if she was good.

19 Q    And -- and what was her response?

20 A    I don't -- she didn't -- yeah, she didn't respond.  She

21 was just trying to ignore him at that point.

22 Q    And what was -- but, based on what she reported to you,

23 what was going through her mind at this point?

24 A    Yeah, she didn't know -- she's hearing all this different

25 language from somebody that -- that she doesn't know, and she

1  was -- at that point, she was becoming scared.

2  Q   Okay.  And at some point during the transport, actually

3  when it went through this District in the Eastern District of

4  Arkansas, did Emma report to you that she told the defendant

5  that she had to urinate?

6  A   Yes.

7  Q   And so, what happened?

8  A   So, at that point, they were nearing a town near

9  Russellville.  Instead of Mr. Kindley driving her to the

10  Russellville jail there for her to use the restroom, he

11  deviated off the highway and started driving down a road, and

12  continued on for several miles, made several different turns.

13  It's a remote area.  I've driven it.  There's nothing that

14  much around at all.  At some point, they stopped.  She gets

15  out of the vehicle.

16  Q   Let me just stop you for a second.  I'm sorry.  Was it

17  dark out?

18  A   Yes.

19  Q   And based upon GPS coordinates and search warrants that

20  you were able to get, you were able to track a general pattern

21  that -- or general route that they went on?

22  A   Yes.

23  Q   And you were able to track about what time of day it

24  occurred?

25  A   Yes.

1  Q   And did you then research whether it would have been dark

2  at that time?

3  A   Yes, and it would have --

4  Q   And it would have been?

5  A   It would have been dark.

6  Q   And so, you, yourself, drove this general route upon

7  learning what it was and verified it, correct?

8  A   Correct.

9  Q   And as you said, it was desolate, there's nothing around?

10 A   Yes, the area that I went in, yes, that's correct.

11 Q   Okay.  And did Emma explain to you that driving off into a

12 desolate area, when she had to go to the bathroom, was

13 actually contrary to what the defendant told her would happen

14 when she had to go to the bathroom?

15 A   Yes.

16 Q   In fact, what -- what should have happened?

17 A   Well, he should have taken her to the jail.

18 Q   Okay.

19 A   Yes.

20 Q   And so, they get to this desolate area, and Emma -- is

21 Emma familiar with this area?

22 A   Yes, she's -- she is somewhat familiar, yes.

23 Q   Meaning the Russellville area, correct?

24 A   Yes.

25 Q   Because she had a relative who lived here?

1  A    Correct.

2  Q    So did she know, based upon your discussions with her,

3  that the defendant was veering off route?

4  A    Yes.

5  Q    And what did she explain what was going through her mind

6  at that point?

7  A    Well, she didn't know where they were going or what they

8  were going to do and that at that time, when they were veering

9  off the road, she kept asking where they were going, Mr.

10 Kindley just kept telling her to shut the fuck up and kept

11 referring to his pistol, holding his pistol.

12 Q    And she told you that that scared her because he kept

13 pointing to his gun?

14 A    Yes.

15 Q    And you pointed, just for the record, that he had his gun

16 on his hip; is that correct?

17 A    Correct.

18 Q    Okay.  And at this point when -- when he's telling her,

19 quote, "Shut the fuck up," what else is he referring -- he's

20 referring to her as an inmate in transit, correct?

21 A    That's correct.

22 Q    And that -- does he continue to kind of refer to her in

23 that manner, as this kind of just an inmate in transit?

24 A    Yes.

25 Q    Okay.  Ultimately, do they pull over?

1  A   They do.

2  Q   And let me just back up one second, what did Emma report

3  to you that every time he gestured toward his gun, put his

4  hand on his gun, referred to her, told her to shut the fuck

5  up, told her she was an inmate in transit, what was going

6  through her mind?

7  A   She was -- she was scared.  She -- she thought he was

8  going to do something to her.

9  Q   And, in fact, did she -- did she feel like she had no

10 choice but to obey him basically?

11 A   Correct.

12 Q   Okay.  So they pulled over in this isolated location, and

13 what happened?

14 A   They got out of the van and Emma was going to try to use

15 the restroom, she asked for a tissue.

16 Q   Let me just back you up, was she shackled?

17 A   Yes.

18 Q   So her feet were shackled.  Did he unshackle her hands?

19 A   Yes, one hand.

20 Q   One hand.  Okay.  And so what happened?

21 A   At that point, she asked for a tissue, Mr. Kindley made a

22 comment to her and then actually shoved her up against the van

23 with his forearm.

24 Q   Okay.

25 A   At the same time, he started grabbing her breasts hard

1  enough to where it left marks on her breasts, and used his

2  other hand to actually shove down into her pants and digitally

3  penetrated her.

4  Q   And what kind of pants was she wearing?

5  A   Like elastic leggings.

6  Q   Okay.  Elastic waist leggings?

7  A   Yes.

8  Q   And she wasn't wearing jails clothes because she was

9  released in the clothes that she came to the jail with, so

10 that's why she was wearing these leggings; is that right?

11 A   Yes.

12 Q   Okay.  And so she described that -- she said -- did she

13 describe the force with which Mr. Kindley first -- first used

14 his forearm against her?

15 A   Yes.

16 Q   What did she say?  Did she talk about like her head

17 knocking back into the van?

18 A   Correct.  Yes.

19 Q   And then what about the force with which he digitally

20 penetrated her?

21 A   Yes.  Yes, she said that he was being so rough that his

22 fingernails were scratching into her vaginal wall and was

23 causing her pain.

24 Q   And in the process, did her underwear tear?

25 A   Yes.

1  Q    Did you take -- and when you met with Emma, did you take

2  those underwear into evidence?

3  A    Yes.

4  Q    Did you look at those underwear?

5  A    I did.

6  Q    Were they torn?

7  A    Yes.

8  Q    Okay.  Consistent with the way in which she explained his

9  hand going down her -- her pants?

10  A    Yes.

11  Q    Okay.  While the defendant was digitally penetrating her,

12  what did he ask her?  You can refer to your notes -- or did he

13  ask her if she liked it?

14  A    Yeah, she -- yeah, he said, yeah, "Do you like that?"

15  Q    And what -- and what tone was using at this point?

16  A    In a angry, angry tone.

17  Q    And what did he -- as he was doing this, what did he then

18  -- like, as he was penetrating her and saying do you like it,

19  then what did he do?

20  A    Well, then, after that, he told her to get on the ground.

21  Q    Okay.  Did he -- did he start -- based upon your

22  conversation with Emma, did he start masturbating against her

23  stomach?

24  A    Yes, he did.

25  Q    And then what did he do?

1  A    Then he told her to get on the ground.

2  Q    Okay.  And did he -- and right before he said get on the

3  ground, or about the same time, did he ask her, quote, "If she

4  sucked cock"?

5  A    Yes.

6  Q    And did she describe that he asked this question with

7  gritted teeth?

8  A    Correct.

9  Q    Okay.  So, he did it -- he was in this kind of -- it was

10 this angry moment?

11 A    Yes.

12 Q    And so, when that happened, when Emma -- when he told her

13 to get on the ground, having, you know, just masturbated

14 against her stomach, what was -- what was Emma's reaction,

15 what did she describe to you?

16 A    She felt like at that point she either had to fight or she

17 was going to die, so then she -- she basically yelled out,

18 "Fuck no."

19 Q    Okay.  Really loud?

20 A    Yes.

21 Q    Okay.  And what happened?

22 A    So then, at that point, there was some animals that were

23 nearby that started making noise and scurrying, and then Mr.

24 Kindley threw her back into the van.

25 Q    And what -- did he mention baby wipes or anything like to

1  her?

2  A    Yes.

3  Q    And what -- what did he actually do?

4  A    Yeah, he asked her to go get the baby wipes out of the

5  van.

6  Q    Okay.  And when you conducted the search of the vehicle

7  upon his arrest, the Grand Caravan, were a package of baby

8  wipes recovered?

9  A    Yes.

10 Q    And similarly, Shella, the first victim, in her narrative

11 she mentioned baby wipes, as well, correct?

12 A    Yes.

13 Q    All right.  When the defendant threw Emma back in the van,

14 having, you know -- having just assaulted her, did he threaten

15 her again, telling her that it only takes one bullet?

16 A    One bullet to the head.

17 Q    Okay.  And as she's describing this to you, what was her

18 emotion and her demeanor?

19 A    Scared, angry.  She felt like that just prior to that she

20 didn't know if she was ever going to see her son again.

21 Q    Okay.  And having met Emma and getting to know her

22 personality a little bit, would you characterize her as overly

23 vulnerable, a little bit stronger, or -- or somewhere in

24 between?

25 A    Probably somewhere in between.

1  Q    Okay.  How about Shella, the woman who you described

2  before had been vaginally raped and then digitally penetrated

3  and then forced to perform oral sex?

4  A    Extremely vulnerable.  She's tiny.  She's a hundred pounds

5  and four foot something tall.

6  Q    And kind of weaker in personality, as well?

7  A    Yes.

8  Q    And so, comparing that to the other victims, for example,

9  there's a woman named Jennifer Schwarp [phonetic], who we're

10 still investigating her allegations of sexual assault up in

11 the Nebraska area, what's her personality like?

12 A    Somewhat more similar to Shella's probably.

13 Q    Kind of like that weaker personality, correct?

14 A    Yes.

15 Q    And so you've seen -- you've kind of -- is it fair to say

16 that over the course of your investigation, you've seen where

17 if -- if the -- if the woman had the gumption or the

18 wherewithal to kind of show some strength back, yell back,

19 threaten, or do something, Mr. Kindley would back down to an

20 extent?

21 A    Correct.  Yeah, he --

22 Q    To the point where if, like, for example, one woman

23 threatened that her family who was in the Cartel was going to

24 -- was going to find him and kill him if he touched her?

25 A    Correct.  Yes.

1  Q   Okay.  And in -- in the examples that I just used, have

2  you found that they all kind of follow the same pattern of

3  driving into a desolate area, some of them threatening them at

4  gunpoint, and some kind of sexual contact, either suggested or

5  followed through upon?

6  A   Yes.

7  Q   Okay.  So after the defendant threw Emma back into the

8  van, did -- did he then take her to go urinate at the

9  Russellville jail?

10 A   Yes, he did.

11 Q   Okay.  And did you -- did you corroborate that that's, in

12 fact, where they went?

13 A   Yes.

14 Q   And were there audio recordings where Mr. Kindley was

15 calling into the jail to let them know he was on his way?

16 A   Correct.

17 Q   And what -- what were those audio recordings?

18 A   The recordings, it was two recordings.  One recording was

19 Mr. Kindley calling the jail, letting them know that he had a

20 female that needed to use the restroom.  Another call was some

21 time around the time that he got to the jail, him saying he

22 was there, and making a comment to the effect of getting lost

23 along the way.

24 Q   Okay.  And going back, we mentioned that you -- you were

25 figuring out where they were during the assault, you were able

1   to use the information that we gleaned from various warrants,

2   to include there was -- there was a time when the defendant

3   was with Emma in this remote location for a period of -- a

4   period of time; is that correct?

5   A    Yes.

6   Q    You were able to verify that?

7   A    Yes.

8   Q    About how long?

9   A    I think about 40 to 45 minutes.

10  Q    And that was like off this beaten path, and then back

11  toward it, correct?

12  A    Correct.

13  Q    And based upon your investigation, is there any reason why

14  he should have done that?

15  A    No.

16  Q    Well, a legitimate reason, I should say, as in terms of a

17  transport officer taking an inmate to the location of the

18  Russellville jail?

19  A    Correct.

20  Q    Okay.  Once -- later that evening, the defendant lodged

21  Emma at the McIntosh County Jail in Oklahoma; is that correct?

22  A    Yes.

23  Q    And in finding the -- can you describe for the Court the

24  steps the defendant took to find a jail to lodge her in, what

25  he was looking for?

1  A    Yeah, he made several calls to various jails throughout
2  the area, trying to find a place that she could stay
3  overnight, ultimately housing her in the McIntosh jail.
4  Q    And one of the thing -- and you were able to see on the
5  phone logs that he made like several calls, correct?
6  A    Yes.
7  Q    And Emma actually told you and reported that the defendant
8  was insistent that she be lodged in a jail where she was
9  required to shower; is that correct?
10 A    That's correct.
11 Q    Like he wanted her to take a shower, and so he made all
12 these phone calls to make sure that she could take a shower,
13 correct?
14 A    Right.  When he was making the phone calls, he was telling
15 the jail he needed a place where it was a requirement she be
16 showered.
17 Q    Okay.  And Emma reported that she didn't necessarily want
18 to shower because she had showered that morning; is that
19 right?
20 A    Yes.
21 Q    Okay.  And, in fact, since the last detention hearing, you
22 were able to get into Mr. Kindley's iPhone, correct?
23 A    Yes.
24 Q    And that had been a -- that had taken some time, because
25 it was both password protected and encrypted; is that right?

1  A   Correct.

2  Q   And you were able to look at both his phone log and the

3  AT&T records that you got via a subpoena and search warrant?

4  A   Yes.

5  Q   Can you tell the Court, there's a -- there's a discrepancy

6  with regarding to calling McIntosh jail; is that correct?

7  A   It's actually the -- the Pope County Detention Center, the

8  one in Russellville.

9  Q   Oh, I'm sorry.

10 A   It's that jail.  There's the -- on the AT&T call logs that

11 we got back, that show Mr. Kindley's call logs, I don't, at

12 this time, see a call that he made to the detention center at

13 Pope County; but, however, on his phone call logs, I do see

14 that there were two calls made, which corroborates with the

15 recordings that we received.  I'm just, at this time, trying

16 to determine if there was some type of attempt to conceal that

17 call to not show that he actually stopped at that jail.

18 Q   Okay.  And using some sort of app or something like that?

19 A   Correct.

20 Q   And again, this investigation and these pieces, now that

21 the phone has been gotten into, is ongoing, correct?

22 A   Yes.

23 Q   Okay.  When Emma was dropped off to be lodged at the

24 McIntosh County Jail, and she -- she slept there that night,

25 correct?

1  A    Yes.

2  Q    And what did she describe she did that night?

3  A    She basically stayed curled up in a ball, crying, that

4  night.

5  Q    Okay.  And did she tell anybody in law enforcement at the

6  jail, like now that he had left her there, did she report it

7  to any corrections officers or anything?

8  A    No.

9  Q    Why not?

10  A    Because Mr. Kindley had conveyed that he -- he knew

11  people.  She didn't know who to -- who to trust.  She knew at

12  the end of the night she would be back into the custody of Mr.

13  Kindley, so who could she tell and who would believe her?

14  Q    And when you said he said he knew people, more

15  specifically, what kinds of people did he say he knew?

16  A    People in law enforcement.

17  Q    Okay.  That he had friends in law enforcement?

18  A    Correct.

19  Q    He, in fact, also claimed to be a U.S. Marshal?

20  A    That's correct.

21  Q    And so this -- this -- these comments of being in law

22  enforcement, and, in fact, holding himself out as U.S.

23  Marshal, is that also a common theme?

24  A    It is with many of the females he transported, he conveyed

25  that he was a U.S. Marshal.

1  Q    In fact, many of the women that you interviewed, to this

2  day, during the interviews, still believe that he's a U.S.

3  Marshal and are still scared of him?

4  A    That's correct.

5  Q    And concerned that they may -- that he may find them?

6  A    Yes.

7  Q    Okay.  The next day, when Mr. Kindley picked her up, and

8  then ultimately dropped her off at the Apache County Jail,

9  correct?

10 A    Yes.

11 Q    And, in fact, Emma was pretty insistent that he not take

12 any more breaks, and to the extent he gets there, that's what

13 -- that was her goal, just to get to that jail?

14 A    She -- she just wanted to get there.

15 Q    Okay.  Did Emma -- based upon your investigation, did Emma

16 disclose the full details to anybody prior to her talking to

17 federal authorities, and just -- I'm talking about the full

18 details?

19 A    To -- the local deputy was the first one.

20 Q    The first one she reported anything to, but in terms of

21 the full narrative?

22 A    No.  No.  That's correct.

23 Q    Okay.  And what was her concern -- so, let's go back a

24 little bit.  She got to the jail.  Did she disclose right

25 away?

1  A   No.

2  Q   Okay.  And one of the things that she was worried about

3  was, again, that the defendant was friends with the jailers at

4  Apache County, correct?

5  A   That's correct.

6  Q   And did he make those statements to her?

7  A   He did.

8  Q   And, in fact, did she observe what appeared to be Mr.

9  Kindley being friendly with one of the corrections officers?

10 A   Yes.

11 Q   Who is that?

12 A   His nickname is Tex.  I think it's Robert Talasek.

13 Q   Okay.  Right.  But he goes by Tex?

14 A   Yes.

15 Q   And she remembers the defendant talking to Tex and that

16 was what -- what worried her?

17 A   Correct.

18 Q   Have you since interviewed Tex?

19 A   Yes.

20 Q   And did you -- have you talked to him about this supposed

21 friendship with Mr. Kindley?

22 A   I have.

23 Q   And what -- what did he explain to you?

24 A   He said that he's not friends with Mr. Kindley, that Mr.

25 Kindley would often come to the jail, would drop off somebody,

1  and would literally stay for hours, talking and talking and

2  talking, and that Tex basically just was trying to get him to

3  leave.

4  Q   And so, based upon your investigation, Emma's vantage

5  point when she was booked in, is it reasonable that she could

6  have seen Kindley speaking to Tex, and therefore, thinking

7  they were friends?

8  A   Correct.

9  Q   Okay.  And, in fact, going back to when you originally

10  began this case, or received information about this

11  investigation and needed to investigate further, one of the

12  concerns was that Mr. Kindley had held himself out to be

13  friends with all these people?

14  A   Yes.

15  Q   So how did that affect your ability to fully investigate?

16  A   So, right, we first learned of the allegations, part of a

17  good investigation would be getting cooperation from other law

18  enforcement agencies.  Mr. Kindley was saying that he was

19  friends with all these people, so it led me to possibly

20  believe that maybe we would not get that level of cooperation

21  with the authorities to get the information that we need, so

22  it was more of a conservative effort.

23  Q   And there was also the concern that -- that if he was

24  friends with these people, especially in Apache County where

25  he did business, that they would tip him off that he's being

1  federally investigated?

2  A    That's correct.

3  Q    Okay.  What did Emma -- so Emma did not report it

4  immediately when he came -- when she came in.  What did she

5  tell you about her cell mate, Shella?

6  A    Yes.  So she was housed with the first inmate that -- in

7  regards to the allegations that have been transported to the

8  Apache.

9  Q    And did she tell you whether or not she and Shella

10 discussed the kind of full details of each of their assaults?

11 A    They didn't discuss in detail, but she observed -- Emma

12 observed Shella crying, curled up into a ball.

13 Q    Okay.  And based upon your investigation and Shella's

14 account of what happened, Shella explained that when Mr.

15 Kindley left her, he said he'd be back, he's going to Alabama

16 to get an inmate?

17 A    Yes, that he'd be back in four days.

18 Q    So when Shella arrived and said she -- excuse me -- when

19 Emma arrived and said she had come from Alabama and was

20 transported by the defendant --

21 A    She put two and two together and realized that must have

22 been the person that Mr. Kindley had brought back.

23 Q    Okay.  And so, according to basically both of them, the

24 most they kind of talked to each other about was like this

25 general like, oh, you know, this kind of like knowing look or

1  this understanding that something had happened?

2  A   Correct.

3  Q   Did neither of them -- based upon your investigation,

4  neither of them took it upon themselves to report to law

5  enforcement, correct?

6  A   Correct.

7  Q   Okay.  Now, obviously, when you got this investigate --

8  this case, your first concern would be that the defense would

9  argue that these women made it up, correct?

10  A   Yes.

11  Q   Okay.  So, in investigating that, did it turn out that

12  there was an inmate whom Shella disclosed her own rape prior

13  to Emma even arriving at the jail?

14  A   Yes.

15  Q   Okay.  And who is that?

16  A   Her name is Christine Cochran.

17  Q   Okay.  And tell the Court about Christine Cochran.

18  A   She's a local from that area.  She does not know Shella or

19  Emma.  She -- she frequents that jail.  She's an alcoholic,

20  and she's very open about it, but she's a common person at the

21  jail.

22  Q   And she is neighbors of one of the corrections officers,

23  correct?

24  A   Yes.

25  Q   And so upon learning from Shella what had happened, what

1    did she -- what did -- well, she learned from Shella prior to

2    Emma's arrival, correct?

3    A    Correct.

4    Q    And neither Emma, nor Shella, went and reported it,

5    correct?

6    A    That's right.

7    Q    But what did Christine Cochran do?

8    A    Christine Cochran, after learning about at least some of

9    the details of -- of -- and that they had been transported by

10   the same person, she told one of the -- I think he's a

11   corporal, Dwight Reynolds.

12   Q    Her former next door neighbor?

13   A    Correct.

14   Q    And then Reynolds is the one who contacted Deputy Dodge,

15   who then did the initial interviews separately of Emma and

16   Shella?

17   A    Yeah, he may have contacted the PREA coordinator first or

18   Deputy Dodge, but ultimately it got to the -- the deputy.

19   Q    And it was ultimately because Christine Cochran was the

20   one who reported it?

21   A    Yes.

22   Q    Okay.  And based upon your discussions with Emma, she

23   didn't disclose to anybody else, other than to law

24   enforcement, correct?

25   A    Correct.

1  Q    Okay.  We're going to probably talk about this a little

2  bit more, but as part of your investigation, did you seek a

3  warrant for the defendant's Facebook account, his Instagram

4  account, and all sorts of various social media platforms?

5  A    Yes.

6  Q    And did his social media -- excuse me, did his Facebook

7  account corroborate the fact that Emma, in fact, blocked Mr.

8  Kindley on Facebook?

9  A    Yes.

10  Q    Okay.  So getting back to the idea of having to

11  investigate the initial allegations, and we talked about the

12  various warrants and tracking down other -- other victims or

13  other inmates that he may have victimized, did you also seek a

14  tracker and a Trap and Trace to monitor Mr. Kindley?

15  A    Yes.

16  Q    And explain for the Court what the purpose in doing that

17  was and what you did as a result.

18  A    Yeah, my -- my fear was that there was a public safety

19  issue involving Mr. Kindley.  There was still further

20  investigation that was needed to corroborate the initial

21  female inmates' statements and to obtain additional statements

22  from other inmates, but, for the time being, to provide safety

23  to the public, I wanted to know the whereabouts of Mr.

24  Kindley.

25  Q    Okay.  And so, what kind of information did the tracker

1  and the Trap and Trace do for you?

2  A   Yeah, the Trap and Trace will basically provide the

3  incoming, outgoing phone calls, text messages.  Not content,

4  but you can tell the calls that are coming in and out.  The

5  tracking warrant will actually provide GPS location data for

6  the cell phone that was in the custody of Mr. Kindley.

7  Q   And this also allowed you to see which jails he was going

8  to, correct?

9  A   Correct.

10  Q   Not only for purposes of safety, but to figure out who he

11  did business with, correct?

12  A   Yes.

13  Q   Because, again, one of the things that was of concern is

14  if we subpoenaed a jail that he frequented and that he had

15  friendships with, then it would give away the fact that we had

16  an investigation, correct?

17  A   Yes.

18  Q   And could we at that point subpoena his business?

19  A   Yes.

20  Q   Okay.  But if we subpoenaed his business, he's a one man

21  business, correct?

22  A   Right.

23  Q   So that would give it away also?

24  A   Correct.

25  Q   Okay.  So, in terms of the -- how did you -- so how did

1   you go about seeing if he had transports; like how did the

2   process actually work?

3   A    So, I would actually -- I would monitor the incoming and

4   outgoing calls to see what jails he called.  It gave me a

5   decent idea on whether or not he would be leaving his house to

6   start doing transports.  In conjunction to that, I would get

7   the GPS location data and that would show his general

8   proximity on where he was going to.  When I saw that he

9   stopped at a jail, I would call the jail, find out who did he

10  pick up, was it a male, was it a female, and then, from there,

11  find out where he was going to, and make another call once he

12  got there, determine did he drop off somebody, did he pick up

13  somebody.

14  Q    Okay.  And you became concerned, more specifically, when

15  he had a female alone with him, correct?

16  A    Correct.

17  Q    And that was the weekend of May 19th of 2017?

18  A    Yes.

19  Q    And explain to the Court -- and this -- at this point,

20  this was the first out-of-state long -- long road transport

21  that he was doing, while you had him under surveillance, of a

22  female alone in his van?

23  A    Correct.

24  Q    Okay.  So explain to the Court what you did.

25  A    So I learned that day that he had picked up a female from

1   Natchez, Mississippi.  It was my belief at the time that it

2   was just him and that female in the vehicle and they were

3   ultimately going to be -- he was going to be transporting her

4   to New Mexico, which was a long trip, it would take at least a

5   day or two.  Ultimately, it took two days -- about two days.

6   He transported her to the area of Otero County.

7   Q   And in preparation for this transport, when we found out

8   that he was going out on it alone, what precautions did you

9   take?

10  A   In regards to?

11  Q   In keeping her safe.  So, for example --

12  A   Oh.

13  Q   Go ahead.

14  A   I understand.

15  Q   Okay.

16  A   Yeah.  So, the entire time, from when he picked her up, I

17  monitored his whereabouts the entire time, so that includes

18  basically almost all hours of the night, finding time to

19  sleep, but also finding time to monitor his location to make

20  sure there was not any unusual stops along the way.

21  Q   Okay.  And was there a plan in place to have the state

22  police do a welfare check if necessary?

23  A   Yes.

24  Q   And was there a plan basically to issue a complaint, if

25  necessary, immediately at that point?

1  A    Correct.  Yes.

2  Q    And at some point, that was a Saturday night, late into

3  the early morning hours of Sunday, I believe, or maybe it was

4  Friday into Saturday, Mr. -- the defendant did stop with

5  Christina Byrd [phonetic] --

6  A    Yes.

7  Q    -- this woman?

8  A    Yes.

9  Q    And so, what did you do?

10 A    Yeah.  So it was a -- the GPS data showed that he had

11 stopped just short of the jail that I thought he would be

12 transporting her to, which greatly concerned me, because I

13 knew -- I didn't know exactly what was going on and why he

14 stopped short of the jail.  There was a -- I knew that there

15 was a sheriff's office that was close to that area that he

16 stopped in, but I had no idea on what he was doing.  So, at

17 around the two hour mark of not knowing where or what they

18 were doing, I literally was dialing out the New Mexico State

19 Police number to call them to get somebody to go and do a

20 welfare check, locate the van, and make sure that she was

21 okay.

22 Q    Okay.  And at that point, that's when she was delivered to

23 the jail?

24 A    It was literally just a couple of minutes after that.

25 Q    And as it turned out, that particular stop was because she

1  was speaking to a detective on information she had on a case,

2  but, obviously, you didn't know that at that moment, correct?

3  A   Correct.

4  Q   So what -- did the FBI go in the middle of night and

5  interview her immediately?

6  A   Yes, I called up an agent in the area and she immediately

7  went to interview her.

8  Q   And, in fact, even though she had stopped and talked to

9  this detective, prior to that, around the Dallas area, Mr.

10  Kindley again, like with every other transport, stopped in a

11  remote location, correct?

12  A   Yes.

13  Q   And -- and part of that transport, did he also engage in

14  sexually inappropriate discussions -- or I should just say

15  comments?

16  A   Yes.

17  Q   And one of the comments that he made to Christina Byrd, if

18  you happen to -- do you know it?

19  A   Yeah, I do have it.  Yeah, he made a comment to Ms. Byrd,

20  was talking about the other females that he had transported,

21  he made the comment, "All I do is go around and fuck bad

22  bitches."

23  Q   Which, again, going back, is -- is a parallel to a comment

24  that he made to his former employee in terms of like what they

25  can do to the women they transport, correct?

1  A   Yes.

2  Q   And do you have that in front of you?

3  A   I do.

4        THE COURT:  Before we get -- before we do that, how

5  much longer do you have with this witness?

6        MS. GOLD:  I have quite a bit.

7        THE COURT:  Okay.  We have two other -- we still have

8  two inmates back there.  We're going to need to take a break

9  so that the Marshals can get them where they're going.

10       MS. GOLD:  Okay.

11       THE COURT:  These -- I'm afraid to say it, these

12  should be short.  So I think we can get these.  So if you'll

13  just --

14       MS. GOLD:  I can -- I can try to abbreviate to the --

15  to the new information that we learned since the last

16  detention hearing.  My concern is making my record though, and

17  -- and --

18       THE COURT:  Oh, I'm not -- yes --

19       MS. GOLD:  Yeah.

20       THE COURT:  -- and you're entitled --

21       MS. GOLD:  Yeah.

22       THE COURT:  I was not -- I don't want to rush you.

23  I'm just thinking of the logistics --

24       MS. GOLD:  Oh, you mean they could be short.  I'm

25  sorry.  Yeah.

1    THE COURT:  -- the logistics of moving -- or I'll

2    defer to the Marshals.  Do you need to get those two guys back

3    where they're going?

4    THE U.S. MARSHAL:  Your Honor, that's what I was

5    checking on.  I do believe we have other counties here right

6    now that are waiting on their pick ups, so if we could --

7    THE COURT:  Right.

8    THE U.S. MARSHAL:  -- then --

9    THE COURT:  So, let's just take a brief recess --

10    MS. GOLD:  Okay.

11    THE COURT:  -- in this hearing.  And if you'll bring

12    out Mr. Jordan when they kind of clear out.

13    THE WITNESS:  Do you want me to stay here?

14    THE COURT:  If you want to stand -- yeah, if you'll

15    stand down and take a break too.  You probably need a glass of

16    water.

17    THE WITNESS:  Thank you, ma'am.

18    (Witness stands down.)

19    (Recess.)

20                          AFTER RECESS

21    THE COURT:  All right.  Are we ready to resume?  Oh,

22    well, Mr. Tarver.

23    And you may resume the stand, you're still under

24    oath.

25    MR. ROBERTS:  Thank you, ma'am.

1    KYLE ROBERTS, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

2   RETAKES THE STAND.

3         THE COURT:  All right.  We're ready to resume.  I

4   think we left off at the McIntosh jail.

5       (Resume Direct Examination of Mr. Roberts by Ms. Gold.)

6   BY MS. GOLD:

7   Q    I think actually I was asking Special Agent Roberts about

8   the comment that the defendant made to Christina Byrd, who was

9   picked up from Natchez, correct?  Is that right?

10  A    I think we -- I think we covered that.

11  Q    Okay.  Because the next question, the Court Reporter might

12  remember, is that he said to Christina Byrd, who is the inmate

13  who was interviewed in Alamogordo in New Mexico, because she

14  was transported overnight while you were tracking her?

15  A    Yes.

16  Q    And the FBI went out right away to interview her?

17  A    Yes.  Correct.

18  Q    Okay.  And so, I just want to get into, because she's --

19  she's -- as far as your investigation revealed, she has got

20  nothing to do with the first two women that reported, correct?

21  A    Correct.

22  Q    And she reported -- what did she report to the FBI; it was

23  like pretty quickly after she arrived at the jail, correct?

24  A    Yes.  She said several things.

25  Q    Okay.  What did she report about her transport?

1  A    Yeah.  She said that at some point along the way, Mr.

2  Kindley began making threats toward her.  Specifically, at

3  some point, Mr. Kindley pulled out a magazine and started

4  removing bullets and explained the purpose behind each bullet,

5  four bullets in total.  He popped out one bullet and said,

6  "This one is for running away."  He removed another bullet and

7  said, "This one is for being disrespectful."  A third bullet,

8  and he said, "This one is for speaking out of turn."  And

9  removed a fourth bullet and said, this -- "This one is for

10 good measure."

11 Q    Okay.  And this is -- he was saying this to Christina Byrd

12 who was being transported; is that right?

13 A    Yes.

14 Q    And she was alone in the vehicle?

15 A    Correct.

16 Q    And this followed some, again, explicit conversation about

17 -- or not -- I hesitate to use the word conversation --

18 explicit comments on behalf of the defendant regarding her sex

19 life, sexuality, and so forth, correct?

20 A    Correct.

21 Q    And, in fact, Christina Byrd reported to the FBI that she

22 had recognized the defendant from a prior transport, correct?

23 A    Yes.  From two years prior.

24 Q    And, in fact, when you pulled the surveillance video from

25 Natchez City Jail where she was picked up, in fact, she said

1  that to him on the video, correct?

2  A    Yeah.  She immediately said, "I remember you."

3  Q    And what did she -- what did she report to the FBI in

4  terms of her reaction when she saw that it was the defendant

5  picking her up again?

6  A    She was scared because she had remembered the transport

7  from two years prior and that she was placed in a vehicle with

8  a bunch of other inmates, but that Mr. Kindley made

9  inappropriate sexual remarks.

10 Q    And these similar -- similarly inappropriate sexual

11 remarks continued with Christina Byrd in this subsequent

12 transport, correct?

13 A    Yes.

14 Q    In fact, he asked her about her teenage daughters?

15 A    Yes, he asked about her teenage -- about her teenage

16 daughters, where they lived, was looking them up on social

17 media, was making comments about their ages, one being 16, and

18 about how that was the age of consent for sex in New Mexico

19 and that was the ripe age for sex, comments such as that.

20 Q    And he also made the comment to Ms. Byrd, "All I do is go

21 around and fuck bad bitches," correct?

22 A    Correct.

23 Q    Now that comment that he made, in terms of the parallel,

24 there was a comment or a description that he gave to his

25 former employees while they were all working together?

1  A   Yes.

2  Q   That's in the same vein; is that correct?

3  A   Correct.

4  Q   And do you have that comment?

5  A   I do.

6  Q   Okay.  And can you let the Court know what that -- what

7  that is?

8  A   Yes.  Mr. Kindley made a comment to one of his former

9  employees and stated to him, he said that he, being Kindley,

10  "picked up a couple of whores at a county jail, stopped

11  somewhere to fuck their brains out, and then dropped them off

12  at another county jail."

13  Q   And this was in the context of these interviews with these

14  former employees who, as we said, were convicted of similar

15  crimes, in explaining that this was like this kind of ongoing

16  sanctioned behavior among all of them, correct?

17  A   Yes.

18  Q   Okay.  And those words were from the defendant?

19  A   Yeah.  That's correct.

20  Q   Okay.  Going back to Christina Byrd's transport, in

21  addition to the comments about the bullets and so forth, did

22  he also tell her that he was going to perform oral sex on her?

23  A   Yes.

24  Q   On her, correct?

25  A   Correct.

1  Q    And what was her response?

2  A    She said that at the time she was menstruating.

3  Q    Okay.  And so she had her period, so?

4  A    Correct.

5  Q    And then, she said that, in part, as a way to stop him

6  from doing so, correct?

7  A    Yes.

8  Q    Okay.  And then, ultimately, what happened with her; did

9  she also, like Emma and like Shella at one point, and like

10 several other women, have to go to the bathroom?

11 A    Yes.

12 Q    And what did the defendant do?

13 A    Well, just -- just prior to that, the -- Mr. Kindley had

14 asked her if she had ever been raped before.  She said that

15 she had been.  Mr. Kindley made a comment that she was all

16 used up.  At some point later on in the transport, Mr. Kindley

17 pulled over to the side of the road, got her out of the

18 vehicle, her pants were pulled down, she urinated on the side

19 of the road, and Mr. Kindley intensely looked to check to see

20 if she truly was menstruating, and made a comment after seeing

21 her that, "I guess you're not lying."

22 Q    And specifically after seeing blood, he said, "I guess

23 you're not lying"?

24 A    Yes.

25 Q    Okay.  So, at that point, after that interview, and that

1  was in the early morning hours right after he dropped

2  Christina Byrd off in Otero County, New Mexico, did you then

3  -- was then a discussion and a -- to issue a complaint for his

4  arrest?

5  A    Yes.

6  Q    And why is that?

7  A    At that point, we had definitely corroborated that he was

8  a threat to the public and had corroborated some of the other

9  victims statements.  There was no reason to believe that, at

10  that point, that he was not a danger to the public.

11  Q    And did you get to the point where you felt like you, by

12  monitoring him, could no longer keep the community safe -- the

13  community at large, meaning wherever he was in the country?

14  A    Yes, because at that time, going from jail to jail, I

15  couldn't monitor one hundred percent exactly where he was at

16  or what he was doing.

17  Q    So, thereafter, he went back home to Northen California,

18  Manteca, I believe; is that correct?

19  A    Yes.

20  Q    And you were able to tell if he was going to stay at home

21  for a while or had a transport based upon your phone call --

22  A    Yes.

23  Q    -- his phone calls, correct?

24  A    Phones calls and based upon the GPS location.

25  Q    So once he stayed at home, if he wasn't making phone calls

1  to jails and so forth and kind of just seemed to be staying

2  there, it was like -- at least based upon the information you

3  had at that point, it was like a little bit of a breather to

4  get the complaint ready, correct?

5  A    Right.  There was no reason to think that he was doing

6  transports within the -- the small town of Manteca.

7  Q    Okay.  And so, what happened then -- or ultimately, he was

8  arrested on June 1st.  What kind of precipitated the -- at the

9  point it was going to happen, but the more immediacy that it

10 happened on the day that it did?

11 A    He became an Uber driver.

12 Q    Okay.  And what was your concern with him driving for

13 Uber?

14 A    My concern was that he was going to be transporting people

15 that would be short trips, you wouldn't know exactly when or

16 where he was picking somebody up, dropping them off, what was

17 going on in the vehicle, so at that point there was no way to

18 ensure public safety.

19 Q    And he was hired at Uber at or around May 31st, correct?

20 A    That's when he began driving.

21 Q    And arrested on June 1st?

22 A    Correct.

23 Q    And where was he -- where was he conducting these Uber

24 transports on his first overnight hours on May 31st?

25 A    He -- he began driving most of the night up near the

University of California, Davis.

Q   How far roughly is UC, Davis, to where he lives?

A   I believe it's just west of Sacramento, so it's -- I think
it's within a couple of hours.

Q   Okay.  So he had to drive a couple of hours to get to that
location?

A   Yes.

Q   Okay.  And so, obviously, the next day is when he was
arrested?

A   Correct.

Q   Okay.  Since the last detention hearing, we mentioned
before you were able to get into his iPhone, correct?

A   Yes.

Q   And that took you some time because of all the apps that
you -- I think you had mentioned earlier today a number of
apps that he had on there?

A   Yeah.  He has over 600 applications on his phone.

Q   And they were encrypted?

A   Well, some of the apps seemed to have some level of
encryption, but the phone, in general, was pass code protected
and encrypted.

Q   Okay.  What's the distinction; do you know?

A   The pass code gives entry into the phone, the way I
understand.  And I think the encryption can cause us problems
as far as doing an extraction on the phone.

1  Q   Okay.  And so, since the last detention hearing, you were

2  able to begin the search of that phone and gain additional

3  evidence, correct?

4  A   Yes.

5  Q   Okay.  I want to talk to you about items that he had on

6  his phone and searches that he conducted at or around the time

7  that he began driving for Uber on that May 31st and June 1st

8  of 2017.

9  A   Okay.

10 Q   And I previously provided to the Court Government's

11 Exhibits 1 -- Composite 1, and it goes 1 -- 1A through 1D, and

12 for -- and Special Agent Roberts, these are -- oh, excuse me,

13 it goes all the way up through 1F.  These are memes that you

14 recovered from Mr. Kindley's phone; is that correct?

15 A   Yes.

16 Q   And they're all memes regarding Uber driving and Lyft

17 driving, correct?

18 A   That's correct.

19 Q   And these are fair and accurate depictions of what you

20 pulled from his cell phone?

21 A   Yes, these were located on his phone.

22 Q   Okay.

23     (Government's Exhibits 1A through 1F identified.)

24         MS. GOLD:  At this point, for the purposes of this

25 hearing, I'd enter Government's Composite 1 with all of A

1    through F into evidence.

2             THE COURT:  Any objection, Mr. Tarver?

3             MR. TARVER:  We'd object to -- based on relevancy.

4             THE COURT:  All right.  What is -- what is the

5    relevance?

6             MS. GOLD:  Sure, Judge, the relevance is that,

7    obviously -- well, I can -- I can ask -- I can get more

8    specific testimony from Agent Roberts in -- in particular with

9    especially one of them, but they're specifically about having

10   sex with Uber passengers, goes to his intent and the potential

11   danger that he could have been to the community at the time.

12   Whether it would be relevant to trial, I don't know.  But

13   certainly, when we're looking at danger to the community and

14   whether he should be out, then this certainly -- and given the

15   fact of the parallels that exist between being a transport

16   officer of women and then being an Uber driver and having,

17   again, unfettered access, and then he's on his phone having

18   these memes of having sex with Uber drivers.  And more

19   particularly, I'll get to 1A.  But that's the relevance of it.

20   It certainly goes --

21            THE COURT:  These -- I mean, these are memes, as you

22   say, they're -- they're not his original posts, are they?

23            MS. GOLD:  And I can ask.

24   BY MS. GOLD:

25   Q   Agent Roberts, you just found them on his phone, like

1  something he would have searched for or --

2  A    Correct, these --

3  Q    -- or received?

4  A    -- these were located on his phone.  There was also

5  searches related to --

6  Q    And we'll get to the searches.

7           MS. GOLD:  I can tie that up to the searches if Your

8  Honor wants.

9           THE COURT:  Well, I'll just -- I'll overrule your

10  objection, but give them whatever -- I'm not sure what -- what

11  weight they're entitled to.  I don't -- I mean, people have

12  tacky things on their phones.

13           MS. GOLD:  Of course, and I think that in isolation

14  we can say that, but given that we have an individual who is

15  --

16           THE COURT:  Right.

17           MS. GOLD:  -- who is sexually assaulting women in his

18  vehicle all over the country, it goes to whether he's a danger

19  to the community.  Obviously, I understand the standard is

20  different for trial.  I'm not necessarily saying we would

21  admit this for trial.  But I think in terms of danger to the

22  community that it is relevant.

23           THE COURT:  Okay.  Well, I'll -- I'll admit it for

24  whatever weight it has.

25      (Government's Exhibits 1A through 1F received.)

1          THE COURT:  I just -- I mean, it's just that people

2  put all sorts of inappropriate --

3          MS. GOLD:  Your Honor, I agree --

4          THE COURT:  -- have it on their phones.

5          MS. GOLD:  I agree.  And in isolation, I understand

6  completely.  However, it certainly goes to his intent.  I

7  mean, that's what we're looking at, right?

8          THE COURT:  Well, his intent to have sex in -- in

9  Uber --

10          MS. GOLD:  Well --

11          THE COURT:  -- cars, but I don't see any of them that

12  look as if it's --

13          MS. GOLD:  Well, let me just --

14          THE COURT:  -- [indiscernible], but --

15          MS. GOLD:  -- let me just then follow up just with

16  regard to Exhibit 1A.

17  BY MS. GOLD:

18  Q   The picture that is depicted there is a -- the -- the

19  caption is "Yes, your [indiscernible], he got five stars that

20  night."  But the picture is of a driver having sex with a -- a

21  passenger.  Can you describe the relevance -- or maybe I

22  shouldn't use that word.  Agent Roberts, can you describe the

23  significance that that picture has with regard to what was

24  reported to you from Shella, the first victim?

25  A   Yes.  Yes.  The -- the picture that's depicted in the meme

1  here, the sex act there is the exact positioning that Shella

2  had reported during her transport and the vaginal rape that

3  occurred in -- in California, it's extremely similar.

4  Q   With her body laying on the floor of the -- with the

5  bottom half of her body out the vehicle, her legs spread, and

6  the defendant raping her from a standing position while in

7  between her legs, correct?

8  A   Yes.

9  Q   And this was after he had threatened her at gunpoint to

10 blow her brains out?

11 A   Correct.

12 Q   Okay.  I also want to then point to, and you started to

13 mention the searches that he conducted, and these were his own

14 Google searches, correct?

15 A   Correct.  Yes.

16 Q   And that is on Government's Exhibit 2, but we don't even

17 need to enter it, we can just elicit testimony if it makes it

18 go more quickly.  Agent Roberts, there were -- there were

19 three searches that the defendant did at around the time he

20 was arrested for driving Uber.  What are the searches that he

21 did?

22 A   The -- the most recent search occurred on June 1st, Mr.

23 Kindley searched using the search terms "Uber female driver

24 fucked."  He also had two searches using search terms "Uber

25 pussy."

1  Q   Okay.  And he also searched, leading up to, in the -- a

2  couple of days before, on May 29th, 2017, he searched under

3  RedTube.com, correct?

4  A   Yes.

5  Q   And what is RedTube?

6  A   RedTube is a pornographic website to view pictures,

7  videos.

8  Q   Like similar to YouTube, but for pornographic videos?

9  A   Yes.

10 Q   And specifically, and it's Exhibit 2C, but I don't -- I

11 can just elicit the testimony, specifically, you have under

12 number 130?

13 A   Yes.

14 Q   And what did Mr. Kindley search for?

15 A   That was -- it was a video that showed up as -- as being

16 viewed.  The video was titled "Teen Nicki Snow fucks Uber

17 driver, big cock cum."

18 Q   And number 132?

19 A   132, it shows a video -- or a search related to "Uber

20 driver porn videos and sex movies."

21 Q   Okay.  As part of your investigation, in addition to

22 interviewing and meeting with prior females that the defendant

23 transported, did you also speak to and interview several of

24 Mr. Kindley's ex-wives and his former girlfriend who he had

25 been living with at the time he was arrested?

1   A   Yes.

2   Q   Okay.  Can you talk to -- can you explain to the Court

3   what you learned from Christy Kindley, who was the defendant's

4   third ex-wife, I believe?

5   A   Yes.  Correct.

6   Q   And she was married to him while he was running Court

7   Services -- or operating Court Services, Incorporated,

8   correct?

9   A   Yes.

10  Q   And what did -- what did Christy Kindley report to you

11  about her experiences with the defendant?

12  A   That she was married to Mr. Kindley for a couple of years.

13  She described living with Mr. Kindley as being very

14  controlling, he monitored who she talked to, placed a GPS

15  tracker on her vehicle, wanted to know where she was at, at

16  all times, and then there was later an incident that it

17  occurred on a couch.

18  Q   And what was that incident?

19  A   It was a incident where Christy had recently went and

20  visited her ex-husband and had sex with him.  She came back,

21  let Mr. Kindley know about it.  Mr. Kindley, at some point,

22  had grabbed her, positioned her on top of Mr. Kindley, held

23  her down and vaginally penetrated her.

24  Q   And did she report -- did she report that as something

25  that she wanted it -- that she wanted or consented to?

1  A   No.

2  Q   No.  And what was Christy Kindley's demeanor and attitude

3  while describing all this to you?

4  A   Emotionally upset, distraught, scared of Mr. Kindley.

5  Q   What did she say with regards to being scared of Mr.

6  Kindley?

7  A   She said that she would have reported it, but Mr. Kindley

8  had always told her it didn't matter what she did, if she got

9  a restraining order, that he knew people, he'd be able to find

10  her, and could find her anywhere.

11  Q   And meaning reporting it -- reporting being raped?

12  A   Correct.

13  Q   Okay.  And did she express concern about her knowing --

14  his knowing her whereabouts even today?

15  A   Yes.

16  Q   What did she say about that?

17  A   She does not want Mr. Kindley to know where she lives.

18  Q   Okay.  Did you also have an opportunity, on several

19  occasions actually, to meet with the defendant's live-in

20  girlfriend at the time that he was arrested?

21  A   Yes.

22  Q   Her name is Erin Huerta, correct?

23  A   Correct.

24  Q   And at the time, they had been living together for just

25  over ten years; is that correct?

1  A    Yes.

2  Q    And her three children had grown up in that household,

3  correct?

4  A    Yes.

5  Q    How did Erin describe her relationship with the defendant?

6  A    It was -- it was similar to Christy Kindley's

7  relationship, a very controlling environment.  She was not

8  allowed to get an outside job.  Mr. Kindley controlled the

9  household.  There was a time that she was extremely depressed

10 and Mr. Kindley placed a firearm on the counter top and

11 basically was insinuating go kill yourself.  That's coming

12 from her.

13 Q    And -- and you said he wouldn't let her get an outside

14 job.  Ms. Huerta basically worked as like the bookkeeper for

15 -- for his transport company when it was solo, correct?

16 A    Yes.

17 Q    And then, in the beginning he paid her; is that right?

18 A    Correct.

19 Q    As time went on though, he stopped paying her, correct?

20 A    Yes.

21 Q    But he forced her to work for him?

22 A    Yes.

23 Q    And she was not permitted to get outside work, correct?

24 A    Correct.

25 Q    And did you have an opportunity during your investigation

1  to learn about her -- her children's -- you know, two of them

2  are grown up, one of them who is a teenager, their views of --

3  A   Yes.

4  Q   -- of the defendant?

5  A   I did.

6  Q   Okay.  And can you tell the Court about that?

7  A   Yeah.  They were extremely fearful that Mr. Kindley would

8  hurt their mom, Erin Huerta.  And the same thing, described

9  living in like -- almost like a prison, he controlled who her

10  friends were, who she could talk to, who she couldn't talk to.

11  Q   And they were scared, especially the youngest, about her

12  mother's safety?

13  A   Yes.

14  Q   Okay.  And is there an occasion where -- well, throughout

15  their -- their time together, where he would make sexually

16  inappropriate remarks at the dinner table or around people who

17  were visiting and so forth?

18  A   Yes.

19  Q   Okay.  And was there a time also where, in front of his

20  daughter -- excuse me -- her younger daughter, being kind of

21  -- similar to what Christy Kindley said about people avoid him

22  because he's law enforcement so he can get away with what he

23  wants?

24  A   Correct.

25  Q   Okay.  Now with regard to his actions toward Ms. Huerta

1  and her children, since the last detention hearing, I want to

2  call your attention to a jail call that Mr. Kindley made,

3  referencing materials that we received in discovery about

4  threats that he made to his -- to Erin Huerta and her

5  children.  Do you know what I'm referring to?

6  A    Yes, ma'am.

7  Q    Okay.  And can you let the Court know the substance of

8  what he said?

9  A    Yes.  On one of the jail calls, Mr. Kindley says:

10                 "One of the things that the

11                 government had is the girl --

12                 girlfriend claims that I -- that I

13                 told her would shoot her and all

14                 of the kids and -- and all that

15                 sort of thing.  Well, I said to

16                 her, to be honest with you, but

17                 it's none of -- none of it's

18                 illegal, and not for anything, but

19                 we all say things to our steering

20                 wheel too in times when we're

21                 angry."

22  Q    Okay.  So, in short, he analogized the threatening her

23  with a gun to being angry and yelling at your -- at his

24  steering wheel?

25  A    Yes.

1  Q   Okay.  One of the issues that has -- going back to the

2  search of the phone and what you have recovered from his cell

3  phone, and going back to Shella, who is the -- whose the

4  victim who came forward first, one of the things that she

5  alleged was that Mr. Kindley took a picture of her naked

6  vagina and then showed her the picture, correct?

7  A   Yes.

8  Q   Now, having gone through several hard drives and through

9  his cell phone, at this point, were you able to find a picture

10 of Shella's vagina?

11 A   I think at this time it's still undetermined.  His -- his

12 devices contain quite a bit of material that's obscene.  It

13 contains pornography.  There's close up shots of vaginas.  So,

14 at this time, I can't say that we do have the photo or we

15 don't have the photo.

16 Q   Okay.  With regard to the close up shots of vaginas, is it

17 just to the point where you really can't, at this point,

18 identify who it's -- who those belong to?

19 A    Not all.  There's some that I can determine that either

20 another female sent it to him online, but there's many that I

21 can't determine.

22 Q   And also, along those same lines of these pictures, were

23 they -- when going through his cell phone, were you able to

24 tell when there were deleted photos?

25 A    Yeah, you can -- you can see.  Yes.

1  Q    What can you see about the deleted photos?

2  A    Deleted photos will usually show up, they'll be either

3  grayed out or color-scaled out.  You can only see part of the

4  image, no image, but there's really probably hundreds of

5  photos that appear to be deleted.

6  Q    And you can't tell when they were deleted because there's

7  no metadata on there?

8  A    Correct.

9  Q    Okay.  So, what I want to point you to then, again,

10 information that was not presented at the last detention

11 hearing, having gone through Mr. Kindley's cell phone -- and

12 again, you can just testify to it rather than entering it into

13 evidence -- but on May 16th and May 18th of 2017, so while

14 this investigation is ongoing, he does two searches regarding

15 photos and iPhones.  Can you tell the Court what those are?

16 A    Yes.  On May 16th, Mr. Kindley searched for -- using the

17 search terms "make photos on iPhone private."  And on May

18 18th, he did a search using the terms "make picture folder

19 private IOS."

20 Q    Okay.  And in listening to his jail calls, he acknowledged

21 that he, in fact, looked for ways to hide photos on his

22 iPhone; is that correct?

23 A    Yes.

24 Q    Okay.  And along those same lines, again, I want to point

25 you to a statement that Mr. Kindley made on a jail phone call,

1   again information that was since learned -- I think this

2   statement was made since the last -- since the last hearing in

3   Arizona, on January 7th of 2018.

4          MS. GOLD:  I apologize to the Court, I -- I wrote

5   2017 in the motion, but it's 2018.

6   BY MS. GOLD:

7   Q   It was an offhanded comment, and he said -- do you have

8   the comment in front of you?

9   A   Yeah, there is -- there is two comments that I see here,

10  two jail calls.

11  Q   Okay.  Yeah.  And you -- yes, go ahead.  The first one was

12  on December 23rd, and we didn't have that for the -- for the

13  first detention hearing.

14         MR. TARVER:  Your Honor, I -- I don't have what

15  they're referring to.  I haven't seen whatever this is.

16         MS. GOLD:  Your Honor, it was provided in discovery.

17  I also quoted it in the motion that was filed last Wednesday.

18  Obviously, we've been giving ongoing discovery, but given this

19  is a detention hearing, certainly, I -- we provided it to Mr.

20  Tarver, but in terms of, you know, a trial setting, I

21  understand he would have more time to go through it, but this

22  was -- he was noticed to it.

23         THE COURT:  Okay.  Well, just -- why don't you tell

24  him, what is -- what is it that you're just looking at -- at

25  your notes or what?

1          THE WITNESS:  This is all provided in the -- the

2   response.

3          THE COURT:  Okay.

4   BY MS. GOLD:

5   Q   You're just using the response to refresh your

6   recollection?

7   A   Yes, ma'am.

8   Q   Okay.  So the quote, first on -- regarding -- there's two

9   quotes regarding the iPhone; first, on December 23rd, 2017,

10  which we didn't have access to until after the detention

11  hearing.  And what was that quote?

12  A   Yeah, it's basically Mr. Kindley talking about learning

13  that -- that we had discovered that he searched for how to

14  hide files on his phone.  He basically said that he had

15  searched for how to hide files on iPhone IOS and looked up

16  people that he transported on Facebook, but none of it is

17  illegal, basically.

18  Q   And that's what he is saying, "None of it is illegal"?

19  A   Correct.

20  Q   Okay.  And then that quote regarding -- on January 7th of

21  2018, when he commented in reference to pictures of vaginas?

22  A   Yes.  And he -- he made the comment, he said:

23                  "As long as you don't take any

24                  pictures of it, it never happened.

25                  According to other people, you

1              know, it's a vagina thing."

2  Q   Okay.  And that comment:

3                  "As long as you don't take

4                  pictures of it, it never

5                  happened."

6      How does that relate to the information you learned from

7  his former colleagues who engaged in this behavior along with

8  him?

9  A   It goes back to a former employee by the name of Albert

10 Long, Mr. Long had -- had been -- he took a female to a hotel,

11 sexually assaulted her, he took photos of -- at least a photo

12 of the assault, but he had sent it out to people -- or at

13 least a person that he worked with.

14 Q   So he sent out this photo of the victim when she was

15 hogtied, correct?

16 A   Yes.

17 Q   And that was what led to authorities learning about it?

18 A   Correct.

19 Q   So this idea being that authorities learned about it

20 because there's a picture, and that's at least seemingly

21 parallel to this statement of "as long as there's no pictures

22 of it, it didn't happen"?

23 A   Correct.

24 Q   Okay.  There also have been issues made in prior hearings

25 of the fact that the initial two victims didn't undergo rape

1  kits, correct?

2  A    Yes.

3  Q    Based upon your experience, in delayed reports such as

4  these, are rape kits typically done?

5  A    No, they're not.

6  Q    No.  Okay.  So, in terms of any physical evidence on them,

7  that wouldn't necessarily exist because of the nature of the

8  fact that something has been delayed?

9  A    Correct.

10  Q    However, thus far, there has been some analysis done on

11  the van that Mr. Kindley drove, correct?

12  A    Yes.

13  Q    And was his semen recovered in it?

14  A    Yes, his semen was recovered on various items.

15  Q    In the van?

16  A    Yes.

17  Q    Okay.  And there, we focused basically on the three

18  victims that were initially in the complaint, but again, you

19  are continuing to investigate allegations of sexual assault on

20  a woman up in Nebraska who was transported by Mr. Kindley,

21  correct?

22  A    Yes.

23  Q    And just briefly, can you just describe the information

24  that you have on that as it relates to the pattern that has

25  emerged over the last year?

1   A    In regards to the transport?

2   Q    Yes.

3   A    Yes.  It's a -- it's another female that Mr. Kindley

4   picked up, he transported her over a long distance.  It was

5   just him and the female in the vehicle.  There was an area

6   that she alleges that Mr. Kindley had stopped off to, next to

7   a corn field, and sexually assaulted her.

8   Q    Okay.  And -- and to be fair, she cannot articulate,

9   whether through some sort -- either because she doesn't

10  remember or because she was unconscious, the actual act of

11  penetration, correct?

12  A    That's correct.

13  Q    But what -- what did she describe that she remembered

14  about it?

15  A    Yeah, she -- she is confident that either Mr. Kindley

16  penetrated her with either his penis or another object.  She

17  woke up and remembered and -- and felt that her underwear was

18  shifted, that she felt wetness, described as semen, located on

19  her, and that Mr. Kindley had assaulted her.

20  Q    And she -- did she also experience vaginal pain?

21  A    Yes, she did.

22  Q    Okay.  And prior to the FBI contacting her in relation to

23  the investigation of Mr. Kindley, predating that, did she file

24  any sort of complaint or write any letters bringing the --

25  bringing it to the attention of anybody what happened to her?

1   A    Yes.

2   Q    What did she do?

3   A    Yeah, she had wrote a letter to her civil attorney that's

4   representing her, and mentioned the words PREA and the fact

5   that something had happened to her during this transport, and

6   other grievances filed with the Otero County Jail.

7   Q    That she had been -- that she had been abused or assaulted

8   at the hands of a transfer officer?

9   A    Correct.

10  Q    And when she mentioned PREA, PREA is the Prison Rape

11  Elimination Act, correct?

12  A    Yes.

13  Q    And the attorney that she wrote to was a -- a civil rights

14  lawyer in Albuquerque, correct?

15  A    Yes.

16  Q    Okay.  With regard to some of the other women that you've

17  interviewed, in terms of their initial reporting of Mr.

18  Kindley's behavior, have you -- have you been able to

19  corroborate several women, based upon their jail calls, where

20  they first called out upon arriving at their destination and

21  talking about Mr. Kindley?

22  A    Yes.

23  Q    That he's a perv, that he's a creep, and made

24  inappropriate comments, and so forth?

25  A    Yes.  Correct.

1  Q   And this runs the span of the 14 victims that you -- women

2  you mentioned earlier?

3  A   Yes, all very similar.

4  Q   Okay.  I also now want to turn your attention to the --

5  what you know based upon -- about Mr. Kindley's ties in this

6  country anywhere.  Can you explain to the Court, in terms of

7  his former wives, former girlfriends and so forth, who does or

8  doesn't want to have contact with him?

9  A   Yes.  I mean, I'm not aware of anybody, former wives, that

10 want to have contact with him.  His son that lives in Indiana

11 does not want to have any contact with him.  His ex-wife that

12 lives in Indiana doesn't want have any contact with him.

13 Other than a few family members in the state of Indiana, I'm

14 not sure of -- of who that wants to remain in contact with

15 him.

16 Q   And his -- his basically *de facto* family for the past

17 decade, plus, was in California, that's Erin and her children.

18 What are their thoughts about the defendant contacting them?

19 A   They do not want their location known to Mr. Kindley.

20 Erin even contacted me, this was a couple of weeks ago or a

21 month ago, whenever Mr. Kindley was moved to this facility,

22 she gets e-mails on when he gets moved, and she had great

23 concern that Mr. Kindley was going to get out of jail and be

24 able to locate where she was at.

25 Q   Okay.  And Christy Kindley, for all intents and purposes,

1  is -- is living in hiding, as far as you can -- you can tell

2  by talking to her?

3  A   Yes.

4  Q   I mean, you met with her, so you know where -- where to

5  find her, but her goal is to stay hidden?

6  A   Yes, she does not want Mr. Kindley knowing where she

7  lives.

8  Q   Now, with regard to Mr. Kindley's mother being a third

9  party custodian, did you have -- did you have the opportunity

10 to go listen to their jail calls, the jail calls between Mr.

11 Kindley and his mother over the past almost year?

12 A   Yes, I have.

13 Q   Actually, not year -- I should say eight months or so?

14 A   Since June.

15 Q   Since June?

16 A   Since June.

17 Q   And can you explain to the Court the tenor of those phone

18 calls?

19 A   Yes.  I can tell you that Mr. Kindley primarily talks to

20 his mom, his dad, and then another female by the name of

21 Diane.  It's primarily those three people.  He's talked to

22 others, but it's primarily those three.  I can tell you that

23 the way that he talks to his mom is completely different than

24 the way he talks to anybody else.  He demands that his mom

25 basically does what he wants.  He gets upset with her if she

1  doesn't do it fast enough, quick enough, the right way.  He

2  has no problem telling her to shut up.  And he's made several

3  comments that his mom drives him insane, that there's no way

4  that he would be able to live in the same house with her, he

5  would have to get out of the house, he would maybe go see some

6  people in Ohio.

7  Q   And let me just clarify for those comments in particular,

8  his mother drives him insane and he'd have to leave an go to

9  Ohio, those -- those comments were made in the wake of the

10 last detention hearing, correct?

11 A   Yes.

12 Q   After he was released to the custody of his mother as a

13 third party custodian, correct?

14 A   Correct.

15 Q   Okay.  That she drives him insane and she's going to --

16 he's going to have to go find business in Ohio and go visit

17 friends and so forth?

18 A   Yes.

19 Q   Okay.  And did his mom make any comments with regard to

20 being able to follow the orders of the Court?

21 A   Yes.  She made the statement that they would obey the laws

22 and rules and the only time they wouldn't obey is if it

23 stepped against their Christian convictions and the Lord.

24 Q   Okay.  And based upon your investigation, when was the

25 last time that you could tell Mr. Kindley lived in Indiana or

1  anywhere near his mother and not across the country?

2  A   It's -- I mean, it's been -- it's been years.  It may be

3  ten or more years.  I don't --

4  Q   In terms of the investigation, you seized eight banker's

5  boxes of records to continue investigating as to Mr. Kindley

6  and any actions that he -- any acts that he took toward --

7  inappropriate sexual acts that he took toward females that he

8  transported, correct?

9  A   Yes.

10  Q   In those eight banker's boxes, approximately how many

11  women are you hoping to still track down?

12  A   Well, I'm going to track all of the women down that I can.

13  There's many.  I don't know how many.  There could be as many

14  as a hundred, there could be more.  I had a conversation with

15  his girlfriend at the time, Erin Huerta, she's very familiar

16  with the women he's transported, and she estimated that he's

17  transported well over a hundred women.

18  Q   Okay.  And, in fact, even this morning, you interviewed

19  another woman who experienced the same kind of pattern of

20  behavior with Mr. Kindley, correct?

21  A   Yes.

22  Q   All right.  Since the filing of the -- of the response,

23  you listened to some jail calls dating back to -- excuse me,

24  from the -- like the week of Valentine's Day; is that correct?

25  A   I believe so.

1  Q    Between Mr. Kindley and several people?

2  A    Recently.

3  Q    There was a comment that he specifically made about his

4  case worker.  Can you tell the Court about that?

5  A    Yeah.  There was some type of exchange between Mr. Kindley

6  and his case worker, where at some point the case worker felt

7  that Mr. Kindley wanted to kiss her.  And then, Mr. Kindley,

8  on a jail call, you can hear him saying that, no, he's not

9  going to kiss her, but he would smack her into Kingdom Come.

10 Q    And he also made comments, three different times, about

11 his dentist in the jail?

12 A    Yes.  He made comments about laying in the chair, and the

13 female dentist was performing work on him, and was talking

14 about her breasts rubbing -- rubbing up against his head.

15 Q    Okay.

16         MS. GOLD:  Could I have a moment, Your Honor?

17         THE COURT:  You may.

18         MS. GOLD:  Thank you.  I have no further questions

19 for Agent Roberts.  Thank you.

20         THE WITNESS:  Thank you.

21         THE COURT:  All right.  Do you have some cross?

22         MR. TARVER:  A little.

23                         CROSS EXAMINATION

24 BY MR. TARVER:

25 Q    Did the FBI or law enforcement offer some sort of monetary

1   award for people to come forward against Mr. Kindley?

2   A    No.

3   Q    Is there a -- a --

4   A    There's no -- no monetary award.

5   Q    There was no -- nobody offered any money?

6   A    No.

7   Q    Is there a website devoted to Mr. Kindley regarding law

8   enforcement; are you aware of that?

9   A    No, sir.

10  Q    When did you talk to Emma, what date?

11  A    I believe it was May 30th/31st, somewhere -- are you

12  talking about the time I interviewed her?

13  Q    Yes.

14  A    Yes.  May 30th/31st, a couple of days before Mr. Kindley's

15  arrest.

16  Q    And you retrieved a -- a pair of underwear from her?

17  A    Yes.

18  Q    And were those submitted for testing?

19  A    No, they were not.

20  Q    And why were they not?

21  A    She said that while she was in jail, she had washed those

22  repeatedly.  I talked with the lab about it, and if that's the

23  case, there was no sense in submitting those for testing,

24  because it would be unlikely to recover any type of DNA.

25  Q    Now my understanding is DNA could be recovered for years

1  on any item, sheets, even after they've been laundered several

2  times.

3  A   I -- I talked with the -- with the lab, and that was the

4  answer that they gave me.

5  Q   And Emma didn't talk to anybody about Mr. Kindley until

6  she came across Shella in the -- in the county jail?

7  A   Yes.

8  Q   And is -- is that her name, Shella?

9  A   Yes.

10  Q   And Shella was the -- the alleged victim in Arizona?

11  A   That's correct.

12  Q   And you interviewed her?

13  A   Yes.

14  Q   And that's the case that was dismissed?

15  A   That's correct.

16  Q   But -- but you filed the charges, you had a detention

17  hearing for Mr. Kindley to be held in custody; is that right?

18  A   Are you talking about in the District of Arizona?

19  Q   Yes.

20  A   Yes.

21  Q   And then, there was another hearing, a subsequent hearing

22  where Mr. Kindley was released with conditions?

23  A   Correct.

24  Q   And -- and part of those conditions was that he couldn't

25  transport anyone; is that correct?

1   A   I -- I'm not aware of all the conditions.

2   Q   Were you there for the hearing?

3   A   No.

4   Q   You didn't testify at that hearing?

5   A   No, sir.

6   Q   And in your reviewing these documents and going through

7   stuff, you didn't review what conditions were placed upon him

8   out of the District of Arizona?

9   A   No.

10  Q   And your testimony today is regarding any type of dangers

11  with regards to him being a either Uber driver or transporting

12  female prisoners; is that correct?

13  A   I'm sorry?  What's the question?

14  Q   Your testimony today about him being a danger is with

15  regards to him driving either an Uber, or something along

16  those lines, or transporting female prisoners?

17  A   Yeah, I mean, it's all of that.  It's -- it's -- the

18  investigation that has shown there are numerous females that

19  he has transported that all have allegations either from

20  hands-on sexual assault to other sexual misconduct.

21  Q   But that's -- my question was, that's all in the realm of

22  him being able to transport these individuals, these female

23  individuals?

24  A   Well, that would be the danger, yes, is that he would have

25  the access to these females alone in a minivan.

1  Q    And these other two former employees that have since been

2  convicted, those individuals were -- were charged and

3  convicted based upon actions that they took?

4

5  A    Correct.

6  Q    Not involving Mr. Kindley?

7  A    Correct.

8  Q    You talked about that -- the search that Mr. Kindley did

9  on his phone about trying to make his photos private?

10  A    Yes.

11  Q    Does that indicate to you that someone else would have had

12  access to his phone?

13  A    No, as -- as far as I know, anybody that I've talked to,

14  nobody had access to his phone other than Mr. Kindley.  It was

15  -- it was password protected.

16  Q    But the fact that he was searching for something that

17  would make any photos on his phone private raised a red flag

18  for you?

19  A    Yes.

20  Q    Even though you knew that no one else had access to his

21  phone?

22  A    That would still concern me, yes.

23  Q    Now, and Mr. Kindley was -- in transporting prisoners, you

24  -- you referred to the fact that he went on these long trips

25  with these female prisoners?

1   A    Yes, sir.

2   Q    And his live-in girlfriend was left at home?

3   A    Yes.

4   Q    This Christina Byrd, did -- in that situation, was she

5   given some pre-warning about Mr. Kindley?

6   A    No, sir.

7   Q    Was she acting as a agent for the FBI?

8   A    No, sir.

9   Q    And so, the FBI allowed Mr. Kindley, even though you're

10  saying he was such a danger, to transport her across the

11  country?

12  A    Well, at the time, there was no reason to believe when he

13  went there he was picking up a female, so that was a very

14  quick moment to understand that he had a female and where he

15  was going to.

16  Q    And then, in interviewing the -- the former employees, are

17  they both still in custody?

18  A    One is in custody and the other is not.

19  Q    And in interviewing them, when Mr. Kindley was made aware

20  of some possible improprieties with one of the employees, did

21  he send a spy to watch that individual?

22  A    That's my understanding, yes.

23  Q    How many of these individuals have filed civil lawsuits or

24  filed civil complaints that you have interviewed?

25  A    I believe only one.

1  Q   And was that filed after you made contact with that

2  individual?

3  A   Yes.

4  Q   And in Mr. Kindley's phone calls with his mother, did his

5  mother iterate and reiterate that she was going to follow the

6  conditions that the Court placed upon him, that he had to do

7  what the Court told him to do?

8  A   Well, I read the statement earlier, I think that as long

9  as if that fell within the boundaries of Christian faith and

10 God, or whatever it was, the comment that she made.

11 Q   But her comment wasn't that we're not going to do what the

12 Court told us -- tells us to do?

13 A   The comment was as long as it fell within the boundaries

14 of, like I said, Christian faith, God.

15          MR. TARVER:  May I have just a moment?

16          THE COURT:  You may.

17 BY MR. TARVER:

18 Q   And in the course of your investigation, did you gather

19 some purchase orders from the different jails?

20 A   Yes.

21 Q   And you -- these purchase orders are prepared prior to Mr.

22 Kindley picking up a prisoner?

23 A   I believe so, yes.

24 Q   And you had the purchase order from the jail before Mr.

25 Kindley picked up Ms. Byrd?

1  A    No.  I did not.  I had no idea he was going to pick up Ms.

2  Byrd.  I think, at some point, he was making a -- along his

3  route, he had maybe called the Natchez jail, so I knew he was

4  going there, but it was -- that would have been minutes or

5  hours before.

6  Q    And there was nothing illegal about Mr. Kindley's -- the

7  searches that he made to the -- the sites on his phone, was

8  there?

9  A    I don't know which sites you're referring to.

10 Q    RedTube?

11 A    Oh.  I'm not aware of anything illegal being about those,

12 unless there was any images that are recovered that would be

13 illegal, but, no, I'm not aware of any.

14 Q    And these individuals that you testified that did not want

15 to have contact with Mr. Kindley, none of these individuals

16 are living with his mother, are they?

17 A    No.

18          MR. TARVER:  Pass the witness.

19          THE COURT:  Anything further?

20          MS. GOLD:  Could I just ask a few clarifying

21 questions?

22          THE COURT:  All right.  Also, you have in your

23 notebook Exhibit 4.

24          MS. GOLD:  I didn't enter all of them all in.  Rather

25 than --

Roberts - Redirect                                    98

1        THE COURT:  Okay.

2        MS. GOLD:  -- just going through the back and forth,

3   Agent Roberts just testified to the substance.

4        THE COURT:  Okay.  So you're not offering those?

5        MS. GOLD:  No.

6        THE COURT:  Okay.

7        MS. GOLD:  No, I didn't offer them and I'm not going

8   to.

9        THE COURT:  Okay.

10        MS. GOLD:  He testified to the substance.

11                         REDIRECT EXAMINATION

12   BY MS. GOLD:

13   Q   Agent Roberts, I just want to clarify, because Mr. Tarver

14   asked you about your concern for obviously Uber passengers,

15   transport victims, as it relates to the case.  But in terms of

16   your -- your investigation, you've now been investigating Mr.

17   Kindley for a year, obviously, one of the criteria here is his

18   danger to the community.  Overall, what is your concern --

19   does your concern extend beyond just people who are in a

20   vehicle that he is driving?

21   A   Yes, it does.

22   Q   And do you base that, in part, because of the interviews

23   you conducted with his ex-wives and his former girlfriend?

24   A   Yeah, it's all that.  I think, based upon the

25   investigation, I don't think he has the ability to make

1  rational decisions that would come about on a daily basis

2  based upon his conduct of transporting prisoners.

3  Q   And going back to Christina Byrd, I -- I know there was a

4  lot about, you know, him getting -- picking her up, your

5  finding out at the last second, and obviously, it was a great

6  concern when he was alone with her.  If you knew then what you

7  know now, a year later, having learned all the information

8  that you have, would you have arrested him sooner?

9  A   He would have been arrested immediately.

10 Q   Okay.  And Mr. Tarver also asked you about the prior

11 detention hearing.  I know that it was done with -- it was

12 done with a little bit of a proffer, but mostly just

13 readdressing a prior hearing.  Is it your understanding that

14 Mr. Kindley was detained in California -- initially detained

15 in Arizona?

16 A   Yes.

17 Q   And then, obviously, released to the custody of the his

18 mother about a month or so ago?

19 A   Correct.

20 Q   And I know you don't know all the conditions, but,

21 obviously, when the release happened, did you, as the agent

22 investigating this, have concerns upon learning about his

23 release and the conditions that were imposed?

24 A   Absolutely.

25 Q   And what were those concerns?

1  A    The concerns were if he were to be released that he would

2  be a danger to the public.  And like I said, he -- I don't

3  think he has the ability to make rational decisions on a daily

4  basis.

5  Q    And what about showing up for court?

6  A    The charges that he's facing are serious charges.  The --

7  I question on whether or not, based upon those charges and

8  based upon the ongoing investigation, that I assume it's going

9  to strengthen, that he would show up for a court date.

10 Q    Okay.  And just to clarify, I know Mr. Tarver asked you

11 about a website and all that; there's no website, correct?

12 A    No, there's no website.

13 Q    But when Mr. Kindley was arrested on a complaint, DOJ had

14 an e-mail address -- a dedicated e-mail address for anybody

15 who had information, that went out on a press release that

16 said if you have information about Mr. Kindley, please call

17 the FBI or send an e-mail to this address?

18 A    Yeah, there was an e-mail and there was a phone number.

19 Q    Okay.  And, you know, I forgot one other thing that I

20 wanted to ask you about, just a year ago, in March of 2017,

21 Mr. Kindley had a -- prior back, a trial which he was

22 acquitted for, a conspiracy to take a -- a firearm on an

23 airplane, and the FBI had to return the firearms post-

24 acquittal.  Are you familiar with what I'm talking about?

25 A    Yes.

1  Q   Okay.  And based upon your search of his phone, what did

2  you learn his reaction to the FBI was, and then what he then

3  later reiterated to his friend?

4  A   Yeah, he made a -- a comment in March of 2017 that an FBI

5  agent wanted to return guns that had been previously seized,

6  and Mr. Kindley made a comment on Facebook that if the FBI

7  agent showed up at his house, that it would be an immediate

8  Ruby Ridge incident.

9  Q   And what's Ruby Ridge?

10 A   Ruby Ridge is -- it was a standoff that occurred back in

11 the '90s, it involved some people that had been assessed with

12 gun charges.  There was a standoff.  There was a couple of

13 U.S. Marshals killed and some other people.  But it was -- it

14 was a violent standoff.

15 Q   And this was -- and as it turns out, this post was in the

16 midst of the investigate -- the investigation, correct?

17 A   Yes.

18 Q   Okay.  Thank you.

19         MS. GOLD:  I have nothing further.

20         THE COURT:  Does that prompt anything else from you,

21 Mr. Tarver?

22         MR. TARVER:  No.

23         THE COURT:  All right.  You've been on the stand a

24 long time, but you may stand down now.

25         THE WITNESS:  Thank you, Your Honor.

1      (Witness stands down.)

2           THE COURT:  I'm happy to hear any closing remarks you

3    would like to make.  Particularly interested in -- I've taken

4    notes, but what's different now from when he was released on

5    conditions in January?

6           MS. GOLD:  Yes.  And I -- I can give you a host of

7    reasons.  First off, I should address, and I should have done

8    this immediately, yes, the Arizona case was dismissed, it was

9    dismissed without prejudice, and in large part has to do with

10   the fact that we have a lot of physical and digital evidence

11   that we need to continue to go through, and that time line was

12   more quick than this one, and we can proceed on this one

13   first.  Should we need to file charges later on, either with

14   that with them or with others, we will do so.  So I'd ask the

15   Court not to consider that in terms of whether it's any

16   negation of his guilt.

17          I will say, respectfully, Your Honor, our position is

18   that I don't know whether the -- the judge in Arizona didn't

19   get a full picture -- and we take responsibility as the

20   Government -- a full picture of the danger he presented and

21   the state of the evidence, but something went wrong.

22          That notwithstanding though, there is significant new

23   evidence.  You know, it is significant -- I am not necessarily

24   saying that the convictions of Cassidy and Long necessarily

25   impute to Mr. Kindley; however, it is very concerning that

1  they each independently related to us that he was well aware

2  of the fact that they were -- like, nobody uses the word

3  "rape," right?  That they -- even -- even post-conviction,

4  that they were having sex with these inmates, that they could

5  do what they want with them.  And his own comments, which

6  Agent Roberts delineated to you, suggests this like sheer

7  objectification and no regard for the humanity of the people

8  he was transporting.  I mean, that is the crux of this, his

9  predatory nature.  And that was not available for the -- for

10  the judge in Arizona.  I mean, we met with them since then.

11        It is highly concerning.  Yes, he certainly did look

12  into it, but the whole idea being is that Albert Long got

13  caught, right, because he took a picture of a hogtied woman,

14  and they all knew about it, and the police found out.  And, in

15  fact, Cassidy said, "You know, what happens in Vegas stays in

16  Vegas," which, you know, it rung so true compared to what Emma

17  told us.

18        In addition to that, we have more women.  I mean, we

19  interviewed yet another one this morning.  Ms. White and I

20  went out to California several weeks ago and interviewed

21  another.  We had to cancel a trip up to Minnesota last week

22  because of the snow storm.  But there are additional, more

23  women.

24        Additionally, you know, there was a lot made -- and I

25  don't know -- and we have a fantastic colleague in Arizona,

Ms. White and I were not there, there was a argument over the
law, there was a lot made about whether or not there was a
picture of Shella's vagina and whether or not there was a rape
kit.  And since then, we have gotten into this phone.  Number
one, it is very clear that he went to lengths to delete
photos.  He certainly has a lot of vaginas on his phone.
Look, in and of itself, is it illegal to possess vaginas?  Of
course not.  I mean, as you said, and we all recognize, people
have different predilections.  But when you look at it in the
-- in the entirety, I mean, I get the argument that you can
search what you want for Uber, but when you are being
investigated for raping the people you transport and the very
-- and the reason we -- we arrested him when we did is
because, I mean, we were freaking out that he then got hired
by Uber.  And then, we find on his phone searches for Uber
pussies, having sex with passengers, and then a picture that
depicts exactly what Shella told us.  I mean, the judge in
Arizona did not have that.  So, even though, respectfully, I
think he got it wrong, and I would ask you to judge that
separately, I think you could even say, fine, be that as it
may, looking at the new evidence, he's surely -- he's surely a
danger.

          Additionally, we also confirmed that his semen was in
his van.  Sure, it's his van, but do people necessarily have
semen in their office places?  I mean, I just think all of

1  that is corroborative; right, you can take everything in

2  isolation and say it's no big deal and explain it away, as he

3  was doing on his phone calls -- I mean, he's a predator.

4          And I -- I don't -- you know, obviously, the Court is

5  going to do what it's going to do, but I don't know how -- and

6  I think I said this in the motion, I don't even know how it's

7  fair to put the responsibility on his mother to ensure the

8  safety of any woman that he comes into contact with, and the

9  -- ensure that he's going to show up.  I mean, he's facing

10 life on count one.  He's facing a five year minimum on count

11 two.  And I don't know what else we're going to find.  Only he

12 knows what we're going to find.

13         So, I implore the Court to detain him.  Absent that,

14 I ask you to put -- and this is in no way endorsing it, but I

15 ask the Court to put more restrictive conditions.  He did not

16 have restrictive conditions.  Home detention, at the very

17 least, with the ankle monitor.  No access to Internet.  No

18 access or contact with any of the ex-wives or the victims.

19 And we can listen to that.  Yeah.

20         THE COURT:  Okay.  And just to clarify, you're moving

21 for detention on both risk of flight and danger to the

22 community?

23         MS. GOLD:  Yes, we are.

24         THE COURT:  All right.  Mr. Tarver?

25         MR. TARVER:  Your Honor, I think that there are

1  conditions, and there have been conditions that have been

2  placed on -- on Mr. Kindley, that the Court can reasonably be

3  assured that he won't be a danger to the community or a flight

4  risk.

5          He's had, as the Court can see, he showed up for a

6  trial, ended up being acquitted.  He was placed on -- released

7  on conditions there, he showed up, there was no issues with

8  him showing up.

9          And the case in Arizona, and in this one, the

10  Government fought just as hard to keep him in custody.  The

11  Court went back, looked at it, and determined that there were

12  some conditions.

13          And I think, you know, the stuff that was presented

14  here today, it looks as if -- if -- the issue, and they can

15  try to skirt around it, is, you know, if -- if their concern

16  is about him transporting female prisoners or having female

17  passengers as an Uber driver, there is an easy way to -- and

18  they did that in Arizona, they prohibited him from being a --

19  a driver, of transporting prisoners, or being in a -- in an

20  occupation where he would have, potentially, female

21  passengers.  His mom talked about the fact that they had a --

22  a job or potential employment for him through the church,

23  where they, my understanding is, they -- they ship packages,

24  they also make pillows that they send all around the world to

25  people who have heart conditions that are in hospitals, and he

1 would be working at that facility, that there's no

2 transportation of female passengers that's involved in that --

3 in that.

4       If he's on electronic monitoring with a curfew, that

5 allows him to work.  And if the Court restricts him from

6 having -- and he's not charged with anything involving his ex-

7 wives or ex-girlfriends, but we have no objection to the Court

8 limiting or restricting his contact to those individuals.

9 They don't live with his mother.  I don't even think any of

10 them even live in Indiana, which is where he would be living

11 with his -- his mother and his stepfather.

12       I think that there are conditions that the Court

13 could place upon him.  And, you know, a lot of the stuff that

14 they've brought in here, it's -- it's reaching, with regards

15 to the -- the memes, and what he searches for, and -- and they

16 say that no one else has access to his phone, but, you know,

17 they are concerned about him putting -- looking for an app on

18 his phone that would hide photos.

19       But there are conditions that the Court could place

20 upon him whereby it could be reasonably assured that he would

21 not be a danger to the community and not a flight risk.

22       THE COURT:  Okay.  Thank you, Mr. Tarver.

23       Well, the conditions -- or the factors that we

24 consider when determining whether there are any conditions

25 that will reasonably assure public safety are set out in the

Bail Reform Act.

And as we -- as I consider those conditions here, on the positive side for Mr. Kindley, he obviously has a mother who is supportive and has traveled here along with his -- his stepfather, he has a pretty scant criminal history, and the prospect of employment.

On the other hand, the allegations here are extremely serious.  You're talking about rape and gun threats to accomplish rape.  In addition to the jail calls, the Government has a -- a pretty strong case against him.  The fact that his ex-wife has reported what I consider violent behavior.  For all those reasons, I -- I cannot come up with any set of conditions that I think would reasonably assure public safety, and I find that by clear and convincing evidence.

I think there's less evidence about his risk of flight, but there's also a lower burden.

This is a case where there's a presumption that he should be detained.  While he has come forward with evidence to rebut the presumption, in these cases, it's not a bursting bubble presumption; in other words, the presumption doesn't go away.  And that's based on the seriousness of the charges.  So, for all those reasons, I do find by the greater weight of evidence that he does present some risk of flight based on the -- his familiarity with travel, with his -- the time that he's

facing if he's found guilty.

      But the more concerning part of this is the danger to the community.  So, for that reason, you're remanded to the custody of the Marshal until your trial.

      Anything further?

      MS. GOLD:  No.  Thank you, Your Honor.

      MS. WHITE:  Thank you, Your Honor.

   (Adjournment at 6:09 p.m.)

     ELECTRONIC SOUND RECORDING CERTIFICATION:

I, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


/s/Robin Warbritton          April 6, 2018
Signature of Approved Transcriber   Date

Robin Warbritton
Typed or Printed Name