IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

UNITED STATES OF AMERICA     )
            )
v.                    )       4:17CR-00267-DPM
            )
            )
ERIC SCOTT KINDLEY      )

## **TRIAL BRIEF OF THE UNITED STATES**

The United States of America, through its undersigned prosecutors, submits this trial brief to aid the Court in the trial of this matter, scheduled to begin March 6, 2020.

## I.    **The Superseding Indictment**

On January 8, 2019, a federal grand jury returned a three-count superseding indictment charging the defendant, a private prisoner transport officer, with crimes related to his sexual assaults of two females in his custody – A.M. and E.S. – during their respective transports. The first transport occurred on or around February 15-16, 2014, and the second occurred on or around January 28, 2017. A.M. and E.S. did not and do not know each other. Specifically, Counts One and Two charge the defendant with violating 18 U.S.C. § 242 for depriving each respective victim of liberty without due process of law which includes the right to bodily integrity, as guaranteed by the U.S. Constitution. The conduct specified in Count One is that the defendant caused A.M.'s mouth to have contact with the defendant's penis against her will, and that the act included aggravated sexual abuse and kidnapping. The conduct specified in Count Two is that the defendant digitally penetrated E.S.'s vagina and grabbed her breasts against her will. The superseding indictment further alleges that these acts resulted in bodily injury and included the use of a dangerous weapon, aggravated sexual abuse, and kidnapping. Finally,

1

Count Three charges the defendant with possessing a firearm in furtherance of his sexual assault of E.S. when he digitally penetrated her vagina amounting to aggravated sexual abuse, as alleged in Count Two.

II.     **The Evidence**

    **a.  The Defendant's Sexual Misconduct, as Alleged in the Superseding Indictment**

The defendant operated his own private prisoner transport company for at least 15 years, first as Court Services, Inc. (CSI), from 2002 to 2013, and then as Group 6, LLC, a company doing business as Special Operations Group (SOG), from 2013 until his arrest on June 1, 2017. His prisoner transport companies were unregulated, were not subject to oversight of any kind, and the defendant frequently transported female inmates alone without another transport officer present. Nonetheless, local jails hired the defendant to transport individuals arrested on out-of-state warrants.

The trial will span a time period during which the defendant operated both companies, because pursuant to the Court's Order permitting evidence of other acts of sexual assaults from three additional victims (Doc. 81), the United States will present the testimony of women whom the defendant sexually assaulted starting in 2012 through 2017.

The federal investigation began as a result of E.S.'s report to local law enforcement that the defendant sexually assaulted her. This brief will therefore begin with E.S.'s account of her transport in 2017, and the evidence that corroborates it, as alleged in Count Two.

    **i.  The Defendant's Sexual Misconduct of E.S., and Corroborative Evidence, as Alleged in Count Two**

The United States will present evidence at trial that the defendant picked up E.S., a 27-year old female, from the Shelby County Jail in Columbiana, Alabama on January 28, 2017, to transport her to Apache County Jail in St. Johns, Arizona where she had an outstanding warrant.

When the defendant arrived, he told E.S. that "what happens in the truck stays in the truck," a reference to the unmarked white Dodge Caravan (hereinafter, "the van") that the defendant used to transport all of the victims who will testify at trial. That initial interaction between the defendant and E.S. was captured on surveillance video, and the defendant repeated similar versions of that phrase to E.S. throughout her transport.

E.S. will testify that the defendant first told her that he would be driving up to Topeka, Kansas to pick up a male inmate as well as a female officer. However, once they reached Tennessee, the defendant admitted that it would just be the two of them for the remainder of the ride to Arizona. He asked if E.S. thought he was good looking, and questioned her about her marriage. He further told her she was pretty, and began using his smartphone to search for her Instagram and Facebook profiles. Facebook records corroborate that E.S. later blocked the defendant from viewing her profile.

During the ride, the defendant offered E.S. hand lotion and lip balm. Although E.S. will testify that the offer initially seemed like an innocuous gesture since she had cracked skin from being in jail, she soon became scared and realized she was in danger. Upon E.S. using the lotion, the defendant bragged about other female inmates who had used lotion and then masturbated in the back seat, rubbing it on their "nipples and pussy."  He then told E.S. that since she was "all lubed up," she should tell him her chest size. E.S. did not answer him, and told the defendant that she did not want to talk, but he continued to tell accounts of sexual encounters with inmates in his van. As set forth below, such accounts are consistent with DNA analysis revealing the presence of the defendant's semen in the van, statements he made to a former jail-mate, and statements he made to T.W., another female he transported. All of that evidence, as well as the testimony of other victims, will corroborate E.S.'s testimony.

More specifically, the defendant described a time when he transported several male inmates and one female inmate in the back of the van.  He bragged that they all "played with [the female inmate], but she didn't mind because she had been in jail." He then went on to say that he "fucked [the female inmate]" for two minutes before dropping her off at a jail. The defendant gave another example of a female inmate performing oral sex on a male inmate and then the female did the same to the defendant because "sharing his caring."  E.S. will testify that the defendant explained to her that these women were "hard up" because they had been in custody. The defendant therefore asked E.S., "What about you, [E.S.]?  Are you good?" E.S. will testify that she responded, "I'm good," and tried to ignore him.

Later, when E.S. told the defendant that she had to urinate, rather than stop at a nearby jail in Russellville, Arkansas, pursuant to what the defendant told her was the procedure when she needed a restroom, he drove into a dark, desolate area. The sun had already gone down, but because E.S. was familiar with the area, she knew that the defendant was detouring far away from the interstate. E.S. will testify that she asked the defendant if he was lost, and he told her to "shut the fuck up" and to remember that she was "an inmate in transit." He repeated that several times, always putting his hand on the gun in his holster, making her believe that he would shoot her. The defendant then pulled over, opened the van door, and pulled her out of the van, asking "You gotta pee or what?" He uncuffed one hand, but she remained shackled at her feet. When E.S. asked if he had toilet paper, he again got angry, reminded her that she was an inmate in transit, again put his hand on his gun, and shoved her up against the van. Her head knocked into the van, and the defendant held her with his forearm firmly across her chest, cupping her breast, leaving bruised fingerprint marks. He shoved his other hand down her elastic-waisted leggings and digitally penetrated her vagina against her will.  She felt his fingernail painfully digging and

4

scratching her vaginal wall. In so doing, the defendant tore her underwear. The Federal Bureau of Investigation ("FBI") subsequently took custody of the torn underwear.

E.S. will testify that the defendant then asked if she "liked it," and began masturbating against her stomach. He then asked if she "sucked cock" and through gritted teeth, told her to "get on the ground." Believing that she was going to die if she passively submitted, E.S. screamed out, "Fuck No!" This seemed to cause animals to start howling, such that the defendant got spooked. He therefore threw E.S. back into the van, while telling her, "it only takes one bullet to the head." He ordered her to hand him wet wipes so he could clean his hands. The FBI seized wet wipes from the defendant's van upon execution of a search warrant.

The defendant then took E.S. to Pope County Jail so that she could finally urinate. Historical cell site data from the defendant's mobile phone number corroborates that there are approximately 40 unaccounted minutes when the defendant was east of Pope County Jail, consistent with E.S.'s description of the defendant driving to a remote location, sexually assaulting her, and then driving back out to the interstate.

The defendant later dropped E.S. at the McIntosh County Jail in Oklahoma to lodge her for the night. The defendant was oddly adamant that E.S. take a shower, consistent with statements the defendant made to a former jail-mate that he used wet wipes, ensured that his victims showered, and employed other methods to cover up his conduct.

E.S. will testify that she neither reported the defendant at McIntosh County Jail, nor when she was finally dropped off at Apache County Jail. The defendant had warned her that he had friends in law enforcement, no one would believe her, and "what happens in the van, stays in the van." Indeed, upon arrival at Apache County Jail, the defendant waved at a corrections officer named, "Tex." To that end, Corporal Robert Talasek, who goes by "Tex," will testify that he was

the shift supervisor when E.S. arrived at the Apache County Jail. He knew the defendant as a transport officer who often talked too much, monopolizing much of the jail staff's time. Corporal Talasek was not friends with the defendant, though he could understand why E.S. misconstrued his courtesy wave to the defendant to mean that he and the defendant were friends. Corporal Talasek will also explain that, unlike other transport officers, the defendant hung around throughout the booking process, within earshot of E.S. Therefore, even if E.S. wanted report the defendant when she arrived, she could not do so without the defendant overhearing her. Additionally, Corporal Talasek will testify that he repeatedly told his supervisors that it was inappropriate that the defendant was transporting inmates without another officer present.

E.S. will further testify that she only reported the defendant's conduct to local authorities upon being approached by the Apache County Jail staff to meet with a local detective to give a statement. She neither sought out local nor federal authorities herself, and disclosed only to another inmate upon being asked about her well-being. E.S. did not know that the inmate to whom she disclosed then took it upon herself to report the defendant's conduct to jail staff. Testimony from other witnesses will corroborate E.S. and establish that as a result of E.S.'s report to authorities, the federal investigation commenced.

### ii. The Defendant's Sexual Misconduct of A.M., and Corroborative Evidence, as Alleged in Count One

A.M will testify that the defendant transported her on two occasions. The first occurred in May 2013, and the second occurred on or about February 15-16, 2014, the latter of which forms the basis for Count One of the superseding indictment. During the first transport, the defendant did not act inappropriately because A.M. was never alone with the defendant, but instead was transported with about five other males and one female. However, it was during the second

transport, when A.M. was 33 years old, that she rode alone with the defendant, and he forced her to put her mouth on his penis against her will.

That transport began when the defendant picked up A.M. from Victoria County, Texas to drive her to Jackson County, Oklahoma due to an outstanding warrant. Because it was the second time he transported A.M., the defendant sarcastically asked her how many times he would have to pick her up. A.M. remained handcuffed and shackled as she was seated in the row directly behind the driver's seat of the defendant's van. She found it odd that the defendant did not place her in the very back of the van. But because of where she was seated, the defendant was easily able to stare at her through the rearview mirror. A.M. will testify that his stares were not in the manner that one would expect from an officer checking on an inmate's well-being, but rather in a manner that seemed lascivious, scaring A.M. He also made sexually explicit comments as soon as the transport began. The defendant told A.M. she was a "pretty girl" and had a "nice mouth," a comment that A.M. took to mean that he wanted her to put her mouth on his penis.

The defendant also asked A.M. about her sexual fantasies, about the size of her "tits," and if she ever had anal sex in the context of his own penis getting "hard." He told her that he was "packing," referencing the size of his penis, and told her of his fantasy to pick up a hitchhiker and "screw her."

A.M. will testify, and the defendant's credit card statements will confirm, that during the transport, they crossed over the Texas border into Arkansas. A.M. was unsure why they were traveling to Arkansas, which was out of the way of her drop-off point in Oklahoma. The defendant then drove to what appeared to be a park or forest. Again, this seemed odd to A.M., but she thought that if she said anything, the defendant would remind her that she was an inmate and to "get in line." The defendant pulled over twice. The first time, he got out of the van, looked

around, got back in the van and said, "Fuck," seemingly because there were other cars nearby.

He slammed the door and they drove off. It appeared to A.M. that the defendant was lost, a ruse

he used with E.S., and with the uncharged victims, as set forth below.

A.M. will testify that the defendant then stopped at a spot where there were no other cars

around. The area was dark and isolated. The sky was "pitch black," and the defendant turned the

van off, extinguishing any remaining light. The defendant again got out of the van, this time

opening the sliding door on the driver's side where A.M. was sitting. At that point, A.M. became

scared, worrying whether the defendant had a gun. The defendant, by the open side of the van

stated, "Come here. I want you to suck my dick." In disbelief, A.M. told him that he could not

order her to do so because she was an inmate. He told her that she had to "suck his dick" because

he bought her food, referencing the burger he previously bought for her, as his prior fast food

purchases made via credit card confirm. This statement and similar statements are consistent

with statements that the defendant made to his former jail-mate. That jail-mate, as set forth

below, will testify that the defendant explained to him that female inmates will do anything for

food, and sometimes you have to "coerce" them to "consent."

A.M., who was still handcuffed and shackled, will explain that she knew that she was at the

defendant's mercy. She feared that if she refused to put her mouth on his penis, the defendant

would harm her, either by pistol-whipping her, stunning her with a stun gun, or beating her and

then falsely claiming she had tried to run away as a justification for her injuries, again a tactic

that the defendant bragged about to his former jail-mate: that all he had to do to coerce them "to

consent" was point to his gun or tell them he would shoot them if they tried to run.

A.M. will testify that she asked the defendant if he was going to uncuff her. He told her that

he would not, and instead instructed her to lean forward from a seated position and put her mouth

on his penis. In fear for her life, she did as the defendant instructed. A.M. will explain that she did not scream because there was no one else around, and although she considered biting his penis, she did not do so because she feared what he would do to her in response.

A.M. will testify that the defendant ejaculated in her mouth. A.M. spit the semen out of her mouth and into her handcuffed hands. She tried to rub the semen under the seat of the van, hoping to leave behind evidence of what happened so that the defendant might ultimately be held accountable for sexually assaulting her.

The defendant then told A.M. that she "was in the top three women that had sucked his dick." He then took off her handcuffs and squirted Germ-X in her hands. A.M. put the Germ-X in her mouth in an attempt to avoid catching any sexually transmitted diseases from the defendant. A.M. felt degraded and sat silently until they reached a jail where she was lodged overnight. A.M. will testify that she did not report the assault to anyone, fearing that no one would believe her and it would therefore only be worse for her once the defendant picked her up in the morning.

When the defendant picked her up the next day, he reminded A.M. that he had a lot of authority, telling her that "people don't believe women because they are easy." As a result, A.M. got the sense that she was not the first inmate that the defendant had sexually assaulted.

The defendant ultimately dropped off A.M. in Oklahoma where she remained in custody for almost two years after she was sentenced. It was only when she was released in 2015 that she told her sister that the defendant had sexually assaulted her, well before the advent of this federal investigation and about three years before federal authorities contacted her. Even though A.M.'s sister told her that an officer had no right to treat her that way, A.M. did not file a police report, once again assuming that no one would believe her because she has a history of drug abuse.

Testimony from A.M.'s sister will corroborate A.M.'s account and will establish that neither A.M. nor her sister expected to be contacted by federal authorities. In fact, when federal authorities went to see A.M. in prison and simply asked about her transport without mentioning more, she immediately began crying and vomited into a nearby trashcan.

### b. Additional Corroborative Evidence

As described above, E.S. only reported the defendant's misconduct to the local authorities in Apache County upon being approached to give a statement. Once the Apache County Sheriff's Office ("ACSO") took E.S.'s statement, the ACSO in turn alerted the FBI because the ACSO did not have jurisdiction, being that the sexual assault occurred in Arkansas.[1]

As part of its investigation, the FBI sought and executed search warrants on the defendant's van and seized corroborative evidence. As set forth below, several items were submitted for DNA analysis. Thereafter, the FBI contacted women whom the defendant had transported to generically inquire about their past experiences during prison transport, without mentioning the defendant's name. It was in this manner that the FBI learned about the defendant's sexual assault of A.M., the victim listed in Count One. Specifically, the FBI, in an effort to locate A.M., first spoke to A.M.'s sister. As mentioned, A.M.'s sister explained that years before the advent of the federal investigation, A.M. disclosed to her (A.M.'s sister) that the defendant sexually assaulted her during her transport.

---

[1] As this Court knows, and as more fully set forth below, both E.S. and her cellmate at the Apache County Jail, S.H., reported the defendant's misconduct. In order to adhere to the Court's Order about Rule 413 evidence (Doc. 81), the United States will take great care not to mention S.H.'s sexual assault in its case-in-chief. The United States will therefore narrowly present evidence as to how the Apache County Sheriff's Office referred the matter to the FBI. *United States v. King*, 36 F.3d 728, 732 (8th Cir.1994) (explaining that "[a]n out-of-court statement is not considered hearsay if it is admitted not for its truth but for the limited purpose of explaining to a jury why a police investigation was undertaken.").

It was also in this manner that the FBI learned about M.P., K.G., and K.K., three other women whom the defendant transported and sexually assaulted, in July 2012, February 2013, and April 2013, respectively. These three woman do not know each other, nor do they know E.S. or A.M.

### i.  Other Acts of Sexual Assault

#### 1.  Sexual Assault of M.P. (July 2012)

Like A.M., the defendant transported M.P. on two separate occasions. The first transport occurred when M.P. was 24 years old, from Las Vegas, Nevada to San Joaquin County, California beginning on July 26, 2012. The second transport occurred the following year in May 2013, when she and another inmate were transported together. It was during the first transport that the defendant forced M.P. to put her mouth on his penis against her will and in so doing, put her in fear for her life.

During the beginning of the first transport, M.P. was initially handcuffed with her hands behind her back and shackled at her legs. The defendant stopped the van outside of Las Vegas to move her handcuffs to the front of her body, telling her he was doing so because he liked her. In so doing, he rubbed his penis against her buttocks. The defendant then placed M.P. back into the van and slowly rubbed her inner thighs.

The defendant began asking personal questions and making sexually explicit comments, as he did with the charged and uncharged victims: M.P. will testify that the defendant asked M.P, if she smoked "weed," to which M.P. replied that she did. The defendant then offered M.P, some "weed" in exchange for a "favor," suggesting to M.P. that other females he had transported in the past had often provided him favors in exchange for drugs. M.P. did not accept the defendant's offer. The defendant made comments about the size of M.P.'s lips and whether she received

compliments about her lips. Although the defendant's comments upset M.P., she did not feel as though she could get mad at him and replied to his comments with one-word answers to appease the defendant.

Along the way, the defendant stopped in a secluded location and took M.P. to a park bathroom. The defendant went inside the bathroom stall with M.P. and watched M.P. urinate. While M.P. was still in the stall urinating, the defendant again made comments about her lips and told her that he had to kiss her on the lips, similar to the comment he made to A.M about her lips.

M.P. will testify that she finished urinating and as she was about to get up from the toilet, the defendant came closer, leaned over and began kissing her lips without her consent. As he was kissing her, he began unbuttoning his pants. M.P. will testify that she tried to pull away and the defendant told her "it's okay," and "I can get you out of trouble." He applied pressure to M.P.'s shoulders, keeping her seated on the toilet. He finished unbuttoning his pants and pulled out his penis. M.P. hesitated, but the defendant physically moved her head closer to him and forced her mouth onto his penis against her will. The defendant ejaculated into her mouth. M.P. spit the defendant's semen onto the floor of the bathroom and the defendant commented that it "couldn't be that bad."

After they left the park bathroom, M.P. will explain that the defendant's attitude towards changed from acting more like a "cop" to flirting with her and trying to get her to believe that she agreed to put her mouth on his penis. He told her about transporting other women and that he liked to go to hotels with them.

After the defendant dropped off M.P. in San Joaquin County, years before the advent of the federal investigation, M.P, disclosed to her mother that the defendant made her uncomfortable. She did not disclose that the defendant forced her to put her mouth on his penis, though she

wrote contemporaneous notes about what had occurred. Although M.P. cannot now find the notes, her friend will corroborate that M.P. wrote notes on yellow-lined paper, and that M.P. disclosed the sexual assault to her.

2. <u>Sexual Assault of K.G.</u> (February 2013)

K.G. was 36 years old when the defendant transported her from Punta Gorda, Florida to Lubbock, Texas, beginning on February 12, 2013. Similar to A.M. and E.S.'s transports, during K.G.'s transport, the defendant drove to a dark, secluded location where he forced K.G. to put her mouth on his penis against her will, all the while making her fear for her life.

K.G. will testify that when the FBI called in 2018 to inquire about her transport, she ignored the call, disbelieving that it was really FBI. It was only after her fiancé called the main number of the FBI to verify who the caller was that K.G. returned the call. At first, she told the FBI that nothing happened with the defendant and that she was one of the "lucky ones." But upon reflection, she contacted the FBI, acknowledging that she had more to disclose. She will explain that she did not initially disclose to the FBI because needed to tell her fiancé that the defendant sexually assaulted her before she could tell federal authorities.

K.G.'s initial impression of the defendant was that he was cocky and an "asshole." Upon picking her up, the defendant immediately began making sexually explicit comments to her. K.G. will testify that the defendant commented on how beautiful she was and how large her breasts were. He asked if he could touch her breasts, to which K.G. replied "no." As they drove, the defendant asked K.G. if she knew where they were. K.G. was not familiar with the area and told the defendant so. The defendant yelled at his GPS device several times and claimed that the GPS device had gotten him lost, causing him to use back roads instead of main highways in an

apparent ruse to get her to a secluded location, much like his pattern of behavior with E.S. and A.M.

The defendant first stopped at a small store. K.G. will testify that she told the defendant that she needed to use the bathroom, but he told her that she could not use the bathroom at the store. Similar to what happened to E.S., the defendant told K.G. that he would stop on the side of the road to let her use the bathroom. Thereafter, he did stop on the side of the road and K.G. believed he stopped so that she could urinate. The location was dark and isolated and there were no other vehicles around. The defendant told K.G. that she could not get out of the van on the rear passenger's side through the sliding door because the light inside the van would draw attention to them, similar to how he extinguished the light prior to sexually assaulting A.M. Instead, he made K.G. climb to the driver's seat and exit through the driver's side door. When K.G. exited the driver's side door, the defendant stood in front of the open door with his pants pulled down, exposing his erect penis. With one hand on his gun, the defendant told K.G., "I want you to suck it." K.G. told the defendant that she did not think that was a good idea, to which he stated, "I want you to suck it now."

K.G. will testify that she was afraid the defendant was going to shoot her, so she gave in. She crouched down, while handcuffed, in front of the defendant. The defendant placed one hand on her shoulder and applied downward pressure, keeping his other hand on his gun. He then put his penis in K.G.'s mouth. Before the defendant ejaculated, he pulled his penis out of her mouth, turned to the left, and appeared to masturbate until he ejaculated.

The defendant later told K.G. something to the effect of, "You better promise not to tell anyone; no one is going to believe you anyway." Although she was extremely upset, K.G. did not cry because she did not want to show the defendant any weakness. They both remained quiet

until the defendant began to talk to her as if nothing happened. The defendant bought her fast

food for dinner and took her to a jail to be lodged overnight. Just like E.S. and A.M., K.G. will

explain that considered reporting the defendant, but out of fear of not being believed, she decided

against it.

### 3. Sexual Assault of K.K. (April 2013)

The defendant transported K.K., who was 23 years old at the time, from Los Angeles

County, California to Flathead County, Montana, beginning on April 18, 2013. The defendant

immediately made sexual inappropriate comments, telling K.K. that dressed like a prostitute and

bragging that he had sex with prostitutes. The defendant offered to let K.K. go if she performed

oral sex on him. Much like E.S., at first, K.K. thought that the defendant was "all talk" with

regard to his sexual comments, but as the transport continued, she became increasingly

concerned for her safety. For example, the defendant touched K.K. in her upper thigh/vaginal

area over her clothes, doing so under the guise of checking her handcuffs when she was seated in

the van. Like with E.S. and A.M., the defendant told K.K. that if she tried to escape during their

trip, he would shoot her and K.K. believed him.

The defendant did not transport K.K. directly to Montana. Instead, he made numerous stops

over the next five days in approximately six different states, picking up and dropping off inmates

along the way. At some point in the trip, when K.K. was alone with the defendant, they drove

through a blizzard. K.K. will testify that the defendant pulled the van off the road near storage

units. They were completely isolated and there were no other vehicles or buildings nearby. The

defendant grabbed K.K. and starting pulling her out of the van. Fearing that the defendant was

about to rape her,  K.K. kicked him in the stomach, and in a moment of desperation, yelled at

him to just shoot her. He backed down when K.K. showed some level of noncompliance, just as

he had responded when E.S. screamed into the darkness as a result of the defendant demanding that she put her mouth on his penis.

 K.K. will testify that when she arrived in Flathead County, she immediately called her parents, and although she did not tell them the specifics of what happened, she warned them about the defendant. She also reported portions of his misconduct to the Flathead County Sheriff's Office, more than five years before the advent of the federal investigation.

### ii.   DNA Analysis of Items Seized From the Van

Various surfaces and items seized from the defendant's van were submitted for serology testing and DNA analysis. Several stains on a pillow as well as the front passenger seat tested positive for the presence of semen. DNA analysis of the pillow stains established that it is 2.2 octillion (2.2 followed by 27 zeros) times more likely that defendant was the contributor to the semen than if another individual was the contributor. Similarly, the front passenger seat tested positive for semen. DNA analysis established that it is 13 quintillion (13 followed by 18 zeros) times more likely if the defendant was the contributor than if another individual is the contributor. Both of these ratios indicate support for the identification of the defendant, *i.e.* the DNA is a match to the defendant.

Notably, the presence of the defendant's DNA on the pillow and the seat will corroborate the portions of E.S.'s account during which the defendant bragged about the women with whom he had sex in the van. It will further corroborate the testimony of his former cellmates to whom he made admissions about coercing women whom he transported to have sex in the van. Finally, it establishes the thoroughness of the federal investigation and attempts to corroborate the victims' accounts. To that end, the United States will also present testimony about the absence of DNA on certain surfaces and the degradation time of DNA from epithelial and sperm cells.

### c.  The Defendant's Statements

#### i.  Admissions to T.W.

T.W. was 37 years old when the defendant transported her from Washington County, Oregon to Otero County, New Mexico where she arrived on February 10, 2017, less than two weeks after the defendant transported E.S. The defendant was alone with T.W for the entire transport, and T.W. believes that but for her attitude and tough-looking physical appearance, he would have harmed her.

T.W. will testify that the defendant immediately made T.W. feel uncomfortable. The defendant bragged about his recent sexual encounters during other transports, corroborating the testimony of E.S. and A.M., and corroborated by the DNA results. For example, he told T.W. that that he received "blow jobs" from female inmates he transported in exchange for giving them cigarettes. He bragged that he "finger bang[ed]" other females he transported, consistent with what he did weeks earlier to E.S. He further bragged that he "hooked up" with other females that he transported, some during the transport, and some after they were released from jail. After listening to the defendant make these sexually inappropriate comments for several hours, T.W. will testify that she finally told him that his comments were disrespectful and that she was "not that kind of girl."

T.W. will testify that the defendant nevertheless continued to describe sexual encounters. The defendant told her that he would "fuck [female inmates] in the back seat [of the van]." Similar to his pattern with other female inmates, he described the size of his penis in detail, telling T.W. that during one stop, his penis "got so hard" it was difficult for him to get out of the van and that he was "blessed," referring to the size of his penis.

The defendant then offered her a cigarette or coffee in exchange for a "blow job, "but T.W. "did not need a cigarette that badly" and reiterated to the defendant that she was not that "kind of girl." The defendant again continued to push the conversation in a sexual direction. When they reached New Mexico, consistent with what he did to E.S. and A.M, the defendant began to drive down dark, back roads. He told T.W. that if he could not find a jail to check T.W. into for the night, they would have to sleep in the back of the van together. T.W. questioned why they would have to do that and the defendant falsely told her that his boss would not approve of the price he would have to pay to check her into a jail – even though the defendant owned the prisoner transport business and had no other employees at the time except for his then-girlfriend. Ultimately, T.W. spent the night in a jail.

On the last day of the transport, the defendant gave T.W. a cigarette at a gas station. T.W. will explain that she thought he was bribing her for fear of her reporting him. To that end, he then told her not to tell anyone that he gave her the cigarette because he did not want it to be "misconstrued," T.W. promised that she would not tell anyone, but nonetheless did tell her family and boyfriend about his sexually inappropriate comments.

### ii.  Statements to the FBI

The FBI conducted a post-*Miranda* custodial interview of the defendant after he was arrested on June 1, 2017. When confronted with the allegations of sexual misconduct involving three individuals whom he transported about whom the FBI was aware at the time, the defendant denied any sexual contact with anyone while in his transport vehicle, claiming that he "would remember that" if it had happened.  The defendant further claimed to have no memory of E.S. The defendant also claimed to never have looked at anyone's vagina because he "was not

interested," a claim that is countered by the hundreds of photographs of stand-alone vaginas recovered via search warrant on his digital devices.[2]

### iii.   Admissions to His Former Fellow Jail-mates

In 2018 to 2019, the defendant discussed being a transport officer with two fellow inmates, one of whom was his cellmate, while they were housed at the West Memphis Correctional Facility in Mason, Tennessee. Each inmate separately heard admissions and descriptions from the defendant about his inmate transports.

Specifically, one jail-mate will testify that the defendant told him about running Group Six, explaining that many of the females he transported wanted to trade sex for food or cigarettes or wanted to have a "good time before going to jail." The defendant therefore said that he was always "bartering for sex or blow jobs."

That jail-mate will acknowledge that in an effort to get more information from the defendant, he often expressed disbelief at the descriptions of his encounters with females so that the defendant would continue talking. The defendant told him that as a transport officer under private contracts, he would arrive at a jail to pick someone up, and dress up the front passenger seat to make it look like there was a second guard in his van. Because he had tinted windows, no one ever questioned him. Notably, when the FBI executed a search warrant of the van, the front passenger was, in fact, dressed to look like a person was sitting there, with a hat perched on the headrest, and a long scarf around the seat.

The jail-mate will testify that the defendant explained that he often pulls over to a deserted area where this is no GPS or "proof of what happened," and would keep the female transports

---

[2] The United States does not intend to enter the aforementioned evidence in its case-in-chief. However, the photographs may become relevant as defense cross-examination progresses, or as rebuttal or impeachment evidence should the defendant testify or otherwise open the door in his case-in-chief.

quiet by showing his gun or telling them what would happen if they tried to escape. He ultimately explained that in order to get the women to "consent" to sex, he would have to "coerce" or threaten them. In response, the jail-mate told the defendant that sex is not consensual if you have to use a gun. The defendant responded something to the effect of, "That's what you have to do."

The defendant further explained that he reminded the women that he was an agent for the federal government, letting them know that if they reported him, he would always be able to get to them – especially because he had friends in law enforcement.

The jail-mate will testify that the defendant described E.S.'s transport, explaining that he picked her up in Alabama. He admitted that he "fingered" her, but stated that she would not give him a "blow job." He pulled his gun on her and told her that no one was going to hear her when she screamed.

The jail-mate will testify that he challenged the defendant on some of his statements because the defendant professed to be a "godly" man, but his actions seemed counter to that. The defendant responded that he sometimes uses religion as a front for his own benefit because it gives him access to the chaplain's office. He also explained that he liked to dominate women, quoting Bible passages in support of that view and how God intended men to be superior to women.

### iv.   Admissions to His Former Employees

The defendant made statements to his former employees, corroborative of the defendant's state of mind and consistent with other evidence.[3]

---

[3] The defendant's employees were convicted of similar crimes involving sexual assaults of females whom they each transported. To the extent the defendant requests a limiting instruction that these witnesses' convictions have no bearing on the defendant's guilt, the United States agrees to such an instruction.

Specifically, William Cassidy will testify that when the defendant hired him, he told Cassidy that when he transports a female prisoner, as long as he gets where he is going, whatever he does along the way is his business. The defendant also referred to female inmates as "pieces of meat" who are "easy to deal with." He further told Cassidy something to the effect of, "If you promise them the world, feed them well, and give them cigarettes, they will be grateful, and there is a good chance you'll probably get fucked out of it, or at least a blow job." Such testimony corroborates the victims' accounts of the defendant's conduct.

III.  **Legal Analysis**

    **a.  Counts One and Two: 18 U.S.C. § 242 (Deprivation of Constitutional Rights)**

The first two counts of the superseding indictment charge the defendant with violating 18 U.S.C. § 242 for engaging in nonconsensual contact with each victim. Count One charges the defendant with causing his penis to have contact with A.M.'s mouth against her will. Count Two charges the defendant with digitally penetrating E.S.'s vagina and touching her breast against her will.

To establish a violation of 18 U.S.C. § 242, the United States must prove three elements beyond a reasonable doubt: (1) that the defendant acted under color of law; (2) that the defendant deprived the victim of a right secured or protected by the Constitution or the laws of the United States; and (3) that the defendant acted willfully. *United States v. Lanier*, 520 U.S. 259, 264 (1997) ("Section 242 is a Reconstruction Era civil rights statute making it criminal to act (1) 'willfully' and (2) under color of law (3) to deprive a person of rights protected by the Constitution or laws of the United States."). To establish a felony violation of § 242, the United States must prove one additional element: (4) either that the defendant used a dangerous weapon or that the offense resulted in bodily injury, or that the crime included aggravated sexual abuse or

kidnapping. If a § 242 violation results in bodily injury or includes a dangerous weapon, there is a statutory maximum of ten years in prison. If a § 242 violation includes aggravated sexual abuse or kidnapping, the statute provides for a sentence of any term of years or for life imprisonment.

Count One charges the enhancement of aggravated sexual abuse and kidnapping, whereas Count Two charges all four of the aforementioned enhancements.

### i.  **The Elements of Section 242**

#### 1.  Color of Law

To act under "color of law" means to act under some form of state-sanctioned authority. *West v. Atkins*, 487 U.S. 42 (1988); *Griffin v. Maryland*, 378 U.S. 130, 135 (1964); *Williams v. United States*, 341 U.S. 97, 99-100 (1951); *United States v. Classic*, 313 U.S. 299, 326 (1941). Although the defendant was a private prisoner transport officer, he was hired by local jails to perform services for inmates reserved solely within the ambit of the state, and was therefore cloaked in the authority of the state. *West v. Atkins*, 487 U.S. 42 (U.S. 1988) (physician who was under contract with state to provide medical services to inmates at state prison hospital on part-time basis acted under color of state law and such conduct was fairly attributable to state); *See also Gwynn v. TransCor Am., Inc.*, 26 F. Supp. 2d 1256, 1265–66 (D. Colo. 1998) (Privately-contracted transport officer acted under color of law when he sexually assaulted an inmate in his custody. But for his cloak of state authority, he would not have been able to violate her Constitutional rights.). The fact that prison transport is a government function is well-settled law, similar to the act of housing prisoners; *Dailey v. Hunter,* No. 04–392, 2006 WL 4847739 (M.D. Fla. March 22, 2006) (Plaintiff sufficiently pleaded that the defendant transport company acted under color of state law for § 1983 purposes based on the transport company's alleged contract for prisoner transportation with county jail); *Irons v. TransCor America, Inc*., No. 01–4328, 2006

WL 618856 (E.D. Pa. March 9, 2006) (Denying summary judgment in § 1983 action because there existed a genuine issue of material fact as to whether the defendant transport company was a state actor since private prison companies obtain custody over prisoners only by way of state authorization and plaintiff established that "defendants exercised control over him comparable to incarceration."). Based on the defendant's actions, statements, and the fact that he had contracted with Jackson County and Apache County to transport A.M. and E.S., respectively, on out-of-state warrants, it should be undisputed that the defendant was acting under color of law.

2.  <u>Deprivation of A Constitutional Right</u>

Counts One and Two implicate each the victim's right to bodily integrity which lies within the Due Process Clause of the Fourteenth Amendment. *Rogers v. City of Little Rock,* 152 F.3d 790, 793-96 (8th Cir. 1998) (Where a woman was raped by a road patrol officer, the essence of the claim was not excessive force but a claim of "nonconsensual violation of intimate bodily integrity which is protected by substantive due process."). *Rogers* delineates that in order to establish that the defendant deprived each victim of her right to bodily integrity, the United States must establish that the contact or touching at issue was unauthorized or had no legitimate government objective and that it was done without consent. *Id*. at 797; *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *See also Hawkins v. Holloway,* 316 F.3d 777, 784 (8th Cir. 2003) (internal citations omitted) ("Actionable claim under § 1983 for a substantive due process violation may accrue where a public official engages in sexual fondling and touching or other egregious sexual contact under color of state law and concluded the plaintiff alleged facts demonstrating such conduct."); *Haberthur v. City of Raymore, Mo*., 119 F.3d 720, 723 (8th Cir.1997) (Person's substantive due process right to bodily integrity or privacy may be violated by "sexual fondling and touching or other egregious sexual contact." Such conduct "was

intrusive, demeaning, and violative of her personal integrity."). Indeed, the *Rogers* Court held

that sexual assault by law enforcement, like the defendant's conduct as alleged in Counts One

and Two, is *per se* conscience-shocking, stating, "[n]o degree of sexual assault by a police

officer acting under color of law could ever be proper." *Rogers* at 796. Just like in *Rogers* where

a police officer followed a woman home and had sex with her without her consent, thereby

violating her Constitutional rights, here too, the defendant violated the rights of A.M. in Count

One, when he forced A.M. to put her mouth on his penis without her consent, and he violated the

rights of E.S. in Count Two when he digitally penetrated her vagina and grabbed her breast, all

without her consent.

    With regard to Count Two, the superseding indictment charges the defendant with violating

E.S.'s right to bodily integrity through two different means: digitally penetrating her vagina and

touching her breasts. Because each one is a different means of depriving E.S. of her right to

bodily integrity, the jury need not be unanimous as to which means the defendant used. Rather,

the jury must be unanimous that the defendant deprived E.S. of her right to bodily integrity. That

is, they do not have to agree to the way in which the United States proves this element, just that

the element was proven. The Supreme Court illustrated this point in *Richardson v. United States*,

526 U.S. 813, 817 (1999). There, the Court distinguished means from elements, explaining that

"a federal jury need not always decide unanimously which of several possible sets of underlying

brute facts make up a particular element, say, which of several possible means the defendant

used to commit an element of the crime." *Id*. The Court cited to the example of a robbery where

force or the threat of force is an element that the government must prove beyond a reasonable

doubt. The Court opined that "some jurors might conclude that the defendant used a knife to

create the threat; others might conclude he used a gun. But that disagreement—a disagreement

about means—would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely, that the defendant had threatened force." *Id.*; *United States v. Gordon*, 713 F. App'x 424, 430 (6th Cir. 2017) (Unanimity not required where Count Two, the travel charge under § 2423(a), and Count Three, the transportation charge under § 2423(b), provided distinct forms of conduct that the jury had to find Defendant intended in order to convict—either criminal sexual activity with the victim or prostitution. But the types of prohibited sexual conduct—prostitution, criminal sexual acts or sexual activity—represent alternative ways by which the sexual conduct may be accomplished; they are not elements themselves. As such, jury unanimity is not required.").

Regardless, the United States will prove that the defendant deprived E.S. of her right to bodily integrity by engaging in both types of sexual misconduct articulated in the superseding indictment, just as it will prove that defendant engaged in sexual misconduct against A.M. In so doing, the United States will prove that neither victim consented to any of the defendant's conduct. *See Florida v. Bostick,* 501 U.S. 429, 438 (1991) (Noting that "'[c]onsent' that is the product of official intimidation or harassment is not consent at all. Citizens do not forfeit their constitutional rights when they are coerced to comply with a request that they would prefer to refuse.").

As evidenced by the defendant's prior arguments at his detention hearing and statements he made during jail calls, the defendant will predictably attempt to cast the victims as liars. Such a defense is of course to be expected because where the identity of the perpetrator is not an issue, the only defense in every sexual assault case is that the victim is lying. This case is no different, and the United States expects to overcome the defendant's attempts to call the victims' credibility into question with the aforementioned evidence. Nonetheless, such a defense

highlights the importance of the availability of Fed. R. Evid 413 evidence to corroborate a victim's account where there are no independent witnesses to sexual assault. *United States v. Enjady*, 134 F.3d 1427, 1432 (10th Cir.1998) (Rule 413 "continues the movement toward focusing on the perpetrators, rather than the victims, of sexual violence. Since neither stranger nor acquaintance rapes generally occur in the presence of credible witnesses, this rule permits other victims to corroborate the complainant's account via testimony about the defendant's prior sexually assaultive behavior … Corroboratory information about the defendant also limits the prejudice to the victim that often results from jurors' tendencies to blame victims in acquaintance rape cases."). Moreover, to the extent the defendant argues that A.M., and the other victims somehow "jumped on the bandwagon" of the federal investigation, testimony of witnesses to whom they initially disclosed prior to the advent of the federal investigation will belie such an argument. *See* Doc. 81 (Court's order permitting testimony of early disclosure witnesses pursuant to Fed. R. Evid. 802(d)(1) (A prior consistent statement is not hearsay if used to "rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying.")).

### 3. Willfulness

In order to prove that the defendant's conduct was willful within the meaning of 18 U.S.C. § 242, the United States must establish that the defendant acted with the specific intent "to deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them." *Screws v. United States,* 325 U.S. 91, 104 (1945). A "willful act" is one committed either "in open defiance or in reckless disregard of a constitutional requirement which has been made specific and definite." *Id*. at 105. The Supreme Court has held that a defendant acts with the requisite specific intent if he acts with

a bad purpose – *i.e.,* knowing that his actions are wrong – with the effect of violating a clearly established constitutional right. *See United States v. Lanier*, 520 U.S. 259 (1997). The defendant need not specifically intend the resulting constitutional deprivation as long as the defendant intended to commit the act, the act resulted in a constitutional deprivation, and the defendant knew that what he was doing was wrong. *See United States v. Reese*, 2 F.3d 870, 881-82 (9th Cir. 1993). Willfulness can be inferred from an act that violates a clearly established constitutional right, such as sexual assault under color of law. *See Rogers* at 796 (Sexual assault under color of law violates the right to bodily integrity); *Bearchild v. Cobban*, No. 17-35616, 2020 WL 239431, at *9 (9th Cir. Jan. 16, 2020) (Sexual assault by a corrections officer is a constitutional violation and serves no legitimate penological purpose); *Crawford v. Cuomo*, 796 F.3d 252, 260 (2d Cir. 2015) ("Sexual abuse of prisoners, once overlooked as a distasteful blight on the prison system, offends our most basic principles of just punishment.").

In addition to the inference that sexual misconduct is willful as compared to an excessive use of force where a defendant can claim a subjective belief that there was a physical threat to show that his acts were not willful, there is ample evidence to show that the defendant knew his actions were wrong. The defendant demonstrated his intent through the statements and threats he made to his victims, and the manner in which he drove to secluded locations and either threatened or referenced the use of his gun in order to silence his victims. Such evidence establishes consciousness of guilt, and proves that he acted willfully – that he knew what he was doing was wrong and did so anyway.

  ii. **The Enhancements of Section 242**

   1. <u>Bodily Injury</u>

27

Count Two of the superseding indictment charges that when the defendant sexually assaulted E.S., his conduct resulted in bodily injury. "Bodily injury" as defined by the Eighth Circuit Model Jury Instructions includes physical pain or any other injury to the body, no matter how temporary. The United States does not need to prove that the defendant intended to cause bodily injury, only that bodily injury resulted from the defendant's conduct, and that such bodily injury was a natural and foreseeable result of the offense conduct. *United States v. Gonzalez*, 436 F.3d 560, 575 (5th Cir. 2006) (Adopting, in § 242 case, definition of bodily injury set forth in 18 U.S.C. §§ 831(f)(5), 1365(h)(4), 1515(a)(5), & 1864(d)(2)). E.S. will testify that when the defendant digitally penetrated her vagina, his fingernail painfully dug against and scratched her vaginal wall. He further left bruised fingerprint marks on her breast.

### 2.  Use of a Dangerous Weapon

Count Two of the superseding indictment also charges that when the defendant sexually assaulted E.S., his conduct included the use of dangerous weapon. A "dangerous weapon" is defined as a "weapon, device, instrument, material, or substance … that is used for, or is readily capable of, causing death or serious bodily injury." 18 U.S.C. § 930(g)(2); See U.S.S.G. 1B1.1 (Application Notes); *United States v. Ankrum*, 590 F.3d 795 (9th Cir. 2009) (a dangerous weapon is capable of causing death or serious bodily injury). E.S. will testify that the defendant repeatedly put his hand on his gun as he told her that she was an "inmate in transit," and in so doing made her believe that he would shoot her. After he sexually assaulted her, the defendant threw E.S. back in the van, and in an effort to ensure she would not report him, reminded E.S. that it would "only take one bullet to the head."

### 3.  Aggravated Sexual Abuse

Counts One and Two of the superseding indictment both charge that the defendant's conduct included aggravated sexual abuse, *i.e.* that the defendant's sexual assaults of both A.M. and E.S. amounted to what constitutes aggravated sexual abuse. Specifically, the United States has to prove that when the defendant caused A.M.'s mouth to have contact with his penis in Count One, and when the defendant digitally penetrated E.S.'s vagina in Count Two, that the defendant did so using physical force or by threatening or placing each victim in fear of death, serious bodily injury, or kidnapping. 18 U.S.C. § 2241(a); *Cates v. United States*, 882 F.3d 731, 737 (7th Cir. 2018) ("We long ago held that the term 'force' in § 2241(a)(1) means physical force," as applied in a 242 sexual assault prosecution.) (internal citations omitted); *United States v. Shaw*, 2018 WL 2423174, *5 (3d Cir. May 30, 2018). (When proving that § 242 violation included aggravated sexual abuse, force "may be satisfied by a showing of … the use of such physical force as is sufficient to overcome, restrain, or injure a person.) *see also United States v. Lucas*, 157 F.3d 998, 1002 (5th Cir. 1998) ("A defendant uses force within the meaning of § 2241 when he employs restraint sufficient to prevent the victim from escaping the sexual conduct;" *United States v. Webb*, 214 F.3d 962 (8th Cir. 2000) (same); *United States v. Allery*, 139 F.3d 609, 611 (8th Cir. 1998) (Holding that "force sufficient to prevent the victim from escaping the sexual contact satisfies the force element" of § 2241(a)(1)). Although physical force is required, actual violence is not necessary to establish force. *See United States v. H.B.,* 695 F.3d 931, 936 (9th Cir. 2012), *quoting United States v. Lauck*, 905 F.2d 15, 18 (2d Cir. 1990) (rejecting a violence requirement for § 2241.). Both A.M. and E.S. will testify that the defendant took them to dark, secluded locations where they were in fear for their life. A.M. feared that at the very least, the defendant was going to pistol whip her if she did not submit to him. E.S. likewise feared that the defendant was going to shoot her after he forcefully shoved his fingers into her vagina.

29

4.  <u>Kidnapping</u>

Counts One and Two both charge that the defendant's conduct included kidnapping. To establish the kidnapping enhancement under 18 U.S.C. § 242, courts look to the definition of kidnapping under 18 U.S.C. § 1201(a)(1), as well as the modern definition. *United States v. Guidry*, 456 F.3d 493 (5th Cir. 2006) (Holding that defendant officer's conduct came within the kidnapping prong of § 242 where he drove arrestee to a dark, secluded area and raped her). A person commits kidnapping if he "unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person." 18 U.S.C. § 1201(a); *Eighth Circuit Pattern Jury Instructions; Fifth Circuit Pattern Instructions*, ("To 'kidnap' a person means to unlawfully hold, keep, detain, or confine the person against that person's will.")

Holding a victim for the purpose of sex acts satisfies the requirement that the victim was held "for ransom or reward or some purpose or benefit." *Id.*; *See United States v. Redmond*, 803 F.2d 438, 439 & n.3 (9th Cir. 1986) (Holding evidence sufficient to convict defendant of kidnapping "for ransom, reward and otherwise, to wit: for the sexual gratification of [the defendant]"); *United States v. Lutz*, 420 F.2d 414, 416 (3d Cir. 1970) (Defendant's purpose was to rape the victim); *United States v. McBryar*, 553 F.2d 433, 434 (5th Cir. 1977) (Defendant's stated purpose was "to go to bed with" the victim); *United States v. Gabaldon*, 389 F.3d 1090, (10th Cir. 2004) (Holding that the inclusion of the words "or otherwise" criminalizes kidnapping for any "purpose desired by the captor"); *See also United States v. Wesson*, 779 F.2d 1443, 1444 (9th Cir. 1986) (per curium) (Kidnapping occurs where the victim voluntarily accompanies the defendant, but makes her desire to go home known, yet stays with defendant after he rapes her, too scared to try to escape.) Here, the evidence will establish that defendant exploited his

authority as a transport officer and under the guise of lawfully transporting each of the two

victims, unlawfully "seized" and "carried away" when he drove them to isolated, remote

locations, thereby "confining" them through a ruse of getting lost.

### b. Count Three: 18 U.S.C. § 924(c) (Possession of a Firearm in Furtherance of a Crime of Violence)

Count Three of the superseding indictment charges the defendant with violating 18 U.S.C. §

924(c) for possessing a firearm in furtherance of a crime of violence. It specifically charges the

"willful deprivation of E.S.'s right to bodily integrity under color of law, including aggravated

sexual abuse, as alleged in Count Two" (Superseding Indictment, Doc. 31), in light of the

Supreme Court's holding in *Sessions v. Dimaya*, 138 S.Ct. 1204 (2018) (Holding the residual

clause of 18 U.S.C. § 16(b) unconstitutionally vague) and *United States v. Davis*, 139 U.S. 2313

(2019) (Holding 18 U. S. C. §924(c)(3)(B) to be unconstitutionally vague).

To establish a violation of 18 U.S.C. § 924(c), the United States must prove beyond a

reasonable doubt that: (1) the defendant committed a violation of 18 U.S.C. § 242 including

aggravated sexual abuse; and (2) the defendant knowingly possessed a firearm in furtherance of

that crime. *Eighth Circuit Pattern Jury Instructions*; *United States v. Warwick*, 167 F.3d 965,

(6th Cir. 1999); *See United States v. Hawkins*, 59 F.3d 723, 729 (8th Cir. 1996) The phrase 'in

furtherance of' is a requirement that the defendant possess the firearm with the intent that it

advance, assist or help commit the crime, not that it actually did so." *Warwick* at 965. As

described above, E.S. will testify that the defendant repeatedly put his hand on the gun in his

holster, making her believe that he would shoot her if she did not submit to him.  He did so again

just before he digitally penetrated her vagina, first putting his hand on his gun and shoving E.S.

against the van. Moreover, the defendant's admissions to his cellmate establish that the

defendant used his gun to "coerce" women to "consent" to sexual contact.

## IV.   **Anticipated Trial Issues**

Though the United States anticipates that the parties will adhere to the Federal Rules of

Evidence, should there later be a disagreement, the United States raises the following evidentiary

issues for the Court which may arise during trial:

### a.  **Rule of Completeness and the Defendant's Self-Serving Hearsay**

It is a well-established legal principle - and likely goes without saying - that a defendant's

statement can only be introduced by the United States – and not by the defendant – as an

admission by a party-opponent. Fed. R. Evid. 801(d)(2). The rule does not require that the

statement actually be an admission or that it be inculpatory. *United States v. Heppner*, 519 F.3d

744, 751 (8th Cir.2008) (Admission by a party opponent is not hearsay when it is offered against

a party and is the party's own statement); *United States v. Reed*, 227 F.3d 763, 770 (7th Cir.

2000) ("As Rule 801(d)(2)(A) merely renders a statement nonhearsay if it was made by the party

against whom it is offered … the statements need neither be incriminating, inculpatory, against

interest, nor otherwise inherently damaging to the declarant's case … The mere fact that the

admitted … statements [were] made by [the defendant], but offered by the government in its

prosecution of him, makes it admissible under [the rule].").

As discussed above, the defendant made multiple statements, both verbally to women he

transported and to former cellmates and employees, as well as to federal law enforcement in a

lengthy recorded statement. The United States may choose not to introduce all or some of the

defendant's statements during its case-in-chief. If that should happen, the defendant is precluded

from eliciting or introducing his own statements through any witness, whether on direct or cross-

examination, as such statements constitute inadmissible hearsay. Fed. R. Evid. 801(c); *United States v. Nakai,* 413 F.3d 1019, 1022 (9th Cir. 2005) (Holding that the defendant's attempt to elicit his own statements from a witness was "inadmissible hearsay"); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988) (Stating that "[i]t seems obvious defense counsel wished to place [the defendant]'s statement to [law enforcement] before the jury without subjecting [the defendant] to cross-examination, precisely what the hearsay rule forbids." *Id*. (*citing* Fed. R. Evid. 801(c)); *United States v. Willis,* 759 F.2d 1486, 1501 (11th Cir. 1985)).

Similarly, if the United States chooses to introduce portions of the defendant's statements at trial, particularly parts of his recorded statement, the defendant may not introduce other portions of his statements, as those other portions are still inadmissible hearsay if offered by the defendant. *Williamson v. United States*, 512 U.S. 594, 599 (1994) (non-self-inculpatory statements are inadmissible, even if they are made within a broader narrative that is generally self-inculpatory). Additionally, Fed. R. Evid. 106, also known as the "rule of completeness," does not change this conclusion. Rule 106 states, "if a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part — or any other writing or recorded statement — that in fairness ought to be considered at the same time." Fed. R. Evid. 106. Yet, Rule 106 will not be applied where completing the statement does not correct a misleading impression. *United States v. Vallejos*, 742 F.3d 902, 905 (9th Cir. 2014) (Court properly excluded redacted portions offered to show the jury the "flavor of the interview," to "humanize" the defendant to prove his "character," and to convey to the jury the voluntariness of the statement.) Portions that are neither relevant nor explanatory are inadmissible, even if they occur in the same recording. *United States v. Gupta*, 747 F.3d 111, 139 (2d Cir. 2014).

Therefore, as the defendant likely knows, he is prohibited from eliciting or introducing his own statements at trial, either through cross-examination of government witnesses or through his own witnesses in his case-in-chief.

### b.  Opening the Door: S.H. and Other Victims of the Defendant's Bad Acts

As the Court knows from the United States' Notice Pursuant to Fed. R. Evid. 413 and 404(b) (Doc. 35), the federal investigation into the defendant's conduct started because both E.S., and another inmate, S.H., each reported that the defendant sexually assaulted them during separate transports that each terminated at the Apache County Jail in Arizona. Since the advent of the investigation, both during his detention hearing, and in his jail calls to family and friends, it has been the defendant's contention that despite the disclosures of other victims, E.S. and S.H. conspired to fabricate their accounts when they were housed together at the Apache County Jail. Indeed, the United States anticipated that would be the defendant's position even before he knew he was being investigated. Anticipating such a defense, the federal investigation focused largely on determining whether the defendant sexually assaulted other women prior to his sexual assaults of S.H. and E.S. Moreover, the United States also correctly anticipated that if the investigation did reveal additional victims, the defendant would claim that these "new" victims either "jumped on the bandwagon" or that the FBI somehow planted accounts in the minds of his victims. Therefore, the United States took great care not to suggest anything about their transport upon first contacting those who were transported by the defendant. Upon learning that someone was sexually assaulted by the defendant, the United States then sought to uncover evidence of disclosures that pre-dated the advent of the federal investigation in order to both verify their accounts and to bely the "bandwagon" defense.

Given the aforementioned anticipated defenses, and because E.S. initially disclosed some of the defendant's sexual misconduct to S.H. prior to any law enforcement involvement, it initially was, and respectfully remains the United States' position that S.H.'s testimony is inextricably intertwined with the investigation. Doc. 35, page 16, footnote 8; *United States v. Irving,* 665 F.3d 1184, 1212 (10th Cir. 2011), *quoting United States v. Parker*, 553 F.3d 1309, 1313 (10th Cir. 2009) ("Intrinsic evidence is that which is 'directly connected to the factual circumstances of the crime and provides contextual or background information to the jury.'"); *United States v. Heidebur*, 122 F.3d 577, 579 (8th Cir.1997) (internal quotation marks omitted) (Intrinsic acts are "such acts [that] are not truly separate bad acts that show propensity, but are intrinsic evidence which is inextricably intertwined with the crime charged."); *United States v. Nguyen*, 608 F.3d 368, 377 (8th Cir. 2010) (internal citations omitted) (Evidence was not "evidence of other crimes, wrongs, or acts" under Rule 404(b), but was evidence of the criminal activity directly charged in the case at bar.); *United States v. Foster*, 889 F.2d 1049, 1053 (11th Cir.1989) (Evidence is inextricably intertwined with the evidence regarding the charged offense if it forms an "integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted."). E.S.'s and S.H.'s tandem disclosures to each other and their official reports to local law enforcement started the federal investigation, and steered its initial direction.

The Court's Order on the Rule 413/404(b) Notice (Doc. 81) did not explicitly rule on whether S.H.'s testimony was inextricably intertwined, but it did permit the United States to introduce her testimony as of one of three instances of the defendant's other acts of sexual assault, out of five possibilities. Even though the Court did not explicitly make a ruling as to the former, but because the United States has chosen not to call S.H. as one of three Rule 413

witness, the United States will present its case-in-chief without reference to S.H.'s sexual assault. To that end, E.S. may generically testify that she made limited disclosures to S.H., but not will not testify that she did so because S.H. herself disclosed what happened on her own transport.

That said, should the defendant, through cross-examination, his case-in-chief, or otherwise, argue or insinuate that E.S. and S.H. conspired to fabricate their sexual assaults – or should he argue the lack of a thorough investigation, or that he has never engaged in any sort of sexual conduct with women whom he has transported (as he did when he interviewed by the FBI), the defendant runs the risk of opening the door to testimony and evidence about S.H., as well as the other victims listed in the United States' 413 Notice. "The doctrine of opening the door allows a party to explore otherwise inadmissible evidence on cross-examination when the opposing party has made unfair prejudicial use of related evidence on direct examination." *United States v. Bagola*, 796 F.3d 903, 909 (8th Cir. 2015), *citing United States v. Durham*, 868 F.2d 1010, 1012 (8th Cir.1989). Such inadmissible evidence must "clarify or rebut an issue opened up" by opposing counsel. *United States v. Beason*, 220 F.3d 964, 968 (8th Cir.2000).

Therefore, such evidence may become admissible in the United States' rebuttal case or during re-direct examinations. For instance, although the United States expects the defendant to argue that it did not meet its burden, attacking the FBI's failure to take a particular investigatory step may, in fairness, invite the litany of investigatory steps that the FBI did take in order to rebut the misimpression that the investigation was roughshod or sloppy. The FBI seized eight bankers' boxes of records of transports that led the FBI to find at least 18 women with whom the defendant engaged in some level of inappropriate sexual behavior. Many of those victims' accounts were corroborated by records, outcry witnesses, or jail calls. S.H.'s account, for example, has been corroborated by digital evidence, surveillance video, and testimonial

evidence. Understandably in light of the strictures of the Court's Rule 413 order, the United

States will not introduce such evidence. However, any argument on the failures of the federal

investigation runs the risk of opening the door to its thoroughness, the existence of other victims,

and a demonstrable pattern of behavior to prove otherwise.[4]

The Unites States, with deference, intends to follow the Court's order and will take great care

to do so. However, if the defendant opens the door, the United States should, at least, be

permitted upon ruling of the Court, to introduce additional background information about the

investigation to clarify or rebut an issue to correct a misimpression of the jury. *Beech Aircraft*

*Corp. v. Rainey,* 488 U.S. 153, n. 18 (1988) (Statement was not hearsay where it was offered to

contribute to a fuller understanding of what the defense had put at issue); *United States v.*

*Christie*, 624 F.3d. 558 (3d Cir. 2010) (Officer's testimony about what other witnesses said was

offered as background to clarify the defendant's insinuation that there was no reliable foundation

for a federal investigation).

### c.  Admissibility of Prior Convictions[5]

Because the defendant is charged with sexually assaulting women whom he was transporting

on outstanding warrants, many of them necessarily have convictions that are admissible for

impeachment purposes. Fed. R. Evid. 609(1)(A) allows for the admission of a witness's prior

felony conviction for purposes of impeachment, subject to Fed. R. Evid. 403. Under Rule 609,

---

[4] The FBI, among others steps that the United States will not introduce, sought  and executed warrants on the defendant's various social media accounts and digital devices that revealed corroborative evidence of some of the Rule 413/404(b) victims; tracked the defendant for several months until it became apparent that he was driving Uber and Lyft on a college campus, and community safety was at risk; interviewed former business partners, friends, and relatives about past abusive relationships; uncovered disturbing, though not illegal, pornographic images, cartoons, and articles about a serial rapist.

[5] The United States did not file a motion in *limine* to address this issue because counsel for the defendant has agreed that the parties will adhere to the Federal Rules of Evidence as it relates to the admissibility of prior convictions for the purposes of impeachment. Accordingly, the parties expect to reach an agreement as to this issue prior to trial. The United States provides this analysis as it relates to A.M. and E.S. only, should a disagreement arise.

the scope of inquiry into prior convictions is limited. "[A]bsent exceptional circumstances, evidence of a prior convictions admitted for impeachment purposes may not include collateral details and circumstances attendant upon the conviction." *United States v. Sine*, 493 F.3d 1021, 1036 n. 14 (9th Cir.2007) (internal citations omitted). Generally, "only the prior conviction, its general nature, and punishment of felony range [are] fair game for testing credibility." *United States v. Albers*, 93 F.3d 1469, 1480 (10th Cir.1996); *see also United States v. Gordon*, 780 F.2d 1165, 1176 (5th Cir.1986) (Limiting cross-examination to "the number of convictions, the nature of the crimes and the dates and times of the convictions" and excluding "the particular facts of previous offenses"). Based on the United States' information to date, A.M. has four felony convictions and E.S. has one felony conviction admissible for impeachment purposes under Fed. R. Evid. 609(1)(A).

E.S. has also been convicted of another felony that is more than 10 years old. Rule 609(b) precludes admission if more than 10 years have elapsed since the conviction, unless the probative value substantially outweighs the prejudice. Fed R. Evid. 609(b).[6]  Specifically, in 2008, E.S. was convicted of felony child abuse for which she was sentenced to probation. E.S. was 15 years old at the time, and was charged as an adult for not getting immediate medical care for her infant, who had been physically abused by the baby's father. Rule 609(b) "establishes what is in effect a rebuttable presumption against the admissibility of prior convictions more than ten years old." *United States v. Felix*, 867 F.2d 1068, 1073 (8th Cir. 1989) (internal citations omitted). It is for the trial court to "determine the 'interests of justice' in considering whether

---

[6] Fed. R. Evid. 609(b)(2) requires "the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." Although the prosecution has not received such notice from the defendant, the United States opposes admission of these convictions should it receive one, and raises it here in the abundance of caution, though expects the parties to resolve any issue via stipulation prior to trial.

evidence of prior crimes should be admitted at trial, in accordance with the terms of Rule 609(b)," *United States v. Singer*, 660 F.2d 1295, 1300 (8th Cir. 1981) (internal citations omitted).

Here, the interests of justice disfavor the admissibility of this conviction. Allowing the jury to learn of E.S.'s stale conviction would only serve to improperly smear a sexual assault victim with a crime she committed more than a decade ago that has no bearing on her credibility. E.S., who was a juvenile at the time (although charged as an adult), took responsibility for her actions and was sentenced accordingly. She paid her penance, and should the jury learn of a child abuse conviction, it will be unduly prejudiced, where in fact, the circumstances surrounding the conviction suggest that E.S. was also being abused. The jury will already learn that E.S. is a convicted felon due to her burglary conviction in 2017 that was the underlying reason for the transport at issue in this case. An additional conviction will add no more probative value.

### d.  The Use of an FD-302 for Impeachment

Most of the United States' witnesses did not give prior statements that were memorialized verbatim. However, federal law enforcement agents did interview every witness, and those agents summarized the interviews in reports and FBI FD-302s. Such summaries about a witness's statements are not tantamount to that witness's actual statements. *See United States v. Severson*, 49 F.3d 268, 271-72 (7th Cir. 1995); *United States v. Schoenborn*, 4 F.3d 1424, 1427 (7th Cir. 1993) (Explaining that a third party's characterization of a statement is not the same as an actual prior statement, unless the witness subscribed to that characterization); *United States v. Burton*, 387 Fed.Appx. 635, 638 (7th Cir. 2010) (same); *United States v. Saget*, 991 F.2d 702, 710 (11th Cir. 1993) (same).

While the United States does not expect its witnesses to testify inconsistently with any of their prior accounts, time, nerves, and trauma are the enemy of sharp memory, especially as it

relates to small details. That said, a witness cannot be impeached with someone else's statement, and therefore cannot properly be impeached using an FD-302 or agent's report. *See United States v. Bao*, 189 F.3d 860, 866 (9th Cir. 1999) ("Only the declarant of the prior inconsistent statement, not another witness, may be impeached with the statement."); *United States v. Tarantino*, 846 F.2d 1384, 1416 (D.C. Cir. 1988) ("Witnesses are not impeached by prior inconsistent statements of other witnesses, but by their own prior inconsistent statements."); *Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir. 1995) ("Whereas an inconsistent statement by a testifying witness can be used to impeach that witness's credibility, an inconsistent account by another source is offered to show an alternative view of the truth."); *Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 718 (4th Cir. 2014) (Explaining an unsigned proposal that was not adopted by the defendant should not have been admitted as a prior inconsistent statement). Should a witness be asked if he or she told law enforcement something different, and the witness denies it, the attempt to impeach with that particular witness must end. *United States v. Adames,* 56 F.3d 737, 744-45 (7th Cir. 1995) (If an attorney begins the impeachment process thinking the witness had made a previous statement, but the witness denies adopting that statement, and the attorney can offer no further proof that the witness made the adopting statement, the impeachment must cease).

### e.  Inadmissibility of Evidence of the Defendant's Good Character

Fed. R. Evid. 404(a)(1) generally prohibits the introduction of evidence of the defendant's character to prove that the person acted in conformity therewith on a particular occasion. Such evidence is admissible only if it relates to a "pertinent" or relevant character trait. Fed. R. Evid. 404(a)(2)(A). The United States speculates that if the defendant attempts to admit good character evidence, it would either be in the form of his military service from 1989 or the fact that he has

become religious and has led prayer circles in custody. Neither is material to whether he sexually assaulted two women whom he transported. *See United States v. Neighbors,* 23 F.3d 306, 310 (10th Cir. 1994) (Trial court properly excluded defendant's good character evidence that he was asked to serve on the board of a substance abuse center because of his strong advocacy against drug abuse because such evidence was not material to whether the defendant, a pharmacist, had violated federal drug statutes by over-ordering several kinds of drugs on behalf of his pharmacy and converting them to his own use); *See also United States v. Washington,* 106 F.3d 983, 999-1000 (D.C. Cir. 1997) (Police officer's commendations were not admissible because the defendant's "dedication, aggressiveness and assertiveness" in investigating drug dealing and carjacking was neither "pertinent" to, nor an "essential element" of, bribery, conspiracy, or drug and firearms charges with which he was charged); *United States v. Nazzaro,* 889 F.2d 1158, 1168 (1st Cir. 1990) (Trial court properly excluded evidence of a police officer's prior commendations because "the traits which they purport to show -- bravery, attention to duty, perhaps community spirit -- were hardly 'pertinent' to the crimes [of perjury and conspiracy to commit mail fraud] of which [the defendant] stood accused.").

Even if evidence of the defendant's prior good acts were indicative of a pertinent character trait or of general law-abidingness – which they are not - Fed. R. Evid. 405(a) limits such evidence to "testimony as to reputation or by testimony in the form of an opinion." Based on the investigation to date, the United States speculates that the defendant may seek to admit the testimony of his mother in this regard. First, she should not be permitted to testify about specific instances of good conduct. Such evidence is not permitted under Rule 405(b), except in cases where the "character or a trait of character of a person is an essential element of a charge, claim, or defense." *United States v. Bordeaux*, 570 F.3d 1041, 1050 (8th Cir. 2009). Such is not the case

here. Second, even if she is permitted to offer some sort of opinion or reputation testimony regarding the good character of the defendant, the United States would then be permitted under Rule 405(a) to inquire of the witness on cross-examination about their knowledge of specific acts of misconduct by the defendant, to include other acts of sexual misconduct and sexually inappropriate behavior that would otherwise be inadmissible. In order to make such inquiry, the United States "must meet two important requirements before utilizing this type of questioning. First, the Government must demonstrate a good faith factual basis for the incidents raised during cross-examination of the witness. Secondly, the incidents inquired about must be relevant to the character traits at issue in the case." *United States v. Monteleone,* 77 F.3d 1086, 1089-90 (8th Cir. 1996) (internal citations omitted). The United States will have met both requirements, and should the circumstance arise, therefore be permitted to inquire about the witness's knowledge of the defendant's various sexual assaults.

### f.   Reference to Equally Available Witnesses During Closing Arguments

The investigation into the defendant's misconduct spanned nearly three years and federal authorities interviewed dozens of witnesses. However, the United States intends to list about 25 witnesses on its witness list and will likely call less than 20 witnesses to testify. All of these witnesses are available to the defendant to call in his case-in-chief, and because these witnesses are equally available to either party, no adverse inference may be drawn from the failure of one party to call them." *Illinois Cent R. Co. v. Staples*, 272 F.2d 829, 834 (8th Cir. 1959); *See also General Dynamics Corp. v. Selb Mfg Co*., 481 F.2d 1204, 1217 (8th Cir. 1983). It would therefore be improper for the defendant to comment in closing argument on the United States' failure to call a particular witness.

The Eighth Circuit Court of Appeals addressed this issue in the context of a missing witness instruction. In *Walker v. United States*, 489 F. 2d 714 (8th Cir. 1974), the Court upheld the trial court's refusal to give an instruction about the prosecution's failure to produce a witness, holding that the defendant "made no adequate showing that the government at the time of trial possessed the sole power to produce [the person at issue] as a witness. Moreover, [the defendant] did not request that the government make [this person] available as a witness, either at the time of trial or earlier." *Id* at 716.  Furthermore, the Court cited E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 11.33 (1970), which states, "If it is peculiarly within the power of either the prosecution or the defense to produce a witness who could give material testimony on an issue in the case, failure to call that witness may give rise to an inference that his testimony would be unfavorable to that party. However, no such conclusion should be drawn by [the jury] with regard to a witness who is equally available to both parties, or where the witness's testimony would be merely cumulative. The jury will always bear in mind that the law never imposes on a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence." Id at n.1. *See also United States v. Hoenscheidt*, 7 F.3d 1528, 1531 (10th Cir. 1993); *United States v. Bramble*, 680 F.2d 590, 592 (9th Cir. 1982) (Upholding denial of missing witness instruction where witness was equally available to both sides).

To the extent the defendant may want to call a witness that the United States has under subpoena, the United States will ensure that such witness is available to the defendant. Although the United States does not expect the defendant to argue that it failed to call certain witnesses (as opposed to arguing that the United States failed to prove its case), should he do so, such an argument would incorrectly imply that the failure to call a witness was because that witness

might exculpate the defendant or negatively reflect on the United States' case. No such witness

exists, let alone an equally available one.

     The United States respectfully files this brief this 11th day of February, 2020.

          Respectfully submitted,

          ERIC S. DREIBAND
          Assistant Attorney General
          Civil Rights Division
          U.S. Department of Justice

          FARA GOLD
          Special Litigation Counsel
          MAURA WHITE
          Trial Attorney
          Civil Rights Division, Criminal Section
          U.S. Department of Justice
          950 Pennsylvania Ave, NW
          Washington, DC 20530