IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 4:17CR-00267-DPM |
| | ) | |
| | ) | |
| ERIC SCOTT KINDLEY | ) | |

## UNITED STATES' SENTENCING MEMORANDUM

The United States of America, through its undersigned prosecutors, respectfully files this sentencing memorandum and requests that this Court impose a life sentence on the defendant. It is the only sentence that can guarantee the safety of the public, and it is only just punishment for his egregious and predatory crimes.

### I.   PROCEDURAL HISTORY

On March 12, 2020, a jury convicted the defendant, a private prisoner transport officer, of all three counts in the superseding indictment related to his sexual assaults of two women in his custody during two different transports. Counts One and Two charged the defendant with violating 18 U.S.C. § 242 for depriving each woman of liberty without due process of law which includes the right to bodily integrity, as guaranteed by the U.S. Constitution. The conduct underlying Count One was that the defendant forced his penis into A.M.'s mouth against her will. The conduct underlying Count Two was that the defendant forced his fingers into E.S.'s vagina and grabbed her breasts against her will. The jury made specific unanimous findings beyond a reasonable doubt that both of the defendant's violations of 18 U.S.C. § 242 included Aggravated Sexual Abuse and Kidnapping. The finding as to each one of those enhancements carries a maximum penalty of

imprisonment for life.[1] The third count for which the defendant was convicted was a violation of 18 U.S.C. § 924(c), for possessing a firearm in furtherance of a crime of violence, *i.e.* the aggravated sexual abuse of E.S. That count carries a mandatory penalty of five years in prison, consecutive to the sentences imposed on Counts One and Two.

A sentencing hearing is scheduled for November 17, 2020.

## II.    FACTUAL SUMMARY

The Court, having presided over the jury trial of this case and reviewed and ruled on all of the accompanying pleadings, knows the facts well. Therefore, other that providing a short summary, the United States will not recite all of the facts here. Rather, this memorandum will focus on why those facts essentially mandate a life sentence - to the extent that words on a page can adequately reflect the staggering havoc that the defendant wreaked on those whom he was sworn to protect.

The defendant operated his own private prisoner transport company for at least 15 years, first as Court Services, Inc. (CSI), from 2002 to 2013, and then as Group 6, LLC, a company doing business as Special Operations Group (SOG), from 2013 until his arrest on June 1, 2017. His prisoner transport companies were unregulated, were not subject to oversight of any kind, and the defendant frequently transported female inmates alone without another transport officer present. During these transports, the defendant exploited the lack of regulation and repeatedly created the opportunity to sexually assault these women with impunity and without being detected.

The Court heard from six women whom the defendant transported: A.M., E.S., K.G., M.P., K.K., and T.W. Initials are used here to protect their privacy, but the Court knows their full names, saw their faces, and heard them testify in agony as they re-lived their transports. They, like the

---

[1] The jury also made unanimous findings beyond a reasonable doubt as to Count Two that the defendant's conduct resulted in bodily injury to E.S., and that his conduct involved the use of a dangerous weapon. The findings as to each of those enhancements carries a maximum penalty of 10 years in prison.

other women listed below by their initials, are human beings with the same worries, hopes, and constitutional rights afforded to every person in the United States, despite the defendant's efforts to treat them otherwise.

Their transports spanned five years, from 2012 to 2017. The women who testified, just like all of the others, have never met, and only learned of the others' names when asked during direct examination whether they knew one another. They do not. Nonetheless, their accounts mirrored one another. The defendant drove an unmarked white van; he transported each woman alone; he made sexually explicit comments that escalated in depravity; he drove to dark, secluded locations, often under a ruse that he was lost; he put each woman in fear of being raped or killed. In many instances – four of which this Court heard during trial - the defendant's conduct included a brutal sexual assault. Each and every time, the defendant falsely bragged that knew important people in government and law enforcement, making his victims believe that it would be both pointless and dangerous to report him. They were "inmates in transport," as though they were not human, but rather receptacles for his predation.

In January 2017, E.S. and another woman, S.H., were housed together in a county jail in Arizona after the defendant sexually assaulted each of them during separate transports. Fortuitously, they both disclosed to a third inmate who then reported the defendant to local authorities. Those authorities referred the matter to federal authorities.

Knowing that the defendant would falsely claim that E.S. and S.H. conspired to fabricate their accounts, despite no motive to do so, the prosecution team focused its investigative efforts on finding the defendant's past victims. His sexual assaults of E.S. and S.H. appeared to be too practiced and too brazen to have been the defendant's first ones. Moreover, as E.S. testified, the defendant bragged to her about his sexual misconduct during prior transports. A three-year

investigation ensued that only halted because this trial commenced. And, as detailed below, the defendant's criminal conduct ceased only because FBI agents arrested him just as he had begun to work as a ride-share driver. That years-long investigation uncovered 16 women whom the defendant subjected to some form of sexual misconduct during transport, often culminating in forceful sexual assault. The investigation also revealed that the defendant employed the same behavior in his home life, using psychological manipulation and extreme fear to control the lives of his domestic partners. (*See* Doc. 35, United States' 413/404(b) Notice, Victim Impact Statements (VIS) of K.M.K. and E.H., Exs. 12 and 13).

## III.    LEGAL ARGUMENT

A life sentence is the only fair and just sentence. It is what the United States Sentencing Guidelines ("The Guidelines") recommend, and is what the defendant's crimes warrant. In order to impose such a sentence, the Court must first calculate the correct Guidelines range, and then consider the factors set forth in 18 U.S.C. § 3353(a) to "make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 49–51 (2007).

### a.    The PSR's Guidelines Recommendation of Life in Prison

The United States, consistent with the analysis in its brief addressing the defendant's Pre-Sentence Report (PSR) objections (Doc. 144) and its supplemental limited response to those objections (Doc. 147), urges the Court to adopt the calculations set forth in the PSR. Those calculations result in a total offense level of 52. That is nine levels above 43, the maximum level accounted for by the Sentencing Table. Indeed, the defendant's crimes were off the proverbial charts. The recommended sentence for a level 43 or higher is life in prison.

Notably, this sentence recommendation only accounts for the defendant's sexual assaults of A.M. and E.S., as charged in the superseding indictment and for which he was convicted. It does

not account for the sexual assaults of K.G. and M.P., in Florida and California, respectively, the attempted sexual assault of K.K. on an icy road en route to Montana, or the fear he instilled in T.W. en route to New Mexico, when he made her believe that he was about to rape her. Nor does it account for the defendant's similar and equally predatory and life-altering sexual misconduct to which he subjected those whom he transported and who did not testify at trial: S.H., C.B.1, C.B.2, K.A., A.K., M.L. M.M. and D.C.[2]

> b.   The 3553 Factors Necessitate A Life Sentence

In addition to considering the Guidelines' recommended sentence, the court must also consider factors set forth in 18 U.S.C. § 3553(a). Those factors guide the court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth in the statute, *i.e.*, most relevantly, to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C). The only sentence sufficient to meet those purposes is a life sentence.

> i.   History and Characteristics of the Defendant

In addition to the aforementioned statutory purposes, the court must also consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). In that vein, the Court should look not only to the heinous crimes committed against A.M. and E.S. for which he was convicted, but also to the defendant's demonstrated pattern of practiced predatory behavior and the widespread devastation that he left in his wake.

The Supreme Court has repeatedly held that a trial court can and should consider uncharged relevant conduct when imposing a sentence in order to fully understand the scope of the

---

[2] Had the United States been jurisdictionally permitted to charge all of the defendant's crimes in one jurisdiction, we would have done so.

defendant's conduct. *United States v. Watts*, 519 U.S. 148, 151–52, (1997) (internal citations omitted) ("Highly relevant-if not essential [to the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."). This includes a defendant's past criminal conduct, even if such conduct did not result in a conviction or is beyond the reach of federal jurisdiction. *See Nichols v. United States*, 511 U.S. 738, 747 (1994); *see also Edwards v. United States*, 523 U.S. 511, 513–14 (1998). The defendant's uncharged criminal conduct committed against all of women whom he transported falls into this category, as does his sustained abuse against K.M.K., his former wife, and E.H., his former live-in girlfriend. E.H. served, without compensation at the defendant's insistence, as his company's bookkeeper. In doing, she unwittingly – and through no fault of her own - abetted his depravity by arranging contracts with local jails, giving the defendant the authority to transport the women whom he would later victimize.

The court may rely upon such uncharged relevant conduct to enhance a sentence imposed within statutory limits. *United States v. Mustafa*, 695 F.3d 860, 862 (8th Cir. 2012). The Guidelines themselves are instructive on this point. It specifically notes that a "plea agreement . . . containing a stipulation that specifically establishes the commission of additional offenses shall be treated as if the defendant had been convicted of additional counts charging those offenses." U.S.S.G. § 1B1.2(c). While the defendant did not plead guilty nor did he stipulate to any facts, it is telling that the Guidelines would otherwise consider – and treat as a conviction – uncharged conduct when calculating a sentencing recommendation. Here, however, the United States is not asking the Court to enhance the defendant 's sentence because of all of the defendant's criminal conduct. Rather, the United States is asking the Court to follow, and not deviate from, the Guidelines' recommendation of life imprisonment because of all of it. Moreover, it is certainly well within the

Court's prerogative to rely on the defendant's uncharged conduct relative to the four additional victims who testified. For those instances of misconduct, the Court itself had the opportunity to listen to their testimony and consider all of the evidence that corroborated their accounts.

ii.  <u>Reflecting the Seriousness of the Defendant's Offenses, Promoting Respect for the Law, and a Just Punishment</u>

The United States next addresses three of the sentencing purposes contemplated by 18 U.S.C. § 3553(a)(2)(A), namely, reflecting the seriousness of the defendant's offenses, promoting respect for the law, and imposing a just punishment. In so doing, we emphasize that all of this Court's considerations should ultimately conclude that a life sentence is the only just punishment because it is the only possible sentence that truly reflects the gravity of the defendant's crimes.

1.  <u>Promoting Respect for the Law</u>

The United States hesitates to suggest that any sentence would promote the defendant's respect for the law. The federal investigation established that the defendant does not believe the law applies to him. During his recorded jail calls, he unoriginally, but repeatedly, referred to this investigation as a "witch hunt." He flagrantly flouted his constitutional obligations with every turn he took down a dark and isolated road with a terrified woman in his custody. As his former wife wrote in her victim impact statement, the defendant believes that "rules don't apply to him." (Ex. 12). But while the defendant may never respect the law, a life sentence may begin to restore the public's confidence in, and therefore respect for, the rule of law – especially where the defendant committed unspeakable acts while exploiting the authority granted to him by virtue of acting under color of law.

The defendant's abuse of authority was an insidious betrayal of the public trust, and the manner in which the defendant did so was unimaginably egregious. Indeed, the recurring theme among all of the victim impact statements (VIS), (Ex. 1-13), was the corrosive impact of a person with power

shattering their trust with his vile words and acts. As E.S. wrote, "I was in in the hands of what I thought would be the law and a person that was there to protect me. I encountered countless officers through 9 states, 1500 miles, and feared all of them. I still struggle with any sort of [law enforcement] and probably forever will." (Ex. 2.). *See also, M.P.'s VIS* (Ex. 3) ("Growing up in a colored neighborhood, it was a 'thing' not to like the police. I never disliked them, I never had a problem with police….now, SMH I question everyone."); *K.G.'s VIS* (Ex. 4) ("I have a hard time trusting any male authority figure, especially in the justice system."); *J.M.'s VIS* (Ex. 5) ("What he did to me also made me fear law enforcement and I have lost trust in everyone…"); *M.L's VIS* (Ex. 6) ("I'm wary of government officials because of what Eric Kindley had said and done during my transport …The offender in this case used his so called 'position of power' to cause myself to endure undue stress, grief, and loss of self-worth."); *J.S.'s VIS* (Ex. 8) (I have been afraid to leave my house. I no longer trust men (especially ones who are supposed to protect me). I no longer trust the judicial system."); *S.H.'s VIS* (Ex. 9) ("That power that he had, to just be able to do that to anyone he wanted to makes me sick. All under the guise of being a federal marshal. He used that badge to abuse me instead of protect me. I don't like talking to cops now because of this. I live in constant fear and it's always in the back of my mind that law enforcement has something over me. That badge of his destroyed my life.").

There continues to be a pervasive and long-term impact on the victims individually, but the defendant's exploitation of his Constitutional authority also has a deleterious effect on the rule of law generally. Adherence to the rule of law is essential for a civil society to function. Those who think they are beyond the reaches of the law, and act accordingly, need to be held account. That is why courts have held that crimes committed by those who abuse their positions of authority should be treated more seriously than crimes committed by private citizens. *See United States v. Thames*,

214 F.3d 608, 614 (5th Cir. 2000) ("[A] defendant's status as a law enforcement officer is often times more akin to an aggravating as opposed to a mitigating sentencing factor, as criminal conduct by a police officer constitutes an abuse of a public position."); *United States v. Hebert*, 813 F.3d 551, 563 (5th Cir. 2015) (affirming an upward variance in the sentencing of a defendant-officer based on the district court's finding that the defendant abused his position of trust when committing the offense). It is also why the Guidelines impose a six-level enhancement for crimes committed under color of law. See U.S.S.G. § 2H1.1.[3]

2. Reflecting the Seriousness of the Offenses and Imposing a Just Punishment

The fact that the defendant acted under color of law when he violently sexually assaulted his victims only begins to reflect the seriousness of his offenses. To adequately articulate the severity of his conduct, the United States refers the Court to the trial testimony, and to the attached victim impact statements. The victims' words better capture the depths of the defendant's depravity than the United States ever could. (Attachment 1, Exs. 1-13).[4] There is little more to add except to highlight the gravity and the impact of the defendant's crimes that the Court may not otherwise know.

To that end, each victim traveled to Arkansas from out-of-state to testify at trial. Although the United States paid their travel expenses, it was not without cost to them. Most were not within driving distance, and they had to travel alone to confront the most terrifying experiences of their lives and to see, for the first time since their respective transports, the very person who inflicted

---

[3] The United States anticipates that, like most defendants convicted of violating 18 U.S.C. § 242, the defendant will cite to *Koon v. United States*, 518 U.S. 81 (1996), as a basis for a variance, claiming that as a transport officer, he is susceptible to prison abuse. But that is not reason enough. Unlike the officers in *Koon* who infamously assaulted Rodney King, there was no "extraordinary notoriety and national media coverage of this case" warranting a departure due to "*unusual* susceptib[ility] to prison abuse." *Id* at 111-112. Moreover, the defendant has been in federal custody since June 1, 2017, without incident, as corroborated by his thousands of recorded jail calls.

[4] Unredacted victim impact statements have been simultaneously provided to the Court and filed under seal, pursuant to the Court's order. (Doc. 137).

that harm on them. K.G., for example, who lives two hours from the nearest airport, had to use a shuttle service to get home from the airport, despite her fear of being transported.

The defendant's victims only now know that they were not alone in being targeted by the defendant. Though many assumed that there were others because he so flagrantly bragged of his sexual conquests during transports, they nonetheless feared they were alone in disclosing what happened, and they were therefore hesitant to meet with the prosecution team during the investigation. This was not only because the defendant instilled long-term distrust in law enforcement, but also because he lied and claimed he was friends with people in law enforcement and that no one would ever believe them. Because of that, the prosecution team met them wherever they felt most safe: in prison offices and empty cafeterias in Texas, Arizona, and New Mexico, on park benches and in libraries in Arkansas and Louisiana, late at night or early in the morning in FBI offices in Washington and Montana, and in their homes, in the corner of empty restaurants, or in the backseats of cars, out of earshot from their families, in Pennsylvania, California, and Minnesota.

Despite the prosecution team's attempts to reassure them that the defendant could no longer hurt them, that the jury was there to listen to their accounts, and that they had no reason to be ashamed of what the defendant did to them, many of his victims remained fearful, distrustful, and shameful. E.S. wrote in her VIS, "I struggled to tell my story because how could I trust a jury or system that let me down before, not to let me down again." (Ex. 2). Likewise, minutes before K.K. testified, she waited in the witness room, and was still undecided as to whether she could withstand being in the vicinity of the defendant. As this Court knows, she ultimately did, deciding that she had to do her part, lest the defendant be released from custody and kill his next victim, had he not

already done so – something which she feared during her entire transport.[5] Minutes before A.M. testified, she waited in the United States Marshal Service (USMS) holding block, petrified of the USMS deputies, believing that they were friends of the defendant. She was relieved after her testimony, both because she realized she was safe and because she able to tell the jury what happened to her without vomiting in front of them, as she feared she would do. M.P. was similarly, although unwarrantedly, ashamed to look at the jury while testifying about the specifics of what the defendant did to her in the bathroom stall of that park in California. Rather than look at the floor and whisper as she often did when recounting her ordeal, she kept her head up and remained facing the jury, choosing on her own to get through it by closing her eyes when she spoke of the most traumatizing part of the defendant's conduct.

There are few crimes more serious than a serial predator who abuses the powers afforded to him by the state to essentially kidnap and terrorize the women whom he was entrusted to keep safe. Although they will recover and thankfully, many have found peace by testifying and/or providing impact statements, the defendant has caused irreparable harm to more than a dozen lives, in the most horrific and calculated manner. The only just punishment that could ever reflect the severity of his offenses or begin to restore respect for the law is a sentence of life in prison.

### iii.   Deterrence and Protecting the Public From Further Crimes of the Defendant

The United States cannot emphasize enough the importance of protecting the public from defendant and deterring his additional criminal conduct. 18 U.S.C. § 3553(a)(2)(C)-(D). If past is prologue, there is absolutely no reason to think that the defendant will not reoffend. He has shown neither remorse, nor any humanity in the wake of the extraordinary evil that he has brought upon

---

[5] K.K. declined to submit a victim impact statement, deciding instead that she wants to move on and no longer think about the defendant's conduct.

the women who have entered his life. If the defendant gets released from prison, he will again create an opportunity to abuse, rape, or terrorize, and he will seize upon it.

The United States is not asking this Court to sentence the defendant to life in prison in order to generally deter sexual assault by those acting under color of law. In truth, the United States is skeptical that such deterrence is even possible. The defendant is proof of that. Two of his former CSI employees were federally prosecuted for similar conduct and sentenced to prison. See *United States v. Albert Long*, 09-cr-29 (W.D. Ky., 2011); *United States v. William Cassidy*, 14-cr-41 (N.D. Fla., 2015). It did not stop the defendant. Rather, he simply followed the advice that he gave to his colleagues to not get caught. And, as the trial established, he was successful at evading detection for a very long time. In fact, all of the criminal conduct about which the Court heard at trial occurred from 2012-2017, after one of his employees had been prosecuted and in the midst of the prosecution of another employee. Obviously, their prison sentences did not deter him. The only way to deter the defendant's future criminal conduct is to deny him the opportunity to ever again engage in such conduct. The only way for the court to protect the public from the defendant is to ensure he remains in prison for the rest of his life. *See United States v. Jeffries*, 615 F.3d 909, 912 (8th Cir. 2010) (Upholding the statutory duty to impose a sentence that will protect the public from a defendant's further crimes as the basis for sentencing him at the top end of his guideline range).

The United States is not merely hypothesizing that the defendant is likely to reoffend if given the opportunity. The United States respectfully calls this Court's attention to, and incorporates herein, its Response in Opposition to Defendant's Motion for Bond (Doc. 21, pages 11-13 ).[6]  In a subsection within that pleading entitled, *"The Advent of the Federal Investigation and the Defendant's Ongoing Threat to the Community,"* the United States detailed the defendant's

---

[6] On February 27, 2018, the Honorable Beth Deere ordered the defendant be detained pending trial. (Doc 23).

conduct between February 6, 2017, when federal authorities first learned of his sexual assaults on E.S. and S.H., until June 1, 2017, when FBI agents arrested the defendant in California. In short, while the FBI was covertly monitoring the defendant to ensure the safety of the women he transported as the investigation progressed, he engaged in his typical pattern of behavior with C.B.1, who did not testify at trial. He drove to a secluded location, threatened to shoot her and perform oral sex on her, but C.B.1 managed to convince him not to do so because she had her period.

After that, the defendant had a lull in his transports, as the prosecution team began preparing search warrants and an arrest warrant. Unexpectedly though, the defendant then began driving for rideshare companies and the FBI later found that during the same time frame, the defendant possessed sexually graphic memes and had been accessing a pornographic website related to sexual misconduct with rideshare passengers. It was at that point that the FBI could no longer ensure public safety, and agents exigently arrested the defendant.

Now, just as then, the only way this Court can ensure public safety is to ensure the defendant remains in custody. There are only two differences between now and when the defendant was initially detained pending trial. First, now he is a convicted, rather than an accused rapist. And, second, in early 2018, the United States was aware of only six victims. Now, the United States knows of 18, including his former domestic partners - and A.M., whose sexual assault formed the basis of Count One of the superseding indictment, and about whom the prosecution team did not know until the fall of 2018.

       c.   <u>There is No Basis for a Variance</u>

The Guidelines' recommendation coupled with consideration of the 3553 factors support a sentence of life in prison. It really is the only reasonable sentence in light of the facts and

circumstances. It is what justice requires. In order to vary from the Guidelines, the Court must consider "the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance, [and] a major departure should be supported by a more significant justification than a minor one." *Gall* at 50. There is no such justification, sufficiently compelling or otherwise, to warrant any departure - let alone one that would be at least a 10-level reduction of the Guidelines calculation. Indeed, that is the smallest departure necessary to correspond to a recommendation range where the low end of the range would be less than life in prison.

A life sentence is in line with similar cases with similarly egregious conduct. In 2016, the Eighth Circuit Court of Appeals upheld a life sentence of a 66-year old defendant who was convicted of sexually assaulting three of his grandchildren. *United States v. St. Claire*, 831 F.3d 1039, 1043 (8th Cir. 2016). A fourth grandchild testified pursuant to Fed. R. Evid. 414. *St. Claire*, 831 F.3d at 1042. In so holding, the court noted that the Guidelines recommendation was life in prison, and that the trial court properly considered the 3553 factors. *Id*. at 1043. Like here, "the evidence was overwhelming," and like here, that defendant "demonstrated a high risk to re-offend." *Id*. Also similar to the facts here, the "sexual assaults occurred over a period of a decade, [the defendant] abused the trust … that he had with his [victims], he showed no remorse, and he made attempts to cover up his crimes." *Id.*[7]

---

[7] The defendant in that case sought a 30-year sentence, citing his age of 66 years old. The trial court rejected that as a basis for a lower sentence. The United States anticipates that the defendant here will make a similar argument because he is 52-years old. But "age is normally not relevant to sentencing, unless the defendant is elderly or infirm." *United States v. Lee,* 454 F.3d 836, 839 (8th Cir. 2006); *see also* U.S.S.G. § 5H1.1 ("Age may be relevant in determining whether a departure is warranted if considerations based on age … are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."). The defendant is neither, even if he were to argue that he has diabetes and requires insulin. The defendant has been in custody since June 1, 2017, and has been provided with requisite medical care. There is nothing unusual or extraordinary about the defendant's insulin needs that the Bureau of Prisons cannot meet, especially compared to if he were out of custody, without employment and without health insurance. *See* U.S.S.G. § 5H1.4 ("Physical condition … may be relevant in determining whether a departure is warranted, if the condition … is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward."

In *United States v. Shaw,* 891 F.3d 441, 446 (3d Cir. 2018), after trial, a corrections officer was sentenced to 25 years in prison for sexually assaulting an inmate, in violation 18 U.S.C. § 242, including aggravated sexual abuse. Likewise, in *United States v. Cates*, 716 F.3d 445, 446 (7th Cir. 2013) (*reversed on other grounds*), after trial, a police officer was sentenced to 24 years in prison for sexually assaulting a woman, in violation 18 U.S.C. § 242, including aggravated sexual abuse. In both of those cases, the defendants were convicted of sexually assaulting *one* victim. Moreover, in both of those cases, there was no evidence presented that the defendants engaged in a pattern of predatory behavior. Similarly, there was no evidence presented that those defendants had sexually assaulted numerous women. The statutory maximum penalty of life in prison set forth in 18 U.S.C. § 242 for violations involving aggravated sexual abuse and kidnapping exists to provide a just punishment for the very conduct that the defendant has committed for years. It exists for a convicted serial rapist who devastated the lives of the women he tormented.

When he ruined their lives, the defendant forfeited his right to freely live his own life. He cannot be trusted to live in a law-abiding society that respects the Constitution and the basic contours of humanity. He deserves to spend the rest of his life in prison, and should be sentenced accordingly.

## IV.    CONCLUSION

The only just punishment that reflects the gravity of the defendant's offenses and guarantees the safety of the public is a life sentence. The United States therefore respectfully requests this Court to sentence the defendant to prison for remainder of his life.

Respectfully submitted this 9th day of October, 2020.


ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division
U.S. Department of Justice

FARA GOLD
Special Litigation Counsel
MAURA WHITE
Trial Attorney
Civil Rights Division, Criminal Section
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530